UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

———

EL CAMINO RESOURCES, LTD., et al.   )
                                              )
                    Plaintiffs,       )     Case No. 1:07-cv-598
                                                )
v.                                   )     Honorable Janet T. Neff
                                              )
HUNTINGTON NATIONAL BANK,   )
                                            )
                   Defendant.    )
_____)

## OPINION ON MOTION TO DISQUALIFY DEFENSE COUNSEL

        This is a civil action falling within the district court's diversity jurisdiction. The case is one of the many criminal, civil, and bankruptcy actions now pending in this court arising from the massive Cyberco fraud. Plaintiffs El Camino Resources, Ltd. and ePlus Group, Inc. are computer leasing companies that engaged in commercial transactions with Cyberco: El Camino purchased over $11.5 million in computer equipment and ePlus Group over $14.5 million in computer equipment for purposes of leasing the equipment to Cyberco. Plaintiff Bank Midwest is a national banking association that entered into a secured loan transaction with Cyberco in 2004 for $4.925 million. All three plaintiffs allege that they were the victims of fraud by Cyberco and that defendant Huntington National Bank, Cyberco's principal financial institution and depository, aided and abetted Cyberco's fraud. They therefore seek judgment against Huntington National Bank in an amount exceeding $30 million. Huntington is represented in this action by Pepper Hamilton, LLP.

Presently pending before the court are motions by plaintiffs ePlus Group and Bank Midwest to disqualify Pepper Hamilton as defense counsel, on the ground that the firm has a conflict of interest arising from its status as counsel for each of the two moving plaintiffs in other litigation. They assert that Pepper Hamilton's decision to defend Huntington National Bank in this case against the claims brought by plaintiffs is a breach of the firm's duty of undivided loyalty to them and that disqualification is required pursuant to Michigan Rule of Professional Conduct 1.7(a). In connection with the motion to disqualify, both Huntington National Bank and the Pepper Hamilton firm have retained special counsel. Special counsel have argued that the conflict of interest was "thrust upon" Pepper Hamilton through no fault of its own and that the "flexible approach" adopted by some courts allows Pepper Hamilton to continue its representation of Huntington National Bank in this case while withdrawing from its admitted attorney/client relationship with the two moving plaintiffs. Additionally, they argue that Bank Midwest executed a written conflict of interest waiver broad enough to comprehend the present litigation.

On July 31, 2007, the district judge referred this motion to me for decision pursuant to 28 U.S.C. § 636(b)(1)(A). Pursuant to the reference, I conducted a hearing on September 6, 2007, at which plaintiffs' counsel of record presented their positions and special counsel (Dennis Archer, Esq. for Pepper Hamilton and Jon Muth, Esq. for Huntington National Bank) argued in opposition to the motion. Having considered the record and submissions of counsel, I conclude that (1) Pepper Hamilton violated its duty of loyalty to each moving defendant by taking a position in this case directly adverse to them; (2) Pepper Hamilton is ethically precluded from attempting to discharge the moving plaintiffs as clients in order to free itself of the conflict; (3) plaintiff Bank Midwest did not waive its right to object to the conflict of interest raised by this case; and (4) the "flexible

-2-

approach" to conflicts of interest that are thrust upon an attorney does not apply in the circumstances of this case.  Plaintiffs' motions to disqualify will therefore be granted.

## Findings of Fact

In support of its motion, plaintiff Bank Midwest submitted the affidavit of Douglas Neeb, Senior Litigation Counsel for its parent company.  (docket # 20).  ePlus Group submitted the affidavit of Erica Stoeker, General Counsel.  (docket # 33-2).  In response, Huntington National Bank submitted the affidavit of Managing Counsel John Liebersbach.  (docket # 61-2).  Pepper Hamilton submitted the following affidavits, all filed under docket number 68:  Attorneys Robert Hertzberg, Laurence Shiekman, David Fournier, David Murphy, and Jeremy Frey.  All parties were given the opportunity to call any of their witnesses live, but declined to do so.  The facts found in this opinion are gleaned from those affidavits and the exhibits thereto, as well as the record in this case and other related cases pending in this court and the Bankruptcy Court, proper subjects of judicial notice.

### A.    Parties

1.    Plaintiff El Camino Resources, Ltd. is a California corporation with principal place of business located in the State of California.  On or about May 27, 2004, El Camino executed a master equipment lease with Cyberco Holdings, Inc.  Pursuant to the master equipment lease, during the remainder of 2004, Cyberco purported to lease equipment from El Camino in an aggregate amount exceeding $11.5 million.  El Camino alleges that Cyberco fraudulently converted the money earmarked for the leases.

2.      Plaintiff ePlus Group is a Virginia corporation with principal place of business in the State of Virginia.  ePlus Group entered into a master lease agreement with Cyberco effective March 3, 2004, pursuant to which Cyberco thereafter purported to lease computer equipment from ePlus valued in excess of $14 million.  ePlus alleges that Cyberco fraudulently converted the monies earmarked for the equipment.

3.      Plaintiff Bank Midwest is a national banking association organized under federal law with branches in the States of Missouri and Kansas.  In early November 2004, Bank Midwest entered into a secured loan transaction with Cyberco, pursuant to which Cyberco borrowed $4.925 million for the ostensible purpose of acquiring equipment that would stand as security for the loan.  Bank Midwest alleges that Cyberco fraudulently converted the proceeds of the loan.

4.      Defendant Huntington National Bank is a national banking association organized under federal law with principal place of business in Columbus, Ohio.  Plaintiffs allege that Huntington established a comprehensive banking relationship with Cyberco beginning in 2002 and ultimately extended loans to it exceeding $19 million.

5.      Pepper Hamilton, LLC is a national law firm with principal offices in Philadelphia, Pennsylvania, and a substantial presence in several other cities, including Detroit, Michigan.  Pepper Hamilton is counsel of record for defendant Huntington National Bank in this matter, having filed its appearance on July 10, 2007.  As chronicled below, at the time Pepper Hamilton agreed to represent Huntington National Bank in this case, it had an active attorney/client relationship with both ePlus Group and Bank Midwest.

6.      Plaintiffs' complaint asserts four counts against Huntington National Bank: aiding and abetting Cyberco's fraud (count I); aiding and abetting Cyberco's conversion of plaintiffs'

funds (count II); statutory conversion (count III); equitable recovery of stolen property, unjust enrichment and constructive trust (count IV, brought by El Camino only).  The gravamen of plaintiffs' claims against Huntington National Bank is that Huntington aided and abetted Cyberco in its fraud and that the bank accepted from Cyberco and its affiliate Teleservices Group "laundered money" that represented proceeds of the fraud worked by Cyberco on plaintiffs.  For the sake of simplicity, this opinion refers to plaintiffs' claims as the "aiding and abetting claims."

###### B. Related Cyberco Litigation

7.   The Cyberco scam came to a halt on November 17, 2004, when agents of the FBI executed search warrants on Cyberco's office and seizure warrants for the bank accounts and other assets of Cyberco and its affiliates.  Through seizure warrants, the federal government sequestered millions of dollars in bank accounts held in the name of Cyberco or nominees.  The United States began a series of *in rem* forfeiture actions to condemn these funds to the use and benefit of the United States under proceedings established by 18 U.S.C. §§ 981(a)(1)(A) and 981(a)(1)(C), on the theory that the proceeds of the bank accounts were traceable to violations of numerous federal criminal laws.  Relevant to the present case, the United States initiated the following forfeiture actions in this court:

(a)   *United States of America v. One J.P. Morgan Case Bank Account Number 026073870865 In the Amount of $750,000.00*, case no. 1:05-cv-59 (filed 1/24/05);

(b)   *United States of America v. One Comerica Bank Account Number 6811948139 In the Amount of $700,000.00*, case no. 1:05-cv-60 (filed 1/24/05);

(c)     *United States of America v. One Huntington National Bank Account Number 01159630935 In the Amount of $705,168.60*, case no. 1:05-cv-61 (filed 1/24/05);

(d)     *United States of America v. One Independence Community Bank Account Number 92043867 In The Amount of $750,000.00*, case no. 1:05-cv-62 (filed 1/24/05);

(e)     *United States of America v. One Chemical Bank Shoreline Account Number 5024019400 In The Amount of $100,000.00*, case no. 1:05-cv-294 (filed 4/21/05);

(f)     *United States of America v. One Silicon Valley Bank Account Number 3300355711 In The Amount of $113,952.62*, case no. 1:05-cv-295 (filed 4/21/05);

(g)     *United States of America v. One Fifth Third Bank Account Number 7680526741 In The Amount of $20,291.27*, case no. 1:05-cv-296 (filed 4/21/05);

(h)     *United States of America v. One Macatawa Bank Account Number 26002212 In The Amount of $200,000.00*, case no. 1:05-cv-432 (filed 6/22/05); and

(i)     *United States of America v. One Macatawa Bank Account Number 64010200 In The Amount of $25,000.00*, case no. 1:05-cv-433 (filed 6/22/05).

(In this opinion, these nine civil actions, all of which are pending and unresolved in this court, are referred to as the "Forfeiture Cases.")

8.     In November 2004, Bank Midwest retained Pepper Hamilton to represent it in the proceedings that led up to the Forfeiture Cases. In each Forfeiture Case, Pepper Hamilton attorneys located in the firm's Philadelphia or Detroit offices have filed an appearance for Bank Midwest and an answer setting up a claim to the seized funds. In each case, Pepper Hamilton alleged on behalf of Bank Midwest that the seized property "represents the direct and actual proceeds of fraud, conversion and theft against Bank Midwest committed in violation of law." (*See, e.g.,* Answer of Claimant Bank Midwest, N.A., case no. 1:05-cv-61, docket # 21, Defense 1). Pepper Hamilton

-6-

asserted the existence of a constructive trust arising on behalf of Bank Midwest in each of the disputed accounts. (*Id.*). According to the docket sheets of this court in each of the Forfeiture Cases, Pepper Hamilton remains counsel of record for Bank Midwest in each case. Pepper Hamilton filed a motion for leave to withdraw in each case on August 24, 2007, but no such leave has yet been granted.

9.      On December 9, 2004, El Camino and two other creditors filed an involuntary bankruptcy petition for Cyberco Holdings, Inc. in the United States Bankruptcy Court for the Western District of Michigan under Chapter 7 of the Bankruptcy Code (*In re Cyberco Holdings, Inc.*, no. 04-14905). The Bankruptcy Court appointed Thomas C. Richardson as Trustee. On January 21, 2005, Teleservices Group, Inc., a corporation under common ownership with Cyberco, filed a voluntary petition for bankruptcy under Chapter 7, and Mr. Richardson was appointed Trustee. (*In re Teleservices Group, Inc.*, no. 05-00690).

10.      On January 6, 2005, the firm of Warner, Norcross & Judd filed its appearance on behalf of Huntington National Bank in the Cyberco bankruptcy case. Thereafter, the Warner, Norcross firm represented Huntington National Bank in a protracted effort by the bank to avoid or substantially limit a Rule 2004 examination sought by El Camino and the Trustee. El Camino filed its motion for a Rule 2004 examination of Huntington National Bank on March 3, 2005, and the Trustee joined the motion on March 31, 2005; Huntington National Bank, through Warner, Norcross, objected on March 19, 2005. The parties then engaged in a long series of negotiations and motion practice before the Bankruptcy Court. The final hearing took place on February 8, 2007, nearly two years after El Camino and the Trustee had filed their original motions. Counsel for Huntington asked that the examination by El Camino be precluded or limited because the bank believed El

Camino sought the examination "for prelitigation discovery in connection with its own possible claims against Huntington." (Hearing Tr. of 2/8/07, *In re Cyberco Holdings, Inc.*, docket # 771, at 25). While not admitting that El Camino was planning such litigation, its counsel said that it was "possible." (*Id.* at 17-19). Bankruptcy Judge Jeffrey Hughes allowed the examination to proceed, with limitations.

   11. The Cyberco bankruptcy case has spawned numerous adversary proceedings. In one of the proceedings, *Bank Midwest, N.A. v. Cyberco Holdings, Inc., et al.*, Adversary Proceeding No. 05-80020, filed on January 14, 2005, Pepper Hamilton represented Bank Midwest and asserted a claim for constructive trust over the alleged proceeds of the $4.925 million loan to Cyberco. In connection with that case, the firm conducted discovery on behalf of Bank Midwest, including the issuance of a subpoena *duces tecum* on Huntington National Bank. The proceeding led to the execution of a settlement agreement dated March 29, 2006. The agreement provided, among other things, that Huntington would receive $705,168 in funds seized by the government, with Bank Midwest receiving a smaller share. The agreement provided that the settlement did not impair any rights of Bank Midwest "to raise or pursue claims against Huntington, except with respect to the $705,168.60," nor impair any defense of Huntington to such claim. (*Bank Midwest, N.A. v. Cyberco Holdings, Inc., et al.*, No. 05-80020, docket # 70).

   12. Another in the constellation of Cyberco-related cases in this court was *Bank Midwest, N.A. v. Cyberco Holdings, Inc., et al.*, case no. 1:04-cv-795, in which Pepper Hamilton again represented Bank Midwest as plaintiff. The complaint in that case, signed by David Murphy of the Pepper Hamilton firm, sought judgment in an amount approaching $5 million against Cyberco and related persons on theories of fraud, conversion, and constructive trust. The court granted

plaintiff's motion for expedited discovery on December 14, 2004, allowing Pepper Hamilton, on behalf of Bank Midwest, to take immediate discovery of a number of banks, in an effort to trace proceeds of the alleged fraud.  Approximately five months later, Pepper Hamilton filed a motion for leave to withdraw as counsel, in favor of the Willingham & Cote' firm.  On March 13, 2005, the court entered its order granting Pepper Hamilton leave to withdraw as counsel for Bank Midwest in that case.  By amended complaint filed August 24, 2005, Bank Midwest added Huntington National Bank as an additional defendant, alleging that its rights to a $700,000.00 Cyberco account were superior to those of Huntington.

13.    In all of the proceedings listed above, whether filed in this court or the Bankruptcy Court, the objective of Pepper Hamilton's efforts on behalf of Bank Midwest was to recover all or part of the $4.925 million loaned by the bank to Cyberco.  Pepper Hamilton collected fees and costs from Bank Midwest approaching $300,000.00 for prosecution of these matters. (Neeb Aff., ¶ 6).  In each case, Pepper Hamilton asserted that Bank Midwest had been defrauded by Cyberco and its affiliates and that it was entitled to the imposition of constructive trust on the proceeds of that fraud.  Douglas Neeb, in-house counsel for Bank Midwest, avers in his affidavit that in the course of its representation of Bank Midwest on these matters, Pepper Hamilton attorneys participated in numerous confidential attorney/client conversations with the bank's chief lending officer and other bank officials and that the bank provided Pepper Hamilton with "nearly every internal document created by Bank Midwest during its consideration of whether to conduct business with Cyberco and every internal document regarding the Cyberco matters, including documents relating to legal claims against Huntington and Huntington's possible defenses thereto." (Neeb Aff., 7-8).  Jeremy Frey, the principal Pepper Hamilton attorney representing Bank Midwest in the

Forfeiture Cases, does not deny any of these assertions.  Indeed, it would be most unusual for an attorney handling cases of this magnitude not to assemble all relevant facts and engage in confidential communications with in-house counsel and witnesses with relevant knowledge.  Mr. Frey does assert, however, that he was not requested to undertake "any detailed factual review or analysis of any direct claims Bank Midwest may have against Huntington National Bank."  (Frey Aff., ¶ 13).  David Murphy, the Pepper Hamilton attorney who represented Bank Midwest in both *Bank Midwest, N.A. v. Cyberco Holdings, Inc.*, case no. 1:04-cv-795, and the adversary proceeding in the Bankruptcy Court does not deny the receipt of confidential information in connection with his representation of Bank Midwest in those matters.  He does assert, however, that he "did not have any knowledge at that time [when he represented Bank Midwest] that Bank Midwest intended to pursue Huntington as one of the parties involved with the Cyberco fraud" and that there was no direction by the bank to develop a lawsuit against Huntington.  (Murphy Aff., ¶ 8).  He acknowledges that his service of a subpoena on Huntington National Bank (already a client of the firm) raised a "conflict of interest question" which the firm apparently decided to ignore after "due consideration."  (*Id.*, ¶ 9).  Mr. Murphy asserts that he had no knowledge that review of the subpoenaed documents caused Bank Midwest to suspect Huntington as a participant of the fraud with Cyberco.  (*Id.*).

## C.    Trustee's Action Against Huntington National Bank

14.    On December 7 and 8, 2006, the Trustee initiated over fifty adversary proceedings, principally to recover allegedly voidable preferences from Cyberco creditors.  One such proceeding was brought against Huntington National Bank.  *Richardson, Trustee of Cyberco Holdings, Inc. v. The Huntington National Bank*, Adversary Proceeding No. 06-80989 (W.D. Mich.

Bk. Ct.).  The Trustee's complaint asserted ten counts against the bank.  Counts IV through X alleged claims under the Bankruptcy Code to recover payments from the debtor to Huntington National Bank on the theory that such payments were either voidable preferences under 11 U.S.C. § 547(b) or were fraudulent transfers under 11 U.S.C. §§ 548(a), 544(b), and 550.  These are "core" proceedings that the Trustee is clearly entitled to bring in the Bankruptcy Court on behalf of the bankrupt estate and over which the Bankruptcy Court clearly has dispositive jurisdiction.  Counts I, II, and III, however, were of a different nature.  These counts alleged that Huntington National Bank aided and abetted Cyberco's fraud and that "Cyberco's creditors were generally harmed by Cyberco's prolonged existence because the [Cyberco principals] were given the opportunity to perpetrate and expand the Ponzi scheme."  (¶ 142).  Unlike the core statutory claims in the remaining counts, the claims in counts I, II and III apparently arose under state law, and the complaint did not cite any source of authority for the Trustee to bring such actions on behalf of the estate.  The Trustee also filed an adversary proceeding against Huntington National Bank in the Teleservices case to recover certain payments and transfers from Teleservices to the bank, asserting only statutory claims arising under the Bankruptcy Act (or analogous state law) and clearly within the Bankruptcy Court's core jurisdiction.  (*Thomas C. Richardson, Trustee of Teleservices Group, Inc. v. The Huntington National Bank*, Adversary Proceeding No. 07-80037 (W.D. Mich. Bk. Ct.).  These two proceedings are referred to collectively as the "Trustee's actions."  Warner, Norcross & Judd filed an appearance on behalf of Huntington Bank in both proceedings.

   15. At the end of March 2007, John Liebersbach, Senior Vice-President and Managing Counsel of Huntington, contacted Robert S. Hertzberg, a Pepper Hamilton partner resident in its Detroit and New York offices.  (Hertzberg Aff., ¶¶ 1, 4).  Hertzberg, who had been a member

of the Pepper Hamilton firm since March 2002, had a longstanding relationship with Huntington National Bank.  Mr. Liebersbach asked Hertzberg to replace Warner, Norcross & Judd and to represent Huntington National Bank in both of the Trustee's actions.  (*Id.*, ¶ 4).

16.     At the time Huntington sought to engage Pepper Hamilton to represent it in the Trustee actions, both Mr. Liebersbach and Mr. Hertzberg anticipated that other creditors might join in the Trustee's actions or attempt to assert the same or similar claims on their own behalf.  Mr. Hertzberg's affidavit establishes this fact beyond genuine issue:

> I was also informed [by Mr. Liebersbach] that based upon Rule 2004 examinations in the Bankruptcy Court that provided pre-complaint discovery by Huntington to the Trustee and various creditors (including plaintiffs in this action), it was very likely that a number of Cyberco creditors would seek to intervene in the Trustee's Actions on the side of the Trustee or file "me too" suits with allegations redundant to those by the Trustee in the Trustee's Actions.

(Hertzberg Aff., ¶ 6).

### D.     Midwest's Conflict Waiver in the Trustee's Actions

17.     Mr. Hertzberg performed a conflict-of-interest check and learned that Pepper Hamilton actively represented Bank Midwest in the nine Forfeiture Actions identified in paragraph 7 above and that the firm had formerly represented Bank Midwest in the Cyberco-related federal court lawsuit and the bankruptcy adversary proceeding identified in paragraphs 11 and 12 above. (Hertzberg Aff., ¶ 8).  Mr. Hertzberg, although unsure that this was a disabling conflict, discussed the issue with Huntington National Bank, who was willing to waive any potential conflict. Huntington requested that he attempt to secure a waiver from Bank Midwest.  Mr. Hertzberg avers that the purpose of the requested waiver was to allow Pepper Hamilton to defend Huntington

-12-

National Bank against both the Trustee's actions and actions "which likely would be asserted by other creditors." (*Id.*).

18.    Mr. Hertzberg recruited another Pepper Hamilton partner, Laurence Shiekman, to assist him in the Huntington representation.  He asked Shiekman and Jeremy Frey, the Huntington partner handling the forfeiture actions for Bank Midwest, to attempt to procure a conflict-of-interest waiver from Bank Midwest.

19.    Thereafter, Jeremy Frey (Pepper Hamilton counsel representing Bank Midwest) and Laurence Shiekman (Pepper Hamilton counsel on the "Huntington team") spoke to Mr. Neeb, Bank Midwest's in-house counsel.  It is significant to this court that Mr. Frey's affidavit is completely silent on the contents of the conversations with Mr. Neeb.  Rather, only Mr. Shiekman, who was obviously pursuing the interests of Huntington, has provided an affidavit concerning his understanding of those conversations.  In the circumstances of this case, and with all due respect to Mr. Shiekman, the court is skeptical of his understanding of those conversations, which tend to serve only Pepper Hamilton's and Huntington's interests and are at odds with the written waiver ultimately signed by Mr. Neeb.  Even so, Mr. Shiekman acknowledges that Mr. Neeb did not wish to agree to a broad waiver. (Shiekman Aff., ¶ 4).  The first conversation, apparently held on Friday, March 30, 2007, resulted in a draft conflict-of-interest waiver, prepared by Pepper Hamilton, transmitted by Mr. Shiekman by e-mail on Tuesday, April 3, 2007. (*See* Letter from Special Counsel, docket # 74, and attachments).  The draft letter, dated April 3 and set up for Mr. Hertzberg's signature, mentioned only one of the nine Forfeiture Actions in which Huntington was acting as counsel for Bank Midwest, as well as its previous representations of the bank in related bankruptcy matters.  The letter disclosed that Huntington Bank had asked Pepper Hamilton to represent it in the two Trustee's

-13-

Actions, identified by name, as well as "generally with regard to all matters related to or arising in the Cyberco Bankruptcy Case and the Teleservices Bankruptcy Case." The letter referred to these three enumerated matters as the "Huntington Matters" and requested Bank Midwest's consent to Pepper Hamilton's representation of the Huntington Bank in the "Huntington Matters."

20.     The record is devoid of the disclosures, if any, given by Pepper Hamilton to Bank Midwest in support of the requested waiver. Specifically, the record does not disclose that Pepper Hamilton told Bank Midwest that Pepper Hamilton and its prospective client Huntington anticipated future creditor lawsuits and that Huntington had asked Pepper Hamilton to procure a waiver broad enough to allow Pepper Hamilton to take a position adverse to Bank Midwest in any such anticipated lawsuit. Mr. Shiekman avers only that he told Neeb that in the adversarial actions brought by the Trustee, "it might be necessary to depose creditors or otherwise be adverse to them in order to aggressively litigate on behalf of Huntington Bank." (Shiekman Aff., ¶ 3).

21.     Mr. Neeb asserts that at his insistence the draft waiver was "carved back" to make clear that the waiver was only directed to the specifically enumerated adversary proceedings. (Pepper Hamilton ("PH") Ex. F at 2). The documents clearly support this conclusion. On April 6, 2007, Jeremy Frey, on behalf of the Pepper Hamilton firm, sent Mr. Neeb a revised letter embodying a waiver of conflict of interest by Bank Midwest. (PH Ex. A(3)). In the first paragraph of the letter, Mr. Frey again alluded to one, but only one, of the nine pending cases in which Pepper Hamilton was counsel of record for Bank Midwest, as well as the two closed Cyberco and Teleservices bankruptcy matters. Mr. Frey identified the two adversary proceedings commenced by the Trustee against Huntington, which were defined as the "Huntington Matters." Significantly, the third enumerated category ("all matters related to or arising in" the Cyberco bankruptcy) was eliminated. Mr. Frey's

-14-

letter recited that "in its current posture" the single forfeiture case identified was not related to either

of the Huntington Matters.  The letter went on to acknowledge, however, that Pepper Hamilton's

representation of Huntington and Bank Midwest "might give rise to a potential conflict of interest

in the absence of a conflict waiver," without identifying any specific conflict.  Mr. Frey requested

a waiver of conflicts of interest in the following words:

> We, therefore, request that Midwest specifically waive any claim that our
> representation of Huntington in the Huntington Matters represents a conflict of
> interest and thereby consent to our representation of Huntington in the Huntington
> Matters.

(PH Ex. A3).  The requested waiver was further qualified by the following language:

> We further confirm that Midwest's consent, if given, would not be deemed to be a
> consent for our representation of Huntington as a party in any other litigation in
> which Midwest may be or become adverse.

(*Id.*).  Mr. Neeb, on behalf of Bank Midwest, signed the letter under the legend "Consent, as

requested, is hereby given." (*Id.*).  The only reasonable interpretation of the waiver letter, in its final

form, is that the waiver was limited to the two identified "Huntington Matters" and did not extend

to any other pending or future litigation.

        22.    After receiving the conflict-of-interest waiver, Pepper Hamilton attorneys

represented Huntington National Bank in the Trustee's Actions.  Six Pepper Hamilton attorneys, plus

paralegals, expended considerable time and resources in representing the bank, including

organization of thousands of documents.  The firm prepared a motion to dismiss the Trustee's

actions, which was filed on May 4, 2007.  Huntington has paid Pepper Hamilton over $440,000.00

to date in defending the Trustee's actions.  (Hertzberg Aff., ¶ 24).

23.     In response to Huntington's motion to dismiss the Trustee's actions, the Trustee conceded that it lacked standing to asserts counts I, II and III and agreed to dismiss those counts.[1]  With regard to the Trustee's core claims for recovery of allegedly voidable preferences and fraudulent transfers, Bankruptcy Judge Jeffrey Hughes took Huntington National Bank's motion to dismiss under advisement.

## E.     Representation of ePlus Group

24.     Since late 2001, Pepper Hamilton has represented ePlus Group in a number of bankruptcy matters.  (Stoeker Aff., ¶ 3).  This representation included acting as lead counsel in some matters and local counsel in others.  (Fournier Aff., ¶ 2).  At the time the present case was filed, Pepper Hamilton was actively representing plaintiff ePlus Group, Inc. in a bankruptcy case, *In re Cable & Wireless U.S.A.*, No. 03-13711 (Dist. Del. Bk. Ct.), an engagement that the firm accepted in 2003.  At all times during 2007, the *Cable & Wireless* bankruptcy matter was active, and Attorney David Fournier of Pepper Hamilton served ePlus as local counsel.  The firm billed 2.5 hours of professional time to ePlus during the first half of 2007.

## F.     The Present Case

25.     On June 22, 2007, the same day on which the Bankruptcy Court heard the motion to dismiss, plaintiffs initiated the present action.  In their complaint, plaintiffs allege that they were defrauded by Cyberco and its affiliates and that Huntington National Bank aided and abetted

---

[1] At the September 6, 2007 hearing in this matter, special counsel for Huntington represented to the court that the Trustee has taken assignments of the claims of individual creditors and on this basis intends to refile counts I, II and III, limited to those creditors which have assigned their claims. It is therefore likely that the aiding and abetting theories will be litigated in some form in the Bankruptcy Court.

Cyberco in its fraud.  The legal theories and many of the factual allegations in the present complaint mirror those made by the Trustee in the Trustee's actions.

26.     As chronicled above, at the time this case was filed, Pepper Hamilton was actively representing plaintiff ePlus as local counsel in an unrelated bankruptcy case and plaintiff Bank Midwest in the nine Forfeiture Actions related to the Cyberco fraud.  The firm had previously represented Bank Midwest in two related Cyberco matters.  All of these cases were designed to recover for Bank Midwest the same $4.925 million that is the subject matter of the present case, although from different parties.

27.     Huntington National Bank asked Pepper Hamilton to represent it in the present case, because the case presents overlapping legal and factual issues already asserted in the Trustee Actions.  (Liebersbach Aff., ¶ 12).  Mr. Hertzberg again asked Mr. Frey (Bank Midwest's counsel in the nine Forfeiture Actions) and Mr. Shiekman (a member of the Pepper Hamilton team representing Huntington) to procure a supplemental waiver from Bank Midwest.  Bank Midwest refused to do so, advising its counsel Pepper Hamilton that the refusal was based on "the highly confidential and privileged information previously given to Pepper Hamilton by Bank Midwest and the fact that Bank Midwest is a current client of Pepper Hamilton in the forfeiture actions."  (Neeb Aff., ¶ 13).  Mr. Neeb discussed the matter on July 2, 2007, with Mr. Shiekman, who promised to consider the firm's options and to get back to Mr. Neeb.  (*Id.*).  Pepper Hamilton first appeared in this lawsuit on behalf of Huntington by filing a motion for extension of time to answer on July 10, 2007.  (docket # 6).  Two days later, plaintiffs filed a response to the motion (docket # 8) asking that the motion be denied because Pepper Hamilton's representation of Huntington was adverse to its clients ePlus and Bank Midwest and violated Rule 1.7(a) of the Michigan Rules of Professional

Conduct.  On July 16, 2007, Mr. Neeb again contacted Shiekman to inquire as to the status because two weeks had passed and Neeb had not been contacted by Shiekman.  Neeb was advised by Shiekman that the firm was still considering its options and that Shiekman would be discussing the matter with Hertzberg.  (*Id.*).  Later on the same day, Pepper Hamilton filed an answer in the present case on behalf of Huntington (docket # 9), signed by Messrs. Hertzberg and Shiekman, among others.  On the next day, Mr. Hertzberg informed Mr. Neeb that Pepper Hamilton had concluded that a conflict of interest waiver was not necessary after all, because the April 6 waiver was broad enough to encompass the present case.  (Neeb Aff., ¶ 16).  After further inconclusive discussions, the managing partner of Pepper Hamilton sent a letter to Mr. Neeb on July 23, 2007, informing the client that Pepper Hamilton had decided to move to withdraw from all pending matters on behalf of Bank Midwest and that in the circumstances the firm's conduct was consistent with the Rules of Professional Conduct.  (PH Ex. G).

28.     Shortly before appearing for defendant on this case, Pepper Hamilton contacted Ms. Stoeker, General Counsel for ePlus Group, to request a waiver of any conflict.  Ms. Stoeker did not consent.  (Stoeker Aff., ¶¶ 8, 9).  By e-mail dated July 10, 2007, Pepper Hamilton unilaterally terminated its attorney/client relationship with ePlus.  (*Id.*, ¶¶ 6, 7).  Because the firm was only acting as local counsel, it did not believe that leave of the Bankruptcy Court was required as a prerequisite for withdrawal.  (Fournier Aff., ¶¶ 6-7).  In response, ePlus Group demanded that Pepper Hamilton immediately withdraw from its representation of Huntington National Bank (PH Ex. I at 2), but Pepper Hamilton refused.  (PH Ex. J).

29.     Plaintiff Bank Midwest promptly filed its motion to disqualify Pepper Hamilton as defense counsel on July 24, 2007, only two weeks after the firm first appeared for

defendant.  (Motion, docket # 18).  Plaintiff ePlus Group filed its motion on July 30, 2007.  (docket # 26).  Both Pepper Hamilton and Huntington National Bank retained special counsel to oppose the motions, which were heard on September 6, 2007.

## Discussion

A motion to disqualify counsel is the proper method for a party to bring to the court's attention an alleged conflict of interest or breach of ethical duty by opposing counsel.  *See DeBiasi v. Charter County of Wayne*, 284 F. Supp. 2d 760, 770 (E.D. Mich. 2003) (citing *Musicus v. Westinghouse Elec. Corp.*, 621 F.2d 742 (5th Cir. 1980)).  The power to disqualify an attorney from a case is "incidental to all courts, and is necessary for the preservation of decorum, and for the respectability of the profession."  *S.D. Warren Co. v. Duff-Norton*, 302 F. Supp. 2d 762, 766 (W.D. Mich. 2004) (quoting *Ex Parte Burr*, 22 U.S. (9 Wheat) 529, 531 (1824)).  A violation of the rules of professional ethics, however, does not automatically necessitate disqualification of an attorney. *SST Castings, Inc. v. Amana Appliances, Inc.*, 250 F. Supp. 2d 863, 865 (S.D. Ohio 2002).  Rather, the extreme sanction of disqualification should only be utilized when there is a "reasonable possibility that some specifically identifiable impropriety" actually occurred, and where the public interest in requiring professional conduct by an attorney outweighs the competing interest of allowing a party to retain counsel of his choice.  *Id.* (quoting *Woods v. Covington County Bank*, 537 F.2d 804, 810 (5th Cir. 1976)); *accord*, *Moses v. Sterling Commerce (Am.), Inc.*, 122 F. App'x 177, 183 (6th Cir. 2005).  While motions to disqualify are legitimate and necessary to protect the integrity of judicial proceedings and the ethics of the bar, courts must be vigilant in viewing motions to disqualify counsel, as the "ability to deny one's opponent the services of capable counsel is a potent

-19-

weapon." *Manning v. Waring, Cox, James, Sklar & Allen*, 849 F.2d 222, 224 (6th Cir. 1988). The court must therefore balance the interest of the court and the public in upholding the integrity of the legal profession against the right of a party to retain counsel of its choice. *Id.* at 225. A decision to disqualify counsel must be based on a factual inquiry conducted in a manner allowing appellate review. *General Mill Supply Co. v. SCA Servs.*, 697 F.2d 704, 710 (6th Cir. 1982). The Sixth Circuit will review this court's decision on motion to disqualify for an abuse of discretion. *See Moses*, 122 F. App'x at 183.

Under the analysis set forth above, plaintiffs' motions to disqualify Pepper Hamilton as defense counsel raise two separate issues. First, the court must determine whether Pepper Hamilton's representation of Huntington National Bank in this litigation is a violation of the firm's ethical duties. If so, the second question is the appropriate remedy. The court will consider each issue in turn.

### I.      Pepper Hamilton's Representation of Huntington National Bank in This Litigation is a Clear Breach of Its Ethical Duties

#### A.      Violation of Rule 1.7(a)

Ethical rules involving attorneys practicing in the federal courts are ultimately questions of federal law. The federal courts, however, are entitled to look to the state rules of professional conduct for guidance. *In re Snyder*, 472 U.S. 634, 645 n.6 (1985); *see National Union Fire Ins. Co. v. Pittsburgh, Pa. v. Alticor, Inc.*, 466 F.3d 456, 457-58 (6th Cir. 2006), *vacated in part on other grounds*, 472 F.3d 436 (6th Cir. 2007) (applying Michigan Rules of Professional Conduct). The district judges of this court have determined that the ethical obligations of attorneys practicing before it will generally be governed by Michigan Rules of Professional Responsibility. *See* W.D.

MICH. LCIVR 83.1(j); *City of Kalamazoo v. Michigan Disposal Serv. Corp.*, 125 F. Supp. 2d 219, 231 (W.D. Mich. 2000). The general prohibition against direct conflicts of interest is set forth in Rule 1.7(a) of those rules:

> (a) A lawyer shall not represent a client if the representation will be directly adverse to another client, unless:
> > (1) the lawyer reasonably believes the representation will not adversely affect the relationship with the other client; and
> > (2) each client consents after consultation.

MICH. R. PROF. COND. 1.7(a). This rule is founded upon an attorney's fundamental duty of undivided loyalty to clients. "It is a well established ethical principle that 'an attorney owes undivided allegiance to a client and usually may not represent parties on both sides of a dispute.'" *Evans & Luptak, PLC v. Lizza*, 650 N.W.2d 364, 370 (Mich. Ct. App. 2002) (quoting *Barkley v. Detroit*, 514 N.W.2d 242, 246 (Mich. Ct. App. 1994)). "Thus, a lawyer ordinarily may not act as advocate against the person the lawyer represents in some other matter, even if it is wholly unrelated." MICH. R. PROF. COND. 1.7 (comments); *accord Evans & Luptak*, 650 N.W.2d at 371. The duty of undivided loyalty is as old as the legal profession itself, *see Williams v. Reed*, (3 Mason) 405, 418 (C.C. Maine 1824) (Story, J.), and reflects an ancient teaching of Western Civilization: "No man can serve two masters." *Matthew* 6:24.

Under the first sentence of Rule 1.7(a), a lawyer is precluded from representing a client if the representation of that client will be directly adverse to another client. Application of this rule to the present case is essentially mechanical. There can be no question that the interests of plaintiffs on one hand and Huntington National Bank on the other hand are adverse. *See In re Irvin Test. Trust*, 2005 WL 433573 at * 3 (Mich. Ct. App. Feb. 24, 2005) (when a law firm is representing two parties, especially where one is suing the other, it follows then that the representations are

-21-

directly adverse).  Consequently, Huntington National Bank has a conflict of interest if it is presently has an attorney/client relationship with any of the plaintiffs.  With regard to Bank Midwest, the fact of current representation is established by the records of this very court.  Pepper Hamilton is presently counsel of record for Bank Midwest in the nine Forfeiture Actions.  Those actions have been pending in this court for over two years, and Pepper Hamilton has been the only counsel of record for Bank Midwest.  Pepper Hamilton did not even request leave to withdraw from the forfeiture cases until August 24, 2007, one month after Bank Midwest filed the pending motion to disqualify.  Under the clear requirements of the Local Rules of this court, Pepper Hamilton remains counsel of record unless and until the court grants leave to withdraw.  *See* W.D. MICH. LCIVR 83.3(d) ("Withdrawal of appearance may be accomplished only by leave of court.").  No such leave has been granted.

Application of the rule to ePlus is only slightly more involved.  The affidavit of David M. Fournier, a Pepper Hamilton attorney practicing in Philadelphia, establishes that the firm has provided bankruptcy-related services to ePlus Group on a periodic basis for over six years and that the firm at all times in 2007 was acting as local counsel for ePlus Group in the *Cable & Wireless* bankruptcy.  Pepper Hamilton's brief and affidavits tend to downplay the relative scope and importance of this representation, but the nature of the representation is completely irrelevant.  *See Gould, Inc. v. Mitsui Mining & Smelting Co.*, 738 F. Supp. 1121, 1125 (N.D. Ohio 1990) (The law makes no distinction between "lead" and "local" counsel in assessing their ethical duties.).  There are no small or unimportant clients.  Pepper Hamilton cannot and does not deny that ePlus Group was an active client of the firm when Pepper Hamilton agreed to undertake the representation of Huntington National Bank to oppose the claims of ePlus in this case.  "Loyalty to a client prohibits

-22-

undertaking representation directly adverse to that client without that client's consent even if the adverse representations are wholly unrelated." *Florida Ins. Guar. Ass'n., Inc. v. Carey Canada, Inc.*, 749 F. Supp. 255, 259 (S.D. Fla. 1990).

The conflict of interest was not cured by Pepper Hamilton's purported termination of the attorney/client relationship with ePlus by e-mail sent January 10, 2007. The courts universally hold that a law firm will not be allowed to drop a client in order to resolve a direct conflict of interest, thereby turning a present client into a former client. *See, e.g., Picker Int'l, Inc. v. Varian Assoc., Inc.*, 869 F.2d 578, 583-84 (Fed. Cir. 1989); *Unified Sewage Agency of Washington Co. Ore. v. Jelco*, 646 F.2d 1339, 1345 n.4 (9th Cir. 1981); *Stratagem Dev. Corp. v. Heron Int'l, N.V.*, 756 F. Supp. 789, 794 (S.D.N.Y. 1991); *Florida Ins.*, 749 F. Supp. at 261; *Hartford Acc. & Indem. Co. v. RJR Nabisco, Inc.*, 721 F. Supp. 534, 540 (S.D.N.Y. 1989); *Harte Biltmore Ltd. v. First Penn. Bank, N.A.*, 655 F. Supp. 419, 421 (S.D. Fla. 1987). As one state appellate court has summarized the rule:

> Simply put, may the automatic disqualification rule applicable to concurrent representation be avoided by unilaterally converting a present client into a former client prior to hearing on the motion for disqualification? We answer each question in the negative and hold, consistent with all applicable authority, that a law firm that knowingly undertakes adverse concurrent representation may not avoid disqualification by withdrawing from the representation of the less favored client before hearing.

*Truck Ins. Exch. v. Fireman's Fund Ins. Co.*, 6 Cal. App. 4th 1050, 1057 (Cal. Ct. App. 1992).

Pursuant to this universal rule, the status of the attorney/client relationship is assessed at the time the conflict arises, not at the time the motion to disqualify is presented to the court. *See Ehrich v. Binghamton Consol. Sch.*, 210 F.R.D. 17, 25 (N.D.N.Y. 2002). "If this were not the case, the challenged attorney could always convert a present client into a 'former client' by choosing when

-23-

to cease to represent the disfavored client." *Unified Sewage Agency*, 646 F.2d at 1345 n.4.  This

unilateral abrogation of the duty of loyalty cures nothing, but serves to make matters worse.

> Indeed, the offense inherent in taking on the conflicting representation is compounded by seeking to "fire" the client in pursuit of the attorney's interest in taking on a new, more attractive representation.  If, as one judge has written, "the act of suing one's client is a 'dramatic form of disloyalty,' what might be said of trying to drop the first client in an effort to free the attorney to pursue his or her self-interest in taking on a newer and more attractive professional engagement?"

*Universal City Studio, Inc. v. Reimerdes*, 98 F. Supp. 2d 449, 453 (S.D.N.Y. 2000) (quoting *British

Airways PLC v. Port Authority*, 862 F. Supp. 889, 899 (E.D.N.Y. 1994)).  This ethical rule is not

triggered only when the attorney's motives are selfish or otherwise suspect.  The rule vindicates the

attorney's fundamental duty of loyalty:  the breach of ethics is not triggered by bad motive or

excused by good motive.

The Michigan courts have not had occasion to apply this doctrine, which is

colloquially referred to as the "hot potato rule."  The Ethics Committee of the State Bar of Michigan,

however, has issued a  formal ethics opinion that is directly on point.  Opinion RI-139 (Aug. 7,

1992).[2]  In formal opinion RI-139, the Committee applied the general rule that the existence of a

conflict must be judged at the time the conflict arises.  The Committee went on to rely on the "hot

potato rule," remarking that "courts that have considered the issue have held that a firm will not be

allowed to drop a client in order to shift resolution of the conflicts question from Rule 1.7 dealing

---

[2] The Supreme Court Rules concerning the State Bar of Michigan establish a Board of Commissioners, which appoints a standing committee regarding professional and judicial ethics. The Committee's ethics opinions are not binding on the courts, but such formal and informal opinions are deemed instructive.  *See City of Kalamazoo*, 125 F. Supp. 2d at 232 n.4; *Barkley*, 514 N.W.2d at 245-46.

-24-

with current clients, to the more lenient standard in Rule 1.9 dealing with former clients." (Op. at 3).

In its briefing, Pepper Hamilton attempts to do just that, by relying not on the strict rule of preclusion embodied in Rule 1.7(a), but on the more lenient standard set forth in Rule 1.9, which deals with former clients. The firm likewise invokes the three-part "Sixth Circuit rule" set forth in cases such as *Dana Corp. v. Blue Cross & Blue Shield Mut. of N. Ohio*, 900 F.2d 882, 889 (6th Cir. 1990). Both Rule 1.9 of the Michigan Rules of Professional Conduct and the *Dana* rule expressly apply to situations involving former clients. *See SST Castings*, 250 F. Supp. 2d at 867 ("The *Dana* substantially-related test is not applicable where an attorney undertakes employment against a current client."). The federal courts have recognized that the stringent rule against advocating a position adverse to a current client is designed to vindicate the fundamental duty of loyalty, while the rule involving former clients focuses on the existence of confidential information and a substantial relationship between the present matter and the former one. *See Cinema 5 Ltd. v. Cinerama, Inc.*, 528 F.2d 1384, 1386 (2d Cir. 1976). "The more stringent *per se* rule vindicates an entirely different ethical principle than does the substantial relationship test. The propriety of representing interests adverse to a current client must be measured not so much against the similarities in litigation as against the duty of undivided loyalty which an attorney owes to each of his clients." *Ehrich*, 210 F.R.D. at 24; *accord Concat LP v. Unilever, Inc.*, 350 F. Supp. 2d 796, 822 (N.D. Cal. 2004) (purpose of prohibition against concurrent adverse client relationships is to

preserve duty of loyalty, not confidentiality).  A law firm is not privileged to extinguish its duty of loyalty to a present client by unilaterally turning it into a former client.[3]

    In summary, I find that plaintiffs Bank Midwest and ePlus Group have borne their burden of showing that Pepper Hamilton's appearance in this case on behalf of Huntington National Bank represents a direct conflict of interest.  With regard to ePlus Group, this showing is sufficient to establish a violation of Rule 1.7(a) of the Michigan Rules of Professional Conduct.  Regarding Bank Midwest, the court must continue its analysis under Rule 1.7(a), as Pepper Hamilton and Huntington National Bank contend that Bank Midwest waived the conflict, as allowed by the rule.

    B.  <u>Waiver</u>

    By the express terms of Rule 1.7(a), a direct conflict of interest may be waived by the client, after consultation, if the attorney reasonably believes the representation will not be adversely affected.  In the present case, Pepper Hamilton and Huntington Bank argue that Bank Midwest waived any objection to Pepper Hamilton's conflict of interest in the present case by executing the April 6, 2007 conflict waiver.

    Although the moving parties have the ultimate burden to show grounds for disqualification, Pepper Hamilton has the burden of proving full disclosure and of establishing the fact and scope of consent.  Judge Quist has stated the rule as follows:

> The law imposes certain obligations upon . . .  attorneys who seek to advance conflicting interests.  They have the duty to make full disclosure and obtain clear and informed consent. If the transaction thereafter goes sour, theirs is the burden of

---

[3] Under some authorities, discussed in section II below, the dropping of a client might be allowed by the court as an alternative to disqualification for an actual conflict of interest in certain limited circumstances.  None of these cases hold, however, that the conflict of interest between existing clients can be made to disappear by the dropping of one of the clients.

> proving full disclosure and the fact and scope of consent. This burden is not met by
> arguing that the party to whom the duty was owed had constructive knowledge of the
> conflict. *See IBM Corp. v. Levin*, 579 F.2d 271, 281 (3d Cir.1978). Such a position
> would shift the burden from the fiduciary to the party to whom the duty is owed. Id.
> at 282. To satisfy the burden of full disclosure, it is not sufficient that both parties be
> informed of the fact that a lawyer is undertaking to represent both of them. Rather,
> there must be a disclosure of risks in such detail that the person can understand the
> reasons why it may be desirable to withhold consent. *Unified Sewerage Agency v.
> Jelco Inc.*, 646 F.2d 1339, 1345 (9th Cir.1981); *Florida Ins. Guaranty Assoc., Inc.
> v. Carey Canada, Inc.*, 749 F. Supp. 255, 258 (S.D. Fla.1990); *Ransburg Corp. v.
> Champion Spark Plug Co.*, 648 F. Supp. 1040, 1046 (N.D .Ill.1986).

*Glidden Co. v. Jandernoa*, 173 F.R.D. 459, 480 (W.D. Mich.1997). I find that Pepper Hamilton has

failed to carry its burden to establish either that Bank Midwest consented to the conflict in this case

or that the firm made full disclosure sufficient to support such a waiver.

First, the record cannot support a finding that the April 6, 2007 waiver letter applies

to the present lawsuit or that it was intended to. The waiver letter (*PH Ex.* A(3)) refers only to the

two adversary proceedings commenced against Huntington by the Cyberco Trustee in the bankruptcy

court, defining those proceedings as the "Huntington Matters." The letter, drafted by Pepper

Hamilton, requested that Midwest "specifically waive any claim that our representation of

Huntington in the Huntington Matters represents a conflict of interest and thereby consent to our

representation of Huntington in the Huntington Matters." (*Id.* at 2). The letter reflects careful and

lawyerlike draftsmanship, designed to limit the waiver to the two "Huntington Matters" then

pending. That language, standing alone, is sufficient to support a finding that the waiver was limited

to the two pending matters. Any possible ambiguity, however, was eliminated by the following

sentence: "We further confirm that Midwest's consent, if given, would not be deemed to be a

consent to our representation of Huntington as a party in any other litigation in which Midwest may

be or become adverse." (*Id.*). This language unmistakably negates any reading of the document that

would extend Midwest's waiver to the present case, or to any case beyond the two specific Trustee's Actions identified in the waiver letter.

Despite the clarity of the waiver letter, Pepper Hamilton advances an unreasonably broad interpretation that cannot withstand judicial scrutiny. Mr. Hertzberg, the Pepper Hamilton attorney with a longstanding relationship to Huntington National Bank, offers his "understanding" of the waiver, despite the fact that he never spoke to anyone at Bank Midwest. Mr. Hertzberg opines that the scope of the waiver reached the "subject matter of the Trustee's Actions regardless of how such action might be styled." (Hertzberg Aff., ¶ 9). Dismissing the broad reservation for "other" litigation, he opines that only "unrelated" litigation was excluded from the scope of the waiver. (*Id.*). This self-serving interpretation of the scope of the waiver, proffered by an attorney who never spoke to Bank Midwest, is obviously entitled to no weight. Mr. Shiekman, the Huntington attorney who did speak to Bank Midwest's in-house counsel, avers that there was "no expectation that Bank Midwest would later attempt to render this consent illusory by seeking to take over any of the Trustee's claims against Huntington National Bank and then endeavoring to disqualify Pepper Hamilton," without offering any factual basis, arising from his discussion with Mr. Neeb, to support this sweeping generalization. He also opines that the consent "would not apply to other or completely unrelated litigation . . . which could not be deemed reasonably related to the Trustee's Actions." (Shiekman Aff., ¶ 6(b), (c)). Again, Mr. Shiekman presents his bare opinion, unadorned by support from either the waiver letter or his discussions with Mr. Neeb to support this unreasonably broad reading of the waiver letter.

An attorney bears the burden of establishing the "fact and scope of consent." *Glidden Co.*, 173 F.R.D. at 480. If Pepper Hamilton truly intended that the waiver extend to the "subject

-28-

matter" of the Trustee's Actions, no matter how styled, and that the reservation for "other" litigation really meant "completely unrelated litigation," it was the law firm's obligation to express this intent clearly in the proposed waiver letter. Expressing these concepts in a clear fashion would have been simple, had that been the intent of the parties. It has now come to light that Pepper Hamilton indeed tendered a draft letter to Bank Midwest that covered all matters related to or arising in the Cyberco or Teleservices Bankruptcies. This proffered language would have been broad enough to cover the present case, but Bank Midwest's counsel refused to agree to it. The existence of the April 3 draft renders Pepper Hamilton's reading of the April 6 waiver letter inarguable.[4] The final waiver letter must be limited to the two matters specifically identified, as the language of the final letter will bear only that construction and a broad, subject-matter waiver had been specifically rejected by the client.

Perhaps cognizant of the plain import of the waiver letter, Pepper Hamilton's special counsel argues in this court that the waiver should be deemed to cover the present case because it is the "same case" brought by the Trustee in bankruptcy court. This is pure sophistry. As noted in the findings of fact, the Bankruptcy Trustee's complaints against Huntington National Bank contain several common-law counts that are similar, both factually and legally, to the aiding and abetting claims set forth by plaintiffs in this case. The Bankruptcy Trustee's claims, however, were not brought on behalf of any particular creditor or group of creditors, but were asserted on behalf of the bankruptcy estate itself. The ability of the Trustee to bring such claims on behalf of the estate is dubious at best, and the Trustee has since agreed that he lacks standing to pursue these claims on

---

[4] Pepper Hamilton's submissions to this court made no mention of the April 3 letter which, in the circumstances of this case, is a "smoking gun" demolishing the firm's litigation position concerning the meaning of the waiver. The document was produced by special counsel after the hearing, at the court's direction. A firm's duty of candor to the court demands more.

behalf of the estate.  When Bank Midwest consented to Pepper Hamilton's defense of Huntington National Bank against the Trustee's claims, it consented to just that.  The interest of Bank Midwest in the Trustee's claims, if any, was limited to that of a general creditor.  Indeed, at oral argument, special counsel for Pepper Hamilton represented to the court that no conflict of interest existed at all on April 6, 2007, indicating that the interest of Bank Midwest in the Trustee's Actions was tangential and indirect.  By no stretch of construction can Bank Midwest's consent to its counsel's representation of Huntington National Bank in the Trustee's Actions, where Bank Midwest had only a remote interest, be deemed a prospective waiver of any conflict of interest that would arise when Bank Midwest asserted claims, even identical claims, against Huntington National Bank in its own right.  The criticism of Bank Midwest, contained in Pepper Hamilton's affidavits, that it somehow rendered its consent "illusory" by failing to disclose its intent to sue Huntington National Bank is preposterous.  Pepper Hamilton's argument stands the law on its head.  The law firm, and not the client, had a burden of full disclosure.  *See E.F. Hutton & Co. v. Brown*, 305 F. Supp. 371, 398 (S.D. Tex. 1969) ("The rule [against representing conflicting interests] requires counsel -- not clients -- to search out and disclose potential conflicts between clients and the facts which causes them to arise.").  Bank Midwest's violation of its nonexistent duty of disclosure did not, as suggested by Pepper Hamilton, render the waiver "illusory."  Pepper Hamilton remains free to represent Huntington National Bank in the Trustee's Actions, the only subject of the written waiver.

In a related argument, Pepper Hamilton accuses Bank Midwest of some sort of duplicity arising from the client's choice to sue Huntington in Federal District Court, rather than the Bankruptcy Court.  The suggestion is that Bank Midwest is unfairly trying to skirt the effect of the waiver.  Again, this position is untenable.  It is highly doubtful that the Bankruptcy Court would

-30-

have jurisdiction to entertain the present case.  More fundamentally, Pepper Hamilton has cited no authority that would impose upon a client the duty to maximize the effect of a conflict waiver for the benefit of its counsel.[5]

In order to sustain its argument that Bank Midwest somehow waived the actual conflict of interest posed in the present case, Pepper Hamilton has the burden of clearly establishing that the waiver applies to this case (which it has not), and of establishing the sufficiency of its disclosures to the client to support such a waiver.  *See Glidden*, 173 F.R.D. at 480; *General Cigar Holdings, Inc. v. Altadis, S.A.*, 144 F. Supp. 2d 1334, 1338 (S.D. Fla. 2001).  To be sufficient, the disclosure of risks must be "in such detail that the person can understand the reasons why it may be desirable to withhold consent." *Glidden*, 173 F.R.D. at 480.  As the Restatement puts it, "informed consent requires that the client or former client had reasonably adequate information about the material risks of such representation to that client or former client." 2 RESTATEMENT (THIRD) OF THE LAW GOVERNING LAWYERS § 122(1) (2000).

Pepper Hamilton's disclosures in the present case are utterly insufficient to support a waiver of the direct conflict of interest presented in the present case.  Pepper Hamilton's waiver letter identified no direct conflict but said only that continued representation of Bank Midwest "might give rise to a potential conflict of interest in the absence of a conflict waiver." (PH Ex. A(3)). The firm's affidavits are similarly general.  With regard to the nature of the conflict, they disclose only that Mr. Shiekman explained to Mr. Neeb that in the Trustee's Actions, "it might be necessary

------

[5] Pepper Hamilton's attacks on the integrity of a current client, for which the firm remains counsel of record in nine cases in this court, are unseemly, to say the least. This points up one of the many dangers of allowing a firm to drop a client unilaterally -- the firm is motivated to characterize the client as the wrongdoer in order to justify its own conduct.

to depose creditors or otherwise be adverse to them in order to aggressively litigate on behalf of Huntington Bank." (Shiekman Aff., ¶ 3). Significantly, the record does not disclose that Pepper Hamilton ever directly discussed the possibility that the firm would seek to take a position adverse to Bank Midwest if Bank Midwest ever decided to sue Huntington on similar claims, even though both Huntington and Pepper Hamilton considered such claims to be "very likely" (Hertzberg Aff., ¶ 6) and Huntington had asked Pepper Hamilton to secure a waiver from Bank Midwest broad enough to cover not only the Trustee's claims but claims "which likely would be asserted by other creditors." (*Id.*, ¶ 8). The only inference possible on this record is that the law firm did not disclose to its client the likely possibility that undertaking the Huntington defense would lead to a direct conflict of interest in the future.

In summary, Pepper Hamilton's waiver argument is untenable. In order to undertake representation of Huntington National Bank in the Trustee's Actions, Pepper Hamilton realized that a broad waiver of conflict of interest from Bank Midwest was necessary, covering both the Trustee's Actions and all related matters, because of the likelihood that other creditors like Bank Midwest would bring similar claims against Huntington. The firm asked for a broad waiver, which Bank Midwest denied. The waiver as ultimately executed was limited to the two pending Trustee's Actions and specifically excluded any other litigation. Pepper Hamilton failed to procure the necessary broad waiver, but undertook the defense of Huntington anyway. The creditor lawsuit that the firm knew was "very likely" came to fruition only months later. The firm, having failed to get a broad waiver, now tortures the language of the limited waiver in an effort to gain the benefit of the broad waiver refused by its client. Such conduct is unbecoming a great law firm.

-32-

II.    **Remedy**

      This court has concluded that Pepper Hamilton's representation of Huntington National Bank in the present litigation is a violation of Rule 1.7(a) of the Michigan Code of Professional Responsibility and a breach of its duty of undivided loyalty to its clients Bank Midwest and ePlus Group.  The finding of an ethical violation, however, does not automatically require disqualification.  The court should order disqualification only where some "specifically identifiable impropriety" has actually occurred and the balance of relevant factors requires vindication of the integrity of the legal profession over defendant's interest in retaining counsel of its choice.  *See Moses*, 122 F. App'x at 183-84; *SST Castings, Inc.*, 250 F. Supp. 2d at 865.

      In cases involving a direct conflict of interest involving current clients, most courts give decisive weight to vindication of the integrity of the bar.

> An attorney who fails to observe his obligation of undivided loyalty to his client injures his profession and demeans it in the eyes of the public.  The maintenance of the integrity of the legal profession and its high standing in the community are important additional factors to be considered in determining the appropriate sanction for a Code violation.  The maintenance of public confidence in the propriety of the conduct of those associated with the administration of justice is so important a consideration that we have held that a court may disqualify an attorney for failing to avoid even the appearance of impropriety.  Indeed, the courts have gone so far as to suggest that doubts as to the existence of an asserted conflict of interest should be resolved in favor of disqualification.

*Int'l Bus. Mach. Corp. v. Levin*, 579 F.2d 271, 283 (3d Cir. 1978) (citations omitted); *accord Hull v. Celanese Corp.*, 513 F.2d 568, 571 (2d Cir. 1975) (Where clear conflict of interest exists, doubt should be "resolved in favor of disqualification."); *Ehrich*, 210 F.R.D. at 25; *Harte Biltmore, Ltd.*, 665 F. Supp. at 421.  Some courts weigh the duty of loyalty so heavily that they apply a nearly *per se* rule in favor of disqualification.  *See, e.g., Lemelson v. Apple Comp., Inc.*, 28 U.S.P.Q.2d 1412,

1418 (D. Nev. 1993) ("Because the interest sought to be protected by Model Rule 1.7 is one of loyalty, a *per se* rule of disqualification should be applied when that rule is breached.").  In a recent case, the Sixth Circuit Court of Appeals disqualified a law firm with a direct conflict of interest, with little discussion of countervailing factors.  *Nat'l Union Fire Ins. Co. of Pittsburgh v. Alticor, Inc.*, 472 F.3d 436 (6th Cir. 2007).

Pepper Hamilton argues against the remedy of disqualification by relying on the "flexible approach" fashioned by some courts in situations in which a conflict of interest has been "thrust upon" a law firm through no fault of its own.  Several courts have found that conflicts of interest arising during the course of representation and created by corporate mergers or acquisitions should be subject to a "flexible rule" pursuant to which the conflicted firm could withdraw from representation of one client to cure the conflict.  Those few federal courts that have followed the "flexible approach" have done so only when the conflict of interest arises from an unforeseen merger that impacts a long-pending case, and have made it clear that the approach involves only remedy and not the question whether the firm has a conflict of interest.  *See e.g.*, *SWS Fin. Fund A. v. Salomon Brothers, Inc.*, 790 F. Supp 1392, 1399 (N.D. Ill. 1992); *Gould, Inc. v. Mitsui Mining & Smelting Co.*, 738 F. Supp. 1121 (N.D. Ohio 1990).

Contrary to Huntington's argument, the so-called "flexible approach" does not eliminate an ethical violation.  It merely examines options available to courts in fashioning appropriate remedies where ethical standards have been violated.  The limited nature of this approach is demonstrated by *Gould, Inc. v. Mitsui Mining & Smelting Co.*, 738 F. Supp. 1121 (N.D. Ohio 1990), the seminal case in this area.  In *Gould*, Jones, Day Reavis & Pogue (Jones, Day) represented Gould, Inc. (Gould) in a lawsuit filed in 1985 against Petchney and others alleging RICO

and other claims based on Petchney's alleged misappropriations of Gould trade secrets concerning the manufacture of electrolytic copper foil.  *Id.* at 1122.  In 1989, Petchney acquired acquire IG Technologies (IGT).  Jones, Day had represented IGT in various matters prior to the acquisition and Jones Day continued to represent IGT in contractual and licensing matters through the date of the court's decision.  *Id.* at 1123.  Jones, Day never attempted to obtain Petchney's consent to Jones Day's continuing representation of both IGT and Gould.  *Id.*  In 1990, Petchney discovered that Jones, Day continued to represent both Gould and IGT.  Jones, Day refused a request that they withdraw as counsel for Gould.  *Id.*  Judge Joiner, sitting by designation, initially determined that Jones, Day was in violation of DR 5-105 in its representation of current clients Gould against Pechiney's subsidiary IGT.  738 F. Supp. at 1125-26.  Having determined that the firm had committed ethical violations, the court moved on to the question whether disqualification was an appropriate remedy.  *Id.* at 1126.  "In ruling on a motion to disqualify, and considering the possible sanctions available to punish unethical conduct, courts must remember that the court is not the only agency policing lawyers' conduct.  Other agencies are established directly to deal with their conduct, and there may be times when the sanctions of those agencies may be more appropriate than disqualification in the case before the court."  *Id.* The court then examined what have since been referred to as the "*Gould* factors" in fashioning an appropriate remedy.  First, there was no evidence that Petchney had been prejudiced in any way by Jones, Day's representation of Gould.  No confidential Petchney information had passed to Gould as a result of Jones, Day's representation of IGT on matters unrelated to the ongoing unfair competition lawsuit that had been filed five years earlier. *Id.* at 1126.  "Second, disqualifying Jones, Day from representing Gould would not only cost Gould a great deal of time and money, in retaining new counsel, it would significantly delay the

progress of the case." *Id.* at 1127.  The court found that this was a particularly weighty consideration given the complex technology and trade secrets at issue.  Third, "the conflict was created by Petchney's acquisition of IGT several years after the instant case was commenced, not by any affirmative act of Jones, Day." *Id.*  The *Gould* court found that disqualification was not warranted, but also emphasized that "the conflict must not be allowed to endure." *Id.* at 1127.  "Jones, Day can remain counsel for both Gould and IGT only if Petchney consents, and it is clear no consent will be given.  Therefore, Jones, Day must discontinue its representation of either Gould or IGT." *Id.*  The court left the choice, and its attendant ramifications to Jones, Day, giving "Jones, Day a chance to choose how to extricate itself from a conflict which it did not create, but to which it was unethically slow in responding." *Id.* The court reported the ethical violation to the state disciplinary counsel. *Id.*

Similarly, in *SWS Fin. Fund A. v. Salomon Brothers, Inc.*, 790 F. Supp 1392, 1399 (N.D. Ill. 1992), the court found that Salomon Brothers was a current client of Schiff, Hardin and Waite, that any attempted termination of Salomon as a client would have violated the "hot potato" rule, and that the law firm's representation of Hickey violated Rule 1.7 of the Rules of Professional Conduct. *Id.* at 1397-99.  The district court, in its discretion, found that disqualification was not an appropriate remedy.  Disqualification was "one of three sanctions available to enforce prophylactic conflicts rules," the other two being "[d]isciplinary proceedings and civil remedies (*i.e.*, malpractice suits and defenses for the non-payment of legal fees)." *Id.* at 1400.  The court admitted that its refusal to disqualify the firm was a "departure from the norm," but in this particular lawsuit, involving what the court labeled as "mega-firms (like Schiff) and mega-parties (like Salomon Brothers)," the court was concerned that "[w]ith simply a minor investment of some token business,

-36-

such clients would in effect be buying an insurance policy against that firm's adverse representation." *Id.* at 1402.

At least one other court has rejected the *SWS* case's reliance on the size of the client and size of the law firm as unprincipled and unworkable. The same ethics rules apply to all law firms and clients regardless of size:

> This Court is fully aware of the "changes" in the "legal world" and attempts to stay abreast of them and deal with cases in an up-to-date fashion. Keeping that in mind, however, does not somehow lead this Court to believe that "changes" also mean adopting a set of principles and ethics for "mega corporations" and "monster law firms" which is something less than that imposed on small companies and lesser-size law firms. Rule 1.7 stands as is for everyone. This Court notes that, if anything, large law firms have an even greater responsibility to incorporate satisfactory computer conflicts check systems simply because of their size and the fact the lawyers in these firms are not able to manually check their client lists for potential conflicts.

*Lemelson v. Apple Computer, Inc.*, 28 U.S.P.Q.2d at 1419 (rejecting *SWS*'s approach of a size-dependent application of ethical rules regarding disqualification).

Pepper Hamilton places great reliance on the opinion of the New York City Bar Association's Ethics Committee (Opinion 2005-05), entitled "Unforeseeable Concurrent Client Conflicts." This formal opinion attempts to set forth rules applicable to unforeseen conflicts that develop between clients in the course of ongoing representation of both, without fault of the lawyer. The opinion is not authoritative, and many of its conclusions are inapposite to the presentation, as the opinion was issued under New York Disciplinary Rule 5-105(A), which differs materially from Michigan's Rule 1.7(a).[6] Nevertheless, the opinion provides a useful synthesis of the few cases that

---

[6] New York is one of the few jurisdictions that has not adopted the ABA Model Rules of Professional Conduct. Model Rule 1.7(a), in the form adopted in Michigan, strictly forbids a lawyer from undertaking representation of a client directly adverse to another client, in the absence of consent. The New York disciplinary rules are much more lenient. DR 5-105(A) forbids an attorney from taking a position adverse to a client only "if the exercise of professional judgment on behalf

directly apply the "flexible approach" in such unforeseen conflicts.  The opinion defines "thrust upon" conflicts as conflicts between two clients that (1) did not exist at the time either representation commenced but arose only during the ongoing representation of both clients, where (2) the conflict was not reasonably foreseeable at the outset of the representation, (3) the conflict arose through no fault of the lawyer, and (4) the conflict is of a type that is capable of being waived under DR 5-105(C).  Although not all aspects of the formal opinion are persuasive, its definition of "thrust upon" conflicts is an accurate reflection of those limited circumstances in which courts have seen fit to apply the flexible approach.

New York City Bar Formal Opinion 2005-05 emphasizes that the conflict "must truly be unforeseeable," and that the conflict must "truly be no fault of the lawyer."  *Accord, Eastman Kodak Co. v. Sony Corp.*, 2004 WL 2984297, at * 7-8 (W.D.N.Y. Dec. 27, 2004) (accepting the flexible approach "for disqualification issues generated by mergers and acquisitions" but disqualifying counsel because the conflict was foreseeable).  Pepper Hamilton cannot qualify under either of these definitional requirements.

First, at the time Pepper Hamilton undertook to represent Huntington National Bank in the Trustee's Actions in early April 2007, the conflict was eminently foreseeable.  The Cyberco fraud had generated losses approaching $100 million, the bankruptcy assets were inadequate to pay all creditors, and Huntington National Bank was the "deep pocket" most closely associated with Cyberco.  The Trustee alleged that Huntington National Bank had received payments of over $17 million from Cyberco and Teleservices in the waning days of the fraud.  Huntington National

---

of a client will be or is likely to be adversely affected," a far looser standard.  Therefore, some of the conclusions set forth in Formal Opinion 2005-05 are overly favorable to the conflicted lawyer and would not apply in Michigan.

Bank had spent two years fending off the efforts of El Camino to conduct a Rule 2004 examination, the obvious purpose of which was to build a case against the bank.  (*See* Findings of Fact, ¶ 10). Huntington National Bank and Bank Midwest had entered into a settlement agreement on a related Cyberco issue, in which Bank Midwest had specifically reserved its right to assert claims against Huntington in the future, and Huntington had preserved its defenses.  (*See* Findings of Fact, ¶ 11). The proceedings in the Bankruptcy Court, and Huntington National Bank's deep involvement in those proceedings, fully support a finding that in April 2007 it was foreseeable that large creditors such as El Camino (claiming a loss of $11.5 million), ePlus Group (claiming a loss of $14.5 million), and Bank Midwest (claiming a loss of $4.925 million) would assert claims against Huntington National Bank.   The present record, however, supports a finding even stronger than mere foreseeability.  The record shows that both Huntington National Bank and Pepper Hamilton *actually foresaw* the conflict.  The affidavit of Robert Hertzberg, Huntington's principal counsel, establishes this beyond doubt.

> I was also informed [by Mr. Liebersbach, Huntington's counsel] that based upon Rule 2004 examinations in the Bankruptcy Court that provided pre-complaint discovery by Huntington to the Trustee and various creditors (including plaintiffs in this action) it was very likely that a number of Cyberco creditors would seek to intervene in the Trustee's Actions on the side of the Trustee or file "me too suits" with allegations redundant to those asserted by the Trustee in the Trustee's Actions.

(Hertzberg Aff., ¶ 6).  As a consequence, Huntington asked Mr. Hertzberg to attempt to secure a waiver from Bank Midwest so that Pepper Hamilton could represent Huntington National Bank "against the variety of claims asserted in the pending Trustee's Actions and *which likely would be asserted by other creditors*."  (*Id.*, ¶ 8) (emphasis added).  In light of these admissions, Pepper Hamilton cannot be heard to argue that the assertion of claims in this case by the firm's clients Bank

Midwest and ePlus Group was unforeseeable when the firm agreed to represent Huntington National Bank. Both Huntington and Pepper Hamilton considered such creditor claims to be "very likely."[7]

Nor can Pepper Hamilton prevail on the claim that the conflict was not its fault. Understanding that creditor claims were "very likely," Pepper Hamilton proffered Bank Midwest a form of waiver that would have allowed the firm to represent Huntington National Bank not only in the Trustee's Actions but also "generally with regard to all matters related to or arising in the Cyberco bankruptcy case and the Teleservices bankruptcy case." (Draft Conflict Letter of 4/3/07, docket # 74). Counsel for Bank Midwest refused to execute the proffered waiver and ultimately signed an amended letter that waived the conflict only with regard to the two enumerated Trustee's Actions. Consequently, on August 6, 2007, Pepper Hamilton knew of the limited nature of the waiver, knew that the waiver would be ineffective to cover any future lawsuit, knew that a future lawsuit was "very likely," and undertook to represent Huntington National Bank anyway. In the circumstances of this case, its decision can only be deemed reckless.

Finally, Pepper Hamilton cannot succeed in its attempt to blame Bank Midwest and ePlus Group for thrusting the conflict upon it. The firm claims that "the conflict thrust upon Pepper Hamilton is due to Bank Midwest's and ePlus Group's decision to bring this action placing Pepper Hamilton in a current conflict of interest." (Brief at 20, docket # 72). ePlus Group and Bank Midwest no more created the conflict by bringing the suit than Huntington National Bank did by deciding to defend itself. If accepted, Pepper Hamilton's argument would always allow a law firm

---

[7] Pepper Hamilton appears to assert that although creditor suits were likely, a suit by Bank Midwest or ePlus Group in particular was unforeseen. It is simply not believable that lawyers of Pepper Hamilton's caliber could be so obtuse. If the firm deemed "me-too" creditor actions as "very likely," the most likely creditors to bring such actions were those, such as plaintiffs, who had sustained the greatest losses.

to favor its defendant client over its plaintiff client, on the theory that the conflict would have never arisen had the plaintiff not decided to sue.

Those few courts that have adopted the "flexible approach" have done so reluctantly, recognizing that it represents an erosion of the duty of loyalty and therefore should be applied in limited circumstances, when the conflict is truly unforeseeable. All the cases upon which Pepper Hamilton relies to justify its position arose in the context of a client merger or acquisition, in which the conflict truly was unforeseeable and blind-sided the lawyer. The single case cited by Pepper Hamilton that does not involve a merger or acquisition, *Ex parte AmSouth Bank, N.A.*, 589 S.2d 715, 722 (Ala. 1991), is unpersuasive in its reasoning and inapposite on its facts. Without holding that the "flexible approach" is never appropriate outside of the merger and acquisition context, this court holds that it is patently inapplicable in this case.

Finally, the court holds that Huntington National Bank's interest in retaining a lawyer of its choice does not outweigh the gravity of the ethical violation that would be countenanced if Pepper Hamilton were allowed to continue in this case. Unlike many cases in which the "flexible approach" has been applied, the law firm has not been deeply engaged in representing its client for a period of years, nor have the wronged clients delayed in raising the issue. Pepper Hamilton's involvement in the present case is barely two months old, and its involvement in the entire Cyberco matter on behalf of Huntington National Bank is barely five months old. Both Huntington National Bank and Pepper Hamilton make much of the firm's intense involvement in the bankruptcy case since April 2007. The record in that case, however, shows that the firm's overt involvement has been limited to filing a motion to dismiss addressed only to legal issues. The motion has already been partially successful, in that the Trustee has conceded its lack of standing to bring common-law

-41-

claims against Huntington National Bank.  No depositions or other discovery have taken place. Although the firm has spent considerable time organizing documents, there has been no showing that the value of this work is lost forever or that substitute counsel could not make use of it.  By contrast, Bank Midwest has relied on the Pepper Hamilton firm to represent its interest in the Cyberco matters for three years and has paid the firm fees of the same magnitude as those paid by Huntington National Bank.  Bank Midwest's investment in the services of the law firm at least stands on a par with that of Huntington National Bank.  Although the firm's breach of its duty of loyalty to other clients will certainly impose some hardship on Huntington National Bank, that is not the fault of the court or the other clients, but the firm itself.

## Conclusion

The Pepper Hamilton firm has conducted itself in a way that no court would ever condone.  This is not a situation in which a law firm innocently finds itself in a conflict situation not of its own making.  A law firm's duty of loyalty to its clients is paramount, and no court should lightly countenance such a patent breach of that duty.  The motions to disqualify the Pepper Hamilton firm will be granted.


Dated:   September 13, 2007                          /s/  Joseph G. Scoville
                                                     United States Magistrate Judge


-42-