UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

——

EL CAMINO RESOURCES, LTD., et al.        )
                                         )
                    Plaintiffs,          )        Case No. 1:07-cv-598
                                         )
v.                                       )        Honorable Janet T. Neff
                                         )
HUNTINGTON NATIONAL BANK,                )
                                         )
                    Defendant.           )
_____)


**REPORT AND RECOMMENDATION ON
<u>DEFENDANT'S MOTION FOR SUMMARY JUDGMENT</u>**

# TABLE OF CONTENTS

**Page**

**Applicable Standard**     2

**Proposed Findings of Fact**     4

    **A.**     **Dramatis Personae**     5

    **B.**     **Plaintiffs' Transactions With Cyberco and Teleservices**     8
       1.     ePlus Group Leasing Transactions     8
       2.     El Camino Resources, Ltd. Leasing Transactions     9

    **C.**     **Relationship Between Cyberco and Huntington National Bank**     12
       1.     Beginnings of Relationship     12
       2.     Investigation by Gail White     15
       3.     Huntington Decides to End the Banking Relationship With Cyberco     18
       4.     Huntington Goes to the FBI     20
       5.     Timing of Plaintiffs' Transactions     27

**Discussion**     28

    **I.**     **Counts 1 and 2: Aiding and Abetting Fraud and Conversion**     28
       A.     *Erie* Considerations     28
       B.     Michigan Follows Traditional Tort Law for Secondary Liability     31
       C.     Development of the Aiding-and-Abetting Theory in Tort Law     36
       D.     Likely Ruling of Michigan Supreme Court     43
          1.     Knowledge     43
          2.     Substantial Assistance     52
       E.     Analysis of Plaintiffs' Aiding-and-Abetting Claims     59
          1.     Underlying Torts     59
          2.     Sufficiency of the Evidence of Actual Knowledge     63
             (a)     Direct evidence     63
             (b)     Circumstantial evidence     70
          3.     Sufficiency of the Evidence of Substantial Assistance     80

    **II.**     **Count 3: Statutory Conversion**     87

    **III.**     **Count 4: Unjust Enrichment and Constructive Trust (El Camino Only)**     89

**Recommended Disposition**     96

This is a civil action arising under Michigan tort law. This court has subject-matter jurisdiction under 28 U.S.C. § 1332(a)(1) because of complete diversity of citizenship and the requisite amount in controversy. Plaintiffs, computer leasing companies, seek to hold defendant Huntington National Bank responsible for losses incurred by plaintiffs in connection with fraudulent computer leasing transactions between plaintiffs and Cyberco Holdings, Inc. Plaintiff El Camino Resources, Ltd. purchased over $11.5 million, and plaintiff ePlus Group over $14.5 million in computer equipment, for the purpose of leasing the equipment to Cyberco. Plaintiffs allege that they were victims of fraud by Cyberco and related entities and that defendant Huntington National Bank, Cyberco's principal financial institution and depository, aided and abetted Cyberco in committing fraud and conversion. Plaintiffs seek judgment against Huntington National Bank in an amount exceeding $32 million. (Compl. ¶¶ 143, 151, 156-57, 165).

Plaintiffs' complaint asserts four counts against Huntington National Bank: aiding and abetting Cyberco's fraud (count 1); aiding and abetting Cyberco's conversion of plaintiffs' funds (count 2); statutory conversion under Mich. Comp. Laws § 600.2919a (count 3); and equitable recovery by El Camino of $1.945 million received by the Bank under a theory of unjust enrichment (count 4). Presently pending before the court is defendant's motion for summary judgment (docket # 512), which District Judge Janet T. Neff has referred to me for the issuance of a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B). The parties have submitted massive briefs and voluminous evidentiary material in support of and in opposition to defendant's dispositive motion. I conducted a oral argument on the motion on June 12, 2009.

In essence, defendant argues that plaintiffs cannot establish the underlying torts of fraud or conversion by Cyberco, nor have they presented a jury-submissible case on the elements of aiding and abetting sufficient to hold Huntington National Bank responsible for the torts of others.

After review of the record, I conclude that plaintiffs' proofs are insufficient to create liability against Huntington on an aiding-and-abetting theory. I therefore recommend dismissal of counts 1 and 2 on this basis, without reaching the merits of the underlying torts. I further conclude that plaintiffs cannot establish liability under Michigan's conversion statute, as it has been authoritatively construed by the state Supreme Court. On this basis, I recommend entry of judgment on behalf of defendant on count 3.

El Camino's claim in count 4 for unjust enrichment and imposition of a constructive trust seeks to recover $1.945 million received by Huntington Bank from Teleservices, Inc., an affiliate company of Cyberco. El Camino alleges that this money is traceable to the proceeds of fraud received by Teleservices from El Camino the day before the payment. This claim is triable to the court without a jury. I recommend that defendant's motion for summary judgment on count 4 be denied. Drawing all reasonable inferences in El Camino's favor, I find that a reasonable judge, sitting in equity, could find that defendant's retention of these funds may be unjust. However, a reasonable judge could just as easily find on this record that El Camino's negligence in failing to protect itself and its business partners in connection with the Cyberco transactions makes equitable relief against Huntington Bank inappropriate. This issue depends on a balance of the facts and equities in the case, an inappropriate subject for summary judgment.

## Applicable Standard

Summary judgment is appropriate when the record reveals that there are no genuine issues as to any material fact in dispute and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c); *Synbrandt v. Home Depot, U.S.A., Inc.*, 560 F.3d 553, 557 (6th Cir.

2009). The standard for determining whether summary judgment is appropriate is "whether 'the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Moses v. Providence Hosp. Med. Centers, Inc.*, 561 F.3d 573, 578 (6th Cir. 2009) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)); *see Cady v. Arenac County*, 574 F.3d 334, 339 (6th Cir. 2009). The court must consider all pleadings, depositions, affidavits, and admissions on file, and draw all justifiable inferences in favor of the party opposing the motion. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

When the party without the burden of proof seeks summary judgment, that party bears the initial burden of pointing out to the district court an absence of evidence to support the nonmoving party's case, but need not support its motion with affidavits or other materials "negating" the opponent's claim. *See Morris v. Oldham County Fiscal Court*, 201 F.3d 784, 788 (6th Cir. 2000); *see also Minadeo v. ICI Paints*, 398 F.3d 751, 761 (6th Cir. 2005). Once the movant shows that "there is an absence of evidence to support the nonmoving party's case," the nonmoving party has the burden of coming forward with evidence raising a triable issue of fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). To sustain this burden, the nonmoving party may not rest on the mere allegations of his pleadings. FED. R. CIV. P. 56(e); *see Everson v. Leis*, 556 F.3d 484, 496 (6th Cir. 2009). The motion for summary judgment forces the nonmoving party to present evidence sufficient to create a genuine issue of fact for trial. *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1478 (6th Cir. 1990). "A mere scintilla of evidence is insufficient; 'there must be evidence on which a jury could reasonably find for the [non-movant].'" *Dominguez v. Correctional Med. Servs.*, 555

F.3d 543, 549 (6th Cir. 2009) (quoting *Anderson*, 477 U.S. at 252); *see Reed v. International Union, United Auto., Aerospace & Agric. Implement Workers of* Am., 569 F.3d 576, 579 (6th Cir. 2009).

## Proposed Findings of Fact

  <u>Introductory Statement</u>. This case has been the subject of protracted and often rancorous discovery and pretrial proceedings. The parties have taken numerous depositions and have conducted extensive document discovery. The court was called upon on more than one occasion to intervene on issues of discovery of electronically stored information, and probably allowed plaintiffs access to a greater scope of electronically stored information than in any other civil case in the history of this court. Furthermore, the parties are embroiled in litigation in the bankruptcy court involving both Cyberco and Teleservices, Inc., a related corporation. Finally, the parties have had access to the records of criminal cases in this court against the Cyberco principals, including Krista Watson, Paul Wright, and James Horton. As a result, the parties have had more than ample opportunity to prove their claims and have amassed a huge evidentiary record in support of their respective contentions. The device employed by Judge Neff to simplify such cases -- the filing of statements of material facts -- has been largely unsuccessful in identifying points of agreement and disagreement, principally because the nonmoving parties refuse to concede any harmful fact, regardless of the evidence, and often rely on inferences that are neither reasonable nor fairly supported by the record. In those relatively few instances where this process resulted in agreement, the Statement of Material Facts is cited as "SMF."

  In the following proposed Findings of Fact, I have not attempted to engage every factual dispute between the parties, many of which are immaterial to resolution of the case. I have

especially avoided controversies involving the validity of the underlying torts of fraud and conversion committed by Cyberco and related parties. Rather, I have assumed that plaintiffs can mount a jury-submissible case of fraud and conversion committed by Cyberco and have focused only on the question whether, assuming the commission of underlying torts, plaintiffs have sufficient evidence to present their aiding-and-abetting claims against Huntington to a jury under counts 1 and 2 of the complaint.[1] Likewise, for reasons explained more fully in section I.E.2.(b) of the Discussion section, I do not address plaintiffs' efforts to show that Huntington violated its anti-money-laundering obligations or violated its duties to the federal government as a national bank, because in the circumstances of this case those facts, even if true, do nothing to prove that Huntington was aiding and abetting a known fraud. The facts set forth below attempt to identify the parties and transactions at issue and to give a general description of the relevant events giving rise to Huntington's alleged liability. Further facts are developed in connection with analysis of plaintiffs' claims in the "Discussion" section of this report and recommendation.

The record before the court establishes the following material facts, with all factual disputes and all *reasonable* inferences resolved in favor of the plaintiffs.

## A.    Dramatis Personae

1.     Plaintiff El Camino Resources, Ltd. is a California corporation, with principal place of business in Chatsworth, California. It is a privately owned leasing company that has been in the business of leasing computer equipment since the late 1970's. (Compl. ¶¶ 1, 9).

---

[1] If my conclusions about the viability of the aiding-and-abetting theory are rejected, it will be necessary to revisit Huntington's summary judgment motion, as it raises serious issues concerning the viability of the underlying tort claims.

2.      Plaintiff ePlus Group, Inc. is a Virginia corporation, with principal place of business located in Herndon, Virginia. It is a wholly owned subsidiary of ePlus, Inc., a publicly traded corporation. ePlus Group is also engaged in the business of leasing computers. (Compl. ¶¶ 2, 10).

3.      Defendant The Huntington National Bank is a national banking association organized under federal law. The Bank's main office is located in Columbus, Ohio, but it maintains branches across the State of Michigan, including the City of Grand Rapids. (Def. Ex. 1). Huntington established a comprehensive banking relationship with Cyberco beginning in 2002, ultimately extending loans to it exceeding $17 million. (SMF ¶ 6).

4.      Cyberco Holdings, Inc., a Michigan corporation, was established by Barton Watson in 1992, and held itself out as a computer sales and consulting business. (Ex. 170). The enterprise used a number of names, some of which may have pertained to separate corporations, while others were trade names. These names included CyberNet, Cybernet Engineering, and Corporate Property Associates. Cyberco's operations came to a halt on November 17, 2004, when agents of the FBI executed search warrants on Cyberco's office in downtown Grand Rapids, Michigan, and served seizure warrants for the bank accounts of Cyberco and its officers. Cyberco is now in an involuntary bankruptcy proceeding in this court (*In re Cyberco Holdings, Inc.*, No. 04-14905 (W.D. Mich. Bankr.)).

5.      The principals of Cyberco included Barton Watson, Krista Kotlarz Watson, and James M. Horton. Barton Watson committed suicide on November 24, 2004, shortly after the massive Cyberco fraud came to light. By indictment filed on November 30, 2006, the United States charged Krista Watson and others with conspiracy to commit bank fraud, mail fraud, and money

laundering (count 1), defrauding Huntington National Bank and deceiving it into loaning $17 million to Cyberco (count 2), money laundering (counts 3, 5 and 6), and income tax evasion (counts 7, 8 and 9). Krista Watson pleaded guilty to the conspiracy charge and to income tax evasion, and is serving an 84-month prison sentence. (*United States v. Watson*, case no. 1:06-cr-290). By felony information filed April 17, 2006, James Horton was charged with conspiracy to commit bank fraud, mail fraud, and money laundering (count 1), defrauding Huntington National Bank into advancing loans to Cyberco in the amount of $17 million (count 2), and money laundering (counts 3 and 4). Horton pled guilty to all counts and is serving a total of 90 months in federal prison. (*United States v. James Michael Horton*, case no. 1:06-cr-87). In these criminal proceedings, Judge Bell issued restitution orders approaching $100,000,000.00.

6. Teleservices Group, Inc. is an affiliated corporation of Cyberco. According to the testimony of James Horton in the bankruptcy proceedings, Teleservices was a shell corporation that had no employees, assets, or operations. (Horton Exam. 51-52, 118-20). Barton Watson, Krista Watson and other Cyberco employees, using pseudonyms, would impersonate corporate officers of Teleservices when necessary. (*Id.*, 52-54). The principals represented Teleservices to the outside world in a number of ways. To leasing companies such as plaintiffs, Teleservices was said to be a manufacturer or seller of computers. The Watsons and Horton made a number of contradictory representations to Huntington concerning the nature of Teleservices, including describing it as a client of Cyberco, an investment by Krista Watson, a company owned by Barton and Krista Watson, a corporation used to funnel personal funds to Huntington Bank, a vendor of computers (Horton Exam. 122), a call center, or a related entity in the process of becoming the financial leg of the Cyberco group of businesses. (White Dep., 45-47; Hutchings Dep. 129; Hekman Dep. 28-30). The

Cyberco principals offered these explanations for the purpose of deceiving both plaintiffs and Huntington. (Horton Exam. 167-68). Teleservices is also in bankruptcy. (*In re Teleservices Group, Inc.*, No. 05-00690 (W.D. Mich. Bankr.)).

## B. Plaintiffs' Transactions With Cyberco and Teleservices

### 1. ePlus Group Leasing Transactions

(a)     Effective March 3, 2004, ePlus Group and Cyberco entered into a Master Lease Agreement (Compl. Ex. H). Under the Master Lease Agreement, ePlus Group promised to lease to Cyberco certain personal property, to be described in schedules. (¶ 1). The ownership of the leased property remained in ePlus Group. (¶ 7).

(b)     Pursuant to the Master Lease Agreement, ePlus Group and Cyberco entered into four lease schedules, as follows:

(1)     Schedule no. 1 (Compl. Ex. I), dated March 3, 2004, covering 85 servers and two racks for a three-year period, totaling $3,554,820.10;

(2)     Schedule no. 2 (Compl. Ex. J), dated March 16, 2004, covering 65 servers and two racks for a three-year period, totaling $3,485,226.10;

(3)     Schedule no. 3 (Compl. Ex. K), dated September 17, 2004, covering 132 servers and nine racks for a three-year period, totaling $4,990.420.96; and

(4)     Schedule no. 4 (Compl. Ex. L), dated October 6, 2004, covering 63 servers and four racks for a three-year period, totaling $2,489,783.94.

(c)     The computer equipment to be purchased by ePlus Group for purposes of leasing to Cyberco was allegedly manufactured by Teleservices.  When the computer equipment described in each schedule was purportedly delivered from Teleservices to Cyberco, Cyberco issued to ePlus Group a certificate of acceptance, certifying that the assets set forth in the schedule had been delivered to Cyberco, inspected, and found to be in good order.  (Longanecker Dep., 21-22; Compl. Ex. M).

(d)     ePlus Group financed the purchase and lease transactions through third-party lenders, including GMAC and Bank of America, on a non-recourse basis.  When ePlus Group received the certificates of acceptance, it directed its lenders to disburse funds to Teleservices by issuing a "Proceeds Letter." (Longanecker Dep., 15-18).  ePlus Group directed that the proceeds be sent directly to a Teleservices bank account in the Silicon Valley Bank in California.  (*Id.*, 18-19).

(e)     ePlus alleges that its computer leasing transactions with Cyberco and Teleservices were fraudulent and that the leased computer equipment never existed.  It alleges that it delivered monies to Teleservices for the purchase of scheduled equipment for delivery to Cyberco and for its use, but that Teleservices was a sham company set up by Cyberco to create the false impression that Cyberco was leasing and receiving expensive computer equipment in arm's length transactions from a real equipment vendor.  (Compl. ¶ 31).  For present purposes, these allegations are assumed to be true.

2.     El Camino Resources, Ltd. Leasing Transactions

(a)     Effective May 27, 2004, plaintiff El Camino entered into a Master Equipment Lease with Cyberco Holdings.  (Compl., Ex. A).  The Master Equipment Lease contemplated that

Cyberco would lease from El Camino certain computer equipment, including servers, server racks, and related items, for Cyberco's computer service business. The Master Equipment Lease contemplated that the leased property would be described in equipment lease schedules that would be executed by the parties from time to time in the future. (¶ 1.1). The leased equipment would at all times remain the personal property of El Camino. (¶ 1.2).

(b)　　Pursuant to the Master Equipment Lease, El Camino entered into three equipment lease schedules:

(1)　　Equipment lease schedule 001 (Compl., Ex. B) dated June 18, 2004, covering 114 servers and five racks for a total of $3,947,431.32 over the three-year life of the equipment lease;

(2)　　Equipment lease schedule 002 (Compl. Ex. C) dated September 2, 2004, covering 89 servers and ten racks, for a total of $3,558,530.76 over the three-year life of the equipment lease; and

(3)　　Equipment lease schedule 003 (Compl. Ex. D) dated October 18, 2004, covering 142 servers and eight racks, for a total of $5,679,437.76 over the three-year life of the equipment lease.

(c)　　Cyberco represented to El Camino that Cyberco had entered into written purchase contracts with Teleservices to acquire the leased property and that each purchase contract would be assigned by Cyberco to El Camino, thus vesting title in El Camino. (Compl. ¶ 22). El Camino was led to believe that Teleservices was assembling the equipment itself. (Wong Dep., 74-76).

(d)     El Camino financed these transactions by borrowing from third-party lenders, including SouthTrust Bank and American Enterprise Leasing, Inc., on a non-recourse basis. (Wong Dep., 71). El Camino delivered to the third-party lenders promissory notes, backed by security agreements creating a security interest in all of El Camino's interest in the leased equipment. Additionally, Cyberco assigned to the third-party lenders all its right to receive lease payments under the Master Equipment Lease with Cyberco. (*See* Promissory Notes and related documents, Compl. Exs. E, F, and G).

(e)     When Cyberco purportedly received the computer equipment from Teleservices, its President (Horton) sent an acceptance letter to El Camino listing serial numbers. Once Cyberco certified that the equipment was installed to its satisfaction, El Camino made payment to Teleservices. (Wong Dep., 72-75). El Camino paid for the purported servers by depositing (or having its lenders deposit) the purchase price into a Teleservices bank account at the Silicon Valley Bank in California.

(f)     El Camino alleges that its computer leasing transactions with Cyberco and Teleservices were fraudulent and that the leased computer equipment never existed. It alleges that it delivered monies to Teleservices intended for the purchase of scheduled equipment for delivery to Cyberco and for its use, but that Teleservices was a sham company set up by Cyberco to create the false impression that Cyberco was leasing and receiving expensive computer equipment in arm's length transactions from a real equipment vendor. (Compl. ¶ 31). For present purposes, these allegations are assumed to be true.

## C.  Relationship Between Cyberco and Huntington National Bank

### 1.  Beginnings of Relationship

(a)     When James Horton became President of Cyberco in 2000, the company was engaged in the sale of computers and in computer consulting.  (Horton Plea, 13).[2]  The income from the business proved to be insufficient, and the Cyberco principals came up with an idea in January of 2002 to get money from banks and leasing companies "to fill the gap."  (*Id.*).  The principals went to the Huntington National Bank to borrow money "for growth and expansion."  (*Id.*, 14).

(b)     In August 2002, Cyberco and Huntington National Bank established a comprehensive banking relationship.  On October 25, 2002, Cyberco and Huntington entered into a revolving credit loan agreement (Ex. 164) collateralized by a security interest in favor of the Bank on all personal property of Cyberco, including general intangibles and accounts receivable.  (Security Agreement, Ex. 165).  The relationship also included general treasury services such as a checking account and wire transfer services.  (SMF ¶ 6).  Cyberco had five principal accounts at Huntington. The concentration account was designed to receive all incoming funds.  The funds were then passed through to one of four other accounts:  a payroll account, a controlled disbursement account (for paying operating expenses), the merchant account (used to process credit card payments from Cyberco's alleged customers), and a lockbox account.  The line of credit was used to fund the first three accounts, when their balances were insufficient to meet operations.  The lockbox account, which was set up by a separate agreement, was used to secure the Bank's lien on Cyberco's accounts

---

[2] Both parties have cited the transcript of the guilty plea hearing before Judge Bell in *United States v. James Horton* (case no. 1:06-cr-87, docket # 17).

receivable. At the end of each day, all funds were taken out of the four accounts and transferred to the Bank to pay down the line of credit. This is known as a "zero balance" arrangement. (Ex. 239).

(c)     At the outset, Cyberco's revolving loan from Huntington was $9 million. Because Cyberco's accounts receivable were intended as the primary collateral for the loan, Huntington required Cyberco to submit to an audit of receivables before the loan was finally approved. (Hutchings Dep., 300-01). The audit, or "field examination," was conducted in September 2002 by Lender Services of Bingham Farms, Michigan. (*See* Audit Report, Ex. 171). The audit was not conducted at the offices of Cyberco, but at Huntington's commercial loan office in Grand Rapids, because James Horton, Cyberco's President, refused to allow the auditors access to Cyberco's premises or accounting personnel, stressing a desire not to arouse concern among the company's employees about its financial stability. (*Id.*, 6). The audit report noted the lack of access to Cyberco's premises, as well as the fact that the auditors were required to wait excessively for requested information and were not given immediate access to all current accounts receivable data. A member of Huntington's audit staff, Dave Emig, expressed in writing concerns about these discrepancies, as well as the fact that all information was channeled through one person, James Horton. (Ex. 174). Nevertheless, Huntington consummated the Cyberco loan on October 25, 2002. (Ex. 164).

(d)     Beginning in December 2002, Cyberco made a series of significant overdrafts. The first was on December 30, 2002, in the amount of $400,000.00. Bank personnel contacted James Horton, who explained the problem away as the result of a stop-payment issued by a customer (Cargill) on a check that had been issued prematurely. Horton said that this left Cyberco in a temporary cash-flow crunch and asked for an increase in the line of credit of $400,000.00. (Ex. 176).

In January 2003, Cyberco made an overdraft in the amount of $71,500.00, which remained unresolved for several days. (Ex. 177). In February 2003, Cyberco overdrew its account by $1 million. (Ex. 111). Barton Watson explained the situation away, blaming it on an unexpected delay in a deposit from a customer, Lockheed-Martin. Huntington advanced Cyberco $1 million to cover the overdraft pending a permanent increase in the revolving loan. This was based upon Cyberco's provision of a backlog report and favorable receivables and inventory information. (*Id.*). These overdraft situations came to the attention of a number of senior Bank officers, including John Kalb, the Senior Regional Credit Risk Officer. Kalb testified that the situation raised a red flag for him and warranted further investigation. (Kalb Dep., 191-92). Part of the problem was that Cyberco was not using the lockbox, which was designed to secure the Bank's liens on Cyberco's accounts receivable. (*Id.*, 191). Kelly Hutchings, the Commercial Bank Officer with principal responsibility for the Cyberco account, throughout the life of the relationship attempted without success to have Cyberco use the lockbox as required by the loan documents. (Hutchings Dep., 354; Ex. 111). When confronted on the lockbox issue, Cyberco justified its actions by criticizing the bank for providing inferior services and accusing it of "fundamental breaches of trust in your lock box system." (Def. Ex. 6 at FBI 156).

(e)     In March and again in September of 2003, Cyberco demanded a "hard hold" be placed on its automated clearinghouse account, allegedly because Cyberco believed its security had been breached by a former employee. The Bank accepted this explanation at face value and closed down the concentration account and controlled disbursement account immediately, understanding that this action would cause overdrafts. (Ex. 63). An employee in the Bank's Treasury Management Department asked that Bank officials be vigilant for suspicious activity, not

by Cyberco but by the alleged former employee.  (*Id.*).  Glenn Getschow, a Treasury Services Manager at the Bank, participated in a meeting among Bank officers with Barton Watson and possibly James Horton, to explain to them that a hard hold was not necessary and that the Bank could protect Cyberco from attempts by an ex-employee to hack into their accounts, but Cyberco insisted on the hold, which caused twenty-three overdrafts in March of 2003.  (Getschow Dep., 62-71). During September 2003, the second occasion for the hold, a number of significant checks bounced for insufficient funds.  Additionally, in that month, Cyberco received an NSF check in the amount of $2.3 million from Teleservices, drawn on the Silicon Valley National Bank.  Huntington was not then aware that Teleservices was a related corporation to Cyberco.

### 2.  Investigation by Gail White

(a)  Gail White was a 29-year employee of Huntington National Bank.  At the time the Bank received the NSF check from Teleservices, White had no previous substantive involvement with the Cyberco banking relationship.  But, because of the absence on that particular day of the responsible Bank officers, White was called upon to decide whether to cover the shortfall in the Cyberco account caused by the $2.3 million NSF check.  (SMF ¶ 9).  The dishonor of such a large check was not common at the Bank, so White concluded that she should look into the situation before coming to a decision.  (White Dep., 13, 197).  Her initial investigation involved looking at the activity that surrounded the dishonored check.  She noticed that there were large dollar transactions coming through the account, and that many came from a "particular source," namely Teleservices.  (*Id.*, 13-14).  Teleservices was an "unknown entity" to her at the time.  (*Id.*, 14). White also noticed foreign transactions in the account, including transactions involving Pakistan, the

UK, China, and Australia. Seeing transactions from Pakistan triggered her attention, because Pakistan was known for money laundering. (*Id.*, 14-15).

(b)    Gail White went to the region's Chief Risk Officer, John Kalb, to discuss her concerns. She met with him sometime in November 2004. (*Id.*, 18). She did not mention fraud, but just said that she thought something might be wrong. When he inquired concerning her reasons, she mentioned the large NSF check and the large dollar transactions moving from Cyberco accounts out of the country. White thought that Kalb seemed skeptical of her concerns, but he did direct her to do whatever she needed to do and to keep him informed. (*Id.*, 19-20).

(c)    White also informed the portfolio manager of the Cyberco account, Kelly Hutchings, of her findings, including that she was unable to ascertain the nature of Teleservices. (White Dep., 65-66). White found it odd that Teleservices appeared on the payables report, given her knowledge that Teleservices had transferred large amounts of money into Cyberco. (*Id.*, 68).

(d)    In October 2003, apparently at White's instigation, a number of employees of Huntington National Bank met with Cyberco's CEO, Barton Watson. In addition to White, Cal Hekman (the Bank's Commercial Lending Manager), Glenn Getschow (Treasury Manager), and Kelly Hutchings attended the meeting. (White Dep., 44-45). Hutchings established the meeting "to understand how Teleservices works within Cyberco, if it did." (White Dep., 44). Watson presented conflicting explanations concerning the relationship between Cyberco and Teleservices. According to White, Barton said that Teleservices was in the process of being set up as the "financial management leg" of Cyberco, which would be in charge of disbursing money throughout the company. (*Id.*, 46). (This would account for the fact that Cyberco was receiving large transfers of money from Teleservices.) White found this explanation unsatisfying and contradictory, especially

-16-

in light of Watson's statement that Teleservices was to act as a help desk. (*Id.*, 46-47). Other participants at the meeting also received contradictory understandings of the nature of Teleservices. Hekman, for example, believed that Watson said that Teleservices was a "service operation" affiliate. (Hekman Dep., 28). James Horton, President of Cyberco, testified that Cyberco purposely misled Huntington concerning the nature of Teleservices "to allay any suspicion that Huntington might have about what Teleservices was and what its function was, why it [Cyberco] was getting money from Teleservices." (Horton Exam., 167-68). For her part, nothing White learned at the meeting satisfied her suspicions about possible wrongdoing in the Cyberco accounts. (White Dep., 46). Immediately after the meeting, she told other Bank officers that she suspected that the $2.3 million dishonored check from Teleservices was part of a check kite. (Hekman Dep., 136-37).

(e)     White continued her research and analysis concerning the activity in Cyberco's accounts, including tracking deposits and payments in and out of the accounts. (White Dep., 32-33). Her investigation included looking into the "other entities" that she had come across that had different names but similar addresses as Cyberco. She determined, for example, that Teleservices had a number of addresses, but that one was 25 South Division, the same address as Cyberco. (White Dep., 21). In addition, in October 2003, she started compiling an Excel spreadsheet of Cyberco's account activity and other data concerning Cyberco and Teleservices, which she updated periodically. (SMF ¶ 14).

3.     <u>Huntington Decides to End the Banking Relationship With Cyberco</u>

(a)     During the time that Gail White's investigation of Cyberco was continuing, Bank officers decided to terminate the relationship with Cyberco. The process began in December 2003 or January 2004, when Kelly Hutchings approached her superiors and said, "This is getting out of hand, we've got to get out of this relationship." (Hutchings Dep., 440). A principal triggering event for this decision was the failure of Cyberco to provide audited financial statements for 2002. (SMF ¶ 17). Hutchings was also concerned that Cyberco's initial business model had turned out to be inaccurate. (Hutchings Dep., 277-78). A memo written by John Kalb on January 16, 2004, explained that there were no demonstrable financial reasons for terminating the relationship, but there had always been "red flags" associated with the client, including overdrafts, lack of controls, failure to provide audited financials, and the nature of the business. He also expressed concern with the type of deposits coming into the lockbox. (Ex. 90). By memorandum dated January 9, 2004, Kalb informed the Regional President, James Dunlap, of the decision as follows:

> 3. John Irwin, Cal Hekman, Kelly Hutchings and I had a meeting relating to Cyberco and despite the "good numbers" the "red flags" continue. It is our joint conclusion that we should exit the account and I give the team credit for taking this step despite outward financial performance. If there is one thing that has been clear about recent times it is the heightened risk of financial misinformation (as well as fraud) and we need to be cognizant of that fact as we see these red flags. We will keep you informed as to how we will communicate this exit to the client or if there is another chapter to the saga. Here is hoping we don't lose money in the process.

(Ex. 154).

(b)     Management instructed Kelly Hutchings to inform Cyberco of its decision. She and Cal Hekman had lunch with Krista Watson and Jim Horton and told them that they did not think the relationship between Huntington and Cyberco "was a good fit." (Hutchings Dep., 211).

The Bank officers did not mention any of the "red flags" that motivated the decision, nor did they raise with Cyberco its failure to provide audited financial statements for the year 2002. (Hutchings Dep., 213).

(c)     Cyberco officers decided to allow a "gradual migration" by Cyberco from the Bank. (Irwin Dep., 50-51). Consequently, the Bank decided to allow credit extensions during the transition period, but only if Cyberco produced the overdue audited financial statements for 2002. (Hutchings Dep., 198). On January 9, 2004, Kelly Hutchings informed Krista Watson of the Bank's inability to proceed with a credit extension without the audited financials. (Ex. 161). On January 20, 2004, and April 22, 2004, Huntington National Bank did grant Cyberco extensions of its line of credit, despite the fact that the 2002 audited financial statements were never produced. (Exs. 89, 106).

(d)     In connection with Cyberco's second request for an extension of its line of credit on March 29, 2004, Kelly Hutchings did pose to Cyberco a list of questions concerning the history of overdrafts, Cyberco's failure to abide by the lockbox agreement, and its relationship to Teleservices. Hutchings had sent the same questions to Krista Watson four months earlier but received no response. (Hutchings Dep., 216). Cyberco's initial reaction to the request was an e-mail from Barton Watson expressing a sense of "insult" and explaining away the overdrafts as a "clerical error." (Def. Ex. 6 at FBI 104). On March 31, 2004, Horton sent Hutchings a four-page memo with a two-page cover (Ex. 163). Among other things, the memo justified Cyberco's failure to abide by its lockbox agreement by criticizing the Bank's competence, accusing it of "fundamental breaches of trust in your lockbox systems." (*Id.* at 3). With regard to Teleservices, Horton claimed that Teleservices Group had been established by Krista Watson and that it was becoming the basis for

Cyberco's Business Process Outsourcing (BPO) operation. (*Id.* at 4). He advised that the Philippines had become the center for the BPO operations because of their high English-language skills. (*Id.* at 3-4). Hutchings testified that she did not know of the legal relationship between Cyberco and Teleservices before getting the memo, but only understood that Teleservices was a "cash consolidator" for Cyberco, collecting receivables on behalf of Cyberco. (Hutchings Dep., 66-69).

### 4.    Huntington Goes to the FBI

(a)    Even though the Bank had decided to terminate its relationship with Cyberco, Gail White continued the investigation that she had begun in October of 2003. By the time she had reviewed two months' worth of receivable and payable reports for Cyberco, she suspected that Cyberco was conducting a "receivables fraud," pursuant to which Cyberco was reporting work in progress as actual receivables, thereby inflating receivables reported to the Bank. (White Dep., 78-83, 327-29). She also realized that most of the funds being deposited into Cyberco's account were coming from the Teleservices account at Silicon Valley Bank in California. (*Id.*, 84-87). In mid-April 2004, White communicated her suspicions of receivables fraud to John Kalb and said that she questioned the validity of "some" of the receivables. She said that the Bank needed to audit the receivables. He told her that she should call corporate security and get them involved. (White Dep., 78-79, 81). White also informed her direct supervisor, John Irwin, of her concerns about the accuracy of Cyberco's reports of its account receivable. (SMF ¶ 24).

(b)    White contacted Larry Rodriguez, the Bank's West Michigan Corporate Security Officer, who was a 26-year veteran of the Michigan State Police. (SMF ¶ 26). Richard

Harp was the Security Director at the Bank's corporate headquarters in Columbus, Ohio, and was Rodriguez's supervisor. Harp authorized Rodriguez to investigate White's suspicions of illicit activity. (SMF ¶ 27). On March 29, 2004, at Rodriguez's direction, White provided Harp with the spreadsheet of account activity and other data that she had been compiling. (SMF ¶ 28; White Dep., 59).

          (c)       White met with Rodriguez on April 15, 2004. White advised Rodriguez that she first suspected problems with Cyberco in July of 2003, and at first thought that Cyberco was involved in an elaborate kite. (Ex. 84). She showed him the spreadsheet that she had been developing since October 2003, which tracked account activity for Cyberco, including transfers and transactions into and from the account. (White Dep., 79-80). In a memorandum to Richard Harp summarizing his interview with Gail White, Rodriguez reported the following possible irregularities: (1) The Cyberco account was set up as an asset-based lending situation, in which all receivables were to go through the lockbox, but accounts receivable were not going through the lockbox as they should have. Only eleven transactions per month on average were going through the lockbox, when it should have been about sixty. Furthermore, the accounts receivable payments were not following the expected pattern "for legitimate customers of Cyberco." (2) Despite efforts to address the problem by use of wire transfers, a concern remained regarding the accounts receivable. If the accounts receivable were inflated, "more money has gone out than should have and there isn't enough available to cover the loan." (3) The company had provided no financial statements since 2001. (4) The $2.3 million bounced check continued to be a concern, especially because Barton Watson could not provide a satisfactory explanation of what happened. When it had been suggested that there should be some verification of accounts receivable, "Watson threw a fit and demanded that

it not be done." (5) Another problem was that the principals of Cyberco demanded that no personal

credit reporting be done, claiming that it had nothing to with their commercial accounts. (Ex. 84).

By the conclusion of the White interview, Mr. Rodriguez suspected a possible fraud. (Rodriguez

Dep., 33-35). By his own review of the account history, he could not understand exactly what was

going on, but did believe that there were "red flags of fraud." (*Id.*, 35-37).

       (d)     Rodriguez called Harp and informed him that the next step would be to

contact the FBI. (Rodriguez Dep., 125). He also informed Harp of the risk that the Bank might

suffer a $16 million loss as a result. (*Id.*). Harp gave him the go-ahead to contact the FBI. (*Id.*, 125-

26). Rodriguez testified that he then had enough information to contact the FBI "and see if they had

any active investigations on this company." (*Id.*, 128). If they did, then he knew that they had "a

situation." If they did not, he would have to decide on what to do after talking to the FBI. (*Id.*).

Rodriguez had by that time a history of working with the FBI on behalf of Huntington National Bank

and had in the past learned whether indictments had been or would be issued on particular matters

involving the Bank. (SMF ¶ 31).

       (e)     Rodriguez approached Special Agent William Blynn of the FBI, who informed

him that the FBI had an active investigation on Cyberco. (Rodriguez Dep., 44-53). At some point

before May 3, 2004, Rodriguez was in the FBI office on unrelated business and approached the agent

in charge of the investigation, Roberta Gilligan. He told her that he suspected that there may be

some type of fraudulent activity involving Cyberco as it affected the Bank. (Gilligan Dep., 25-26,

105). This was before any subpoenas had been issued for Cyberco records, but after a subpoena had

been served on Huntington in Columbus, Ohio, for records concerning a company known as Stryon,

an entity of Cyberco which turned out not to be related to the fraud. (*Id.*, 105-07). On May 3, 2004,

Rodriguez provided Gilligan with information that he had gleaned from local court records involving cases against Cyberco and its principals. Among other things, he found that Barton Watson had a criminal history and had been sanctioned by the SEC. (SMF ¶ 34). The FBI did not inform Rodriguez of the nature or focus of its investigation. (Rodriguez Dep., 50-53, 66).

(f) Gail White first met with Agent Gilligan of the FBI (as well as Agent Rodney Urlaub of the IRS, and Postal Inspector Gil Webb) on May 20, 2004. Rodriguez arranged this initial interview. (SMF ¶ 40). White copied her entire Cyberco file for the FBI, including her spreadsheet. She gave Agent Gilligan internal Bank e-mails and correspondence to and from Cyberco. Included in the information that White provided the FBI was that portion of White's spreadsheet detailing Cyberco's payments to financial institutions and leasing companies. (SMF ¶¶ 41-43).

(g) Special Agent Gilligan prepared an FBI 302 report to memorialize her interview of Gail White. (Ex. 239). According to the 302 report, White described the relationship between Huntington and Cyberco and detailed for her the nature of Cyberco's accounts at the Bank and its credit relationship. She advised that the collateral for the then $15 million line of credit was Cyberco's accounts receivable, which should have been processed through the lockbox account, but that not many receivables were going to the account. She advised that most of the funds coming into the lockbox account were from a company called Teleservices, Inc. (*Id.*, 1-2). She told Gilligan about the dishonored $2.3 million Teleservices check, drawn on the Silicon Valley National Bank, and about the Bank's subsequent meeting with principals of Cyberco with regard to that transaction. She repeated Watson's description of Teleservices as a "help desk" and his paranoia about ex-employees hacking into the company's accounts. (*Id.*, 2). Referring to her spreadsheet, White shared her conclusion that Teleservices' funds, drawn on the Silicon Valley National Bank in

California, were used to pay Cyberco's debts both to Huntington and to other financial institutions. "White suspected that Teleservices was responsible for collecting the accounts receivable for Cyberco. White advised that Teleservices is the primary source of funds for the Cyberco account. Payments were made by check from Teleservices, but more recently, Teleservices has been wiring funds into the Cyberco account." (*Id.*, 3). White provided Gilligan with a spreadsheet showing wire transfer activity, again showing that transfers to Cyberco were principally from the Silicon Valley Bank account of Teleservices. The spreadsheet also reflected numerous wire transfers from the Cyberco account to overseas entities, including entities in Australia, the Philippines, and Shanghai. (*Id.*, 3).

(h)     According to Agent Gilligan's 302 report, White provided a spreadsheet of internal transfer activity conducted by checks between Cyberco Holdings, Teleservices, and Corporate Property Associates. White thought that it was "unusual" that Teleservices had accounts in Grand Rapids with Founders Trust, but that the business was in New York. She also advised Gilligan of suspicious individual transactions involving Krista Watson and James Horton. (Ex. 239 at 3-4). She also related the episode in which Barton Watson "threw a fit" when the Bank asked to audit the Cyberco accounts receivable. Instead, he purportedly hired the certified public accounting firm Grant Thornton in Hong Kong to certify the accounts receivable, but White thought the audit report contradicted itself and was "basically worthless." (*Id.*, 4). Finally, White advised that "due to the concerns of HNB" Cyberco had been asked to find another bank. (*Id.*, 5). Attached to the 302 report were the spreadsheet and other documents provided by White to Special Agent Gilligan.

(i)     White did not have and thus could not provide to the FBI documentation concerning the source of funds into the Teleservices account at Silicon Valley Bank. She did have

the impression from the bank relationship officers, however, that Teleservices was purchasing equipment on behalf of Cyberco customers and that the customer was paying Teleservices, which acted as a "clearinghouse." (White Dep., 295-96). On the basis of her discussions with White, Agent Gilligan believes that White did not know what the sources of funds from Teleservices to Cyberco were. (SMF ¶ 46; Gilligan Dep., 84-85).

(j) The FBI did not provide White with any confirmation of White's suspicions. It is the FBI's normal practice not to disclose to interviewees information that the FBI learns from other aspects of its investigation, and the FBI followed that practice with regard to its interview of White and other Bank employees. (Gilligan Dep., 104-05; SMF ¶ 49).

(k) Agent Gilligan testified that at the conclusion of White's initial interview, there was an understanding that the FBI would follow up with her and would probably have additional interviews. (Gilligan Dep., 55). Gilligan anticipated that White would be instrumental in helping the FBI determine what Bank records meant or how the transactions flowed. (*Id.*). Following the May 20, 2004 interview, White continued to monitor Cyberco's accounts and provided account information to the FBI in June 2004, August 2004, and September 2004. (Gilligan Dep., 116, 118; White Dep., 359, 527).

(l) A Grand Jury subpoena from this court was issued to Huntington National Bank compelling production, among other things, of all financial records for Cyberco Holdings and specifying certain account numbers. (Ex. 197). Before issuing the subpoena, Special Agent Gilligan contacted Rodriguez to identify the bank accounts that were related to Cyberco so that the subpoena could indicate specific account numbers, and to make it easier for the Bank to obtain the subpoenaed

documents. (Gilligan Dep., 24-25). The FBI issued a second subpoena later in its investigation, again after consulting with White. (White Dep., 360; Gilligan Dep., 121-22).

(m)     Gilligan interviewed White a second time, on June 16, 2004. White advised Gilligan that the unpaid balance of Cyberco's line of credit was $13.8 million and that Cyberco was paying on its line of credit as agreed. According to the FBI 302 report prepared by Agent Gilligan (Def. Ex. 6, at FBI 91-92), White provided numerous computerized printouts reflecting Cyberco's accounts and related information, along with a spreadsheet of recent wire activity and supporting documents. White also provided a copy of the audit report from Grant Thornton, as well as e-mail communications and copies of checks. Like the first interview, the June interview was voluntary. (Gilligan Dep., 122-23).

(n)     Agent Gilligan asked Gail White to participate in a follow-up interview on August 25, 2004. (Gilligan Dep., 123). The interview was memorialized by IRS Agent Rodney Urlaub, who was also present. (Def. Ex. 6 at FBI 135-36). Urlaub's memorandum reflects that White briefly reviewed the history of the line of credit from Huntington Bank. She reported that Cyberco had reduced the indebtedness to around $5 million. "Based upon the suspicious financial activity of Cyberco, Huntington Bank has demanded that Cyberco pay off the line of credit by August 27, 2004." (*Id.*, 135). White also provided to the agents an updated list of payments from Cyberco to other financial institutions, which revealed that wire transfers from Teleservices into the Cyberco bank account were the source of funds to pay off Cyberco's debts to financial institutions. Any remaining wire funds were used to pay down the line of credit. (*Id.*, 135-36). White provided other cancelled checks that she considered "odd or suspicious," including checks to foreign financial services purporting to be for rent. (*Id.*, 136).

-26-

(o) On November 17, 2004, the FBI executed search warrants for the premises of Cyberco and numerous seizure warrants for corporate assets. The FBI did not believe that it had probable cause to conclude that the activities of Teleservices were fraudulent until that time. (Gilligan Dep., 103-04). The FBI concluded that Cyberco was dealing in computer equipment that did not exist. (Gilligan Dep., 104). It also concluded that Huntington itself had been the victim of a fraud arising from its receipt of false financial information. (*Id.*). At no time during its investigation did the FBI advise Huntington that the money coming into Cyberco accounts from Silicon Valley Bank could be the product of unlawful activity. (*Id.*, 118-19; SMF ¶ 64).

5. Timing of Plaintiffs' Transactions

(a) All of the transactions between plaintiffs and Cyberco took place after Huntington informed Cyberco that it was severing its banking relationship with it and after Huntington had made its initial approaches to the FBI. Plaintiff ePlus Group executed the first Master Lease Agreement, effective March 3, 2004. (Ex. 406, found at Def. Ex. 15). Thereafter, it entered into four lease schedules dated March 12, March 22, September 17, and October 6, 2004. Plaintiff El Camino Resources entered into its Master Lease Agreement effective May 27, 2004, with subsequent lease schedules dated January 18, September 2, and October 18, 2004. (*See* Proposed Findings of Fact (B)2(a), (b)). In connection with each transaction, Cyberco represented to plaintiffs that Teleservices, a manufacturer or assembler of computer servers, would sell computer equipment to plaintiffs for purposes of leasing the equipment to Cyberco. Horton, President of Cyberco, admitted that Teleservices was a sham corporation and maintained no computer equipment. (Horton Dep., 119, 152). He further admitted that the purpose of the certificates of acceptance executed by

Cyberco were to create the false impression to the leasing companies that equipment in fact had been manufactured when it had not. (*Id.*, 117-18; *accord*, Horton Plea, 15). In connection with these transactions, plaintiffs remitted into Teleservices' Silicon Valley Bank account over $26 million.

(b)　　At the same time, Huntington National Bank was engaged in a concerted effort to have Cyberco pay down its line of credit and other loans. These efforts were made all the more urgent by the Bank's anticipation that the federal government would bring criminal charges, thus collapsing the Cyberco enterprise. (Ex. 86). Beginning on July 27, 2004, the Bank accepted nine large checks directly from Teleservices, payable to Huntington National Bank, totaling nearly $9 million. (Ex. 135, 156). The final payoff of the Huntington Bank revolving loan was made by a Teleservices check in the amount of $1.945 million on October 22, 2004. (Ex. 156, check no. 1100). Plaintiff El Camino asserts that this payment is directly traceable to a deposit of $4.9 million by El Camino into Teleservices' account earlier that day, the proceeds of a fraudulent computer lease. This was approximately one month before the FBI executed search and seizure warrants, effectively closing down Cyberco.

## Discussion

I.　　**Counts 1 and 2:　Aiding and Abetting Fraud and Conversion**

A.　　*Erie* Considerations

This is a diversity action arising under the law of the State of Michigan. Counts 1 and 2 of plaintiffs' complaint are premised on the legal theory that Huntington National Bank aided and abetted Cyberco in defrauding plaintiffs and in converting their funds. The Michigan Supreme Court has never recognized a claim for aiding and abetting tortious conduct. The parties agree (and the

court has already determined) that the state Supreme Court would accept the approach set forth in section 876(b) of the Second Restatement of Torts. Section 876 reads in its entirety as follows:

> For harm resulting to a third person from the tortious conduct of another, one is subject to liability if he
>
> > (a)    does a tortious act in concert with the other or pursuant to a common design with him, or
> >
> > (b)    knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself, or
> >
> > (c)    gives substantial assistance to the other in accomplishing a tortious result and his own conduct, separately considered, constitutes a breach of duty to the third person.

RESTATEMENT (SECOND) OF TORTS § 876 (1979). Although not using the words "aiding and abetting," section 876(b) is generally recognized as describing a concept of secondary liability similar to the criminal concept of aiding and abetting a crime. The courts accepting the concept of aiding and abetting in the tort context generally identify the elements of this claim as (1) the existence of an independent wrong committed by another; (2) actual knowledge by the aider and abettor of the wrong, and (3) substantial assistance by the aider and abettor proximately causing the plaintiff's injury. *See, e.g.*, *Wight v. BankAmerica Corp.*, 219 F.3d 79, 91 (2d Cir. 2000) (New York law).

Although the parties agree that Michigan courts would follow the Restatement, they disagree on virtually every legal issue in this case. For example, defendants argue that plaintiffs must prove that an alleged aider and abettor had actual knowledge of the underlying tort and acted with the intent to facilitate commission of the tort. Plaintiffs argue for a much more lenient standard, asserting that they need only prove defendant's "general awareness" of improper conduct. It is

therefore necessary for this court to determine how the Michigan Supreme Court would resolve the legal disputes presented in this case.

In answering this question, this court is guided by principles flowing from the landmark decision of *Erie Railroad v. Tompkins*, 304 U.S. 64 (1938). In *Erie*, the Court held that there is no general federal common law to be applied in diversity cases. Rather, the court sitting in diversity must apply state law, as enunciated by the state's highest court. *Erie*, 304 U.S. at 78. If the state's highest court has not decided an issue, then "the federal court must ascertain the state law from 'all relevant data.'" *Garden City Osteopathic Hosp. v. HBE Corp.*, 55 F. 3d 1126, 1130 (6th Cir. 1995) (quoting *Bailey v. V&O Press Co.*, 770 F.2d 601, 604 (6th Cir. 1985)); *see Ellis ex rel. Pendergrass v. Cleveland Mun. Sch. Dist.*, 455 F.3d 690 (6th Cir. 2006). "Relevant data" includes the state's intermediate appellate court decisions, as well as the state supreme court's relevant dicta, restatements of the law, law review commentaries, and the majority rule among other states. *See Angelotta v. American Broad. Corp.*, 820 F.2d 806, 807 (6th Cir. 1987). By examining all relevant data, this court must anticipate how the Michigan Supreme Court would rule in the case. *See Pennington v. State Farm Mut. Auto Ins. Co.*, 553 F.3d 447, 450 (6th Cir. 2009); *In re Dow Corning Corp.*, 419 F.3d 543, 549 (6th Cir. 2005). Above all, the court is to be guided by the principals of federalism embodied in *Erie*: discouragement of forum shopping and avoidance of inequitable administration of the laws. *See Gasperini v. Center for Humanities*, 518 U.S. 415, 428 (1996); *Hanna v. Plumer*, 380 U.S. 460, 468 (1965). Thus, the federal court must avoid engendering substantial variations and outcomes between state and federal litigation which would likely influence the litigants' choice of a forum. *Semtek Int'l., Inc. v. Lockheed-Martin Corp.*, 531 U.S. 497, 504 (2001) (citing *Hanna*, 380 U.S. at 467-68).

B.     Michigan Follows Traditional Tort Law for Secondary Liability

As required by *Erie*, this court's analysis must begin with an examination of existing Michigan law.  At common law, liability for the acts of another is based upon principles of concerted action.  As explained in Prosser & Keeton on Torts:  "All persons who acted in concert to commit a trespass, in pursuance of a common design, were held liable for the entire result.  In such a case, there was a common purpose, with mutual aid in carrying it out; in short, there was a joint enterprise, so that 'all coming to do an unlawful act, and of one party, the act of one is the act of all of the same party being present.'"  W.P. KEETON, DAN B. DOBBS, ROBERT E. KEETON & DAVID G. OWEN, PROSSER & KEETON ON THE LAW OF TORTS at 322-23 (5th ed. 1984) (quoting Sir John Haydon's Case, 1613, 11 Co. Rep. 5, 77 Eng. Rep. 1150 (1613)).  The authors explain that the concept of concerted action, although "somewhat extended beyond its original scope, is still the law."  *Id.* at 323.  In this context, the authors include liability arising from aiding the wrongdoer as falling within the concept of concerted action in pursuance of a common plan or design:

> All those who, in pursuance of a common plan or design to commit a tortious act, actively take part in it, or further it by cooperation or request, or who lend aid or encouragement to the wrongdoer, or ratify and adopt the wrongdoer's acts done for their benefit, are equally liable.

PROSSER & KEETON, 323 (footnotes and citations omitted).  The authors dismiss as "clearly wrong" liability based upon the defendant's mere knowledge of what another person is doing.  (*Id.*).  Even though the last edition of the treatise was published in 1984, it presents no separate discussion of the concept of aiding and abetting a tort, beyond the brief mention above in the context of pursuit of a common plan or design.

A much more recent treatise, Harper, James & Gray on Torts presents a similar discussion of secondary liability. 3 FOWLER V. HARPER, FLEMING JAMES, JR. & OSCAR S. GRAY ON TORTS § 10.1 (3d ed. 2007). In a chapter titled "Contributing Tortfeasors and Contribution Among Them," the authors explain that the traditional common law rule for joint liability "requires the existence of a concert of action or the breach of a joint duty." *Id.* at 1. The authors identify four categories in which parties will be held responsible for producing an indivisible harm: (1) the actors knowingly join in the performance of the tortious act or acts; (2) the actors fail to perform a common duty owed to the plaintiff; (3) there is a special relationship between the parties (for example, master and servant or joint entrepreneurs); and (4) although there is no concerted action, nevertheless the independent acts of several actors concur to produce indivisible, harmful consequences. *Id.* at 13. Like Prosser, the text of Harper, James & Gray contains no discussion of aiding and abetting a tort as an independent theory of liability. Rather, the concept is mentioned only in a footnote referring to section 876 of the Second Restatement of Torts and cases decided under it. The footnote is appended to the following sentences:

> As noted previously, the clearest example of a joint tort is the action of tortfeasors in pursuance of a common plan or design. The wrongdoers are said to have acted in concert, and by universal authority they are jointly and severally liable. Each defendant is entirely liable, whether his acts caused the damage or not.

HARPER, JAMES & GRAY § 10.1 at 14.

Michigan law has adhered to this traditional view of secondary tort liability, which predicates liability on the pursuit of a common design or purpose. The most developed body of Michigan law in this area is the law of civil conspiracy, defined as a combination of two or more persons by concerted action to accomplish an unlawful purpose. *Fenestra, Inc. v. Gulf Am. Land*

*Corp.*, 141 N.W.2d 36, 48-49 (Mich. 1966). "The root principle upon which the law of conspiracy rests is a preconceived plan to unlawfully work some public or private wrong or injury by concerted action, originating in combination, either carried out by joint action, or, at least, pursuant to a joint arrangement and understanding." *Popielarski v. Jacobson*, 59 N.W.2d 45, 53 (Mich. 1953) (quoting *Sobin v. Frederick*, 211 N.W. 71, 74 (Mich. 1926). "A common design or purpose is the essence of the charge of conspiracy. . . ." *Brown v. Evans*, 112 N.W. 1079 (Mich. 1907). The conspiracy standing alone, however, is not actionable. The gravamen of the action is not the combination but the wrongful acts causing damage. *Coronet Dev. Co. v. F.S.W., Inc.*, 150 N.W.2d 809, 812 (Mich. 1967); *Roche v. Blair*, 9 N.W.2d 861, 863 (Mich. 1943).

Michigan law clearly recognizes a cause of action for conspiracy to defraud. *See, e.g., Fenestra, Inc.*, 141 N.W.2d at 48-49; *Popielarski*, 59 N.W.2d at 53; *Bush v. Sprague*, 16 N.W. 222, 225 (Mich. 1883). The law requires establishment of both a common plan or design and that the defendant charged with responsibility acted with intent to commit the tort. *Rosenberg v. Rosenberg Bros. Special Acct.*, 351 N.W.2d 563, 569 (Mich. Ct. App. 1984). Allegations of a conspiracy to defraud must be supported by clear and satisfactory proof. *Vermeylen v. Knight Inv. Corp.*, 252 N.W.2d 574, 577 (Mich. Ct. App. 1977) (citing *Harvey v. Lewis*, 98 N.W.2d 599 (Mich. 1959)).

A less developed, but nevertheless firmly established Michigan legal doctrine is "concert of action." A plaintiff may proceed on a theory of concert of action if it can prove "that all defendants acted tortiously pursuant to a common design." *Abel v. Eli Lilly & Co.*, 343 N.W.2d 164, 176 (Mich. 1984). The doctrine, which was developed to deter hazardous group behavior, *id.* at 176 n.19, provides that persons acting in concert or with a common design or purpose are responsible for each other's acts. *See McCoy v. DeLiefde*, 135 N.W.2d 916, 920-21 (Mich. 1965). A plaintiff

is entitled to recover on a concert of action theory if it proves that the defendant acted tortiously pursuant to a common design and that such action proximately caused the injury. *Cousineau v. Ford Motor Co.*, 363 N.W.2d 721, 729 (Mich. Ct. App. 1985).

In an early case, the Michigan Supreme Court relied on this theory to affirm a judgment against defendant who did not directly participate in a fraud. *Kefuss v. Whitley*, 189 N.W. 76 (Mich. 1922), was a suit for rescission by a rural banker who was induced to buy a large subdivision in another county on the basis of oral misrepresentations made by a co-owner. Defendant Davey contended that he could not be held responsible for fraud committed by the co-owner in which he did not participate. The Supreme Court rejected this argument:

> Where there is evidence that parties are acting in collusion, 'Everything said, done, or written by any one of the parties to the combination, in furtherance of the common purpose, is deemed the act of all.' In my opinion, the fair inference to be drawn from the proofs is that Mr. Davey knew all about the deal with plaintiff, and having accepted the fruit of the fraud, he may not complain of a decree which so far as possible places the parties in statu quo.

189 N.W. at 83 (citations omitted). The Michigan courts consider *Kefuss* to represent an application of the concert of action theory, which is related to, but is distinct from, civil conspiracy. *See Korn Family, Ltd. P'ship v. Harbor Bldg. Co.*, No. 272813, 2008 WL 239651 at * 3 (Mich. Ct. App. Jan. 29, 2008). Whereas civil conspiracy requires proof of an agreement, express or implied, a fraud theory based on concert of action requires proof that parties "knowingly acted to further a common purpose." *Id.*

In summary, Michigan law regarding secondary liability for the acts of others is based firmly upon the existence of the defendant's commitment to a common design or purpose with the

primary tortfeasor.[3] Liability under a civil conspiracy theory is based upon the defendant's adoption of the common purpose or design by agreement, either express or implied. In a concert of action theory, liability is premised upon not agreement, but action in furtherance of a common purpose. Under both theories, Michigan law holds defendants liable for all foreseeable acts of the other tortfeasor. "Conspiracy, by reason of the connection involved among the conspirators, may cause individuals to be responsible, who, but for the conspiracy, would not be responsible at all." *Roche*, 9 N.W.2d at 863 (quoting *Bush*, 16 N.W. at 225). Likewise, if two persons act in concert with a common design or purpose and one of them commits a wrongful act injuring a third party, the person acting in concert with the wrongdoer is liable for the injury under a concert of action theory. *Gaufin v. Valind*, 256 N.W. 335, 336 (Mich. 1934). In either case, the defendant's embrace of the actor's purpose or design -- whether by agreement or by action -- renders the defendant liable for the underlying tort.

Although the Michigan Supreme Court has never cited section 876 of the Second Restatement, in any context, the foregoing principles of Michigan law fall squarely within section 876(a) of the Second Restatement, which provides that a person is subject to liability for harm resulting from the tortious conduct of another if the person "does a tortious act in concert with the other or pursuant to a common design with him." The Restatement's comment on clause (a) is so consistent with Michigan law that it could have had its genesis there:

> Parties are acting in concert when they act in accordance with an agreement to cooperate in a particular line of conduct or to accomplish a particular result. The agreement need not be expressed in words or may be implied and understood to exist from the conduct itself. Whenever two or more persons commit tortious acts in

---

[3] Excluded from this concept are other theories of secondary liability, such as vicarious liability for the acts of employees or agents under a *respondeat superior* theory.

concert, each become subject to liability for the acts of the others, as well as for his own acts.

RESTATEMENT (SECOND) OF TORTS § 876, comm. (a). The Michigan Supreme Court has never, however, adopted a theory of aiding and abetting tortious conduct as reflected in section 876(b), which imposes liability not on the basis of agreement or action pursuant to a common purpose or design, but on the basis of the knowledge that another's conduct constitutes a breach of duty and substantial assistance or encouragement that the other so conduct himself.[4] The question for this court under *Erie* is whether the Michigan Supreme Court would endorse such an expansion of its settled law and, if so, the circumstances in which it would do so.

## C.    Development of the Aiding-and-Abetting Theory in Tort Law

The original Restatement of Torts embodied the concept of a person's liability for the tortious act of another on an aiding-and-abetting theory, borrowed from the criminal law. RESTATEMENT OF TORTS § 876(b) (1939). For the next forty years, the principal courts applying and

---

[4] Plaintiffs cite *Echelon Homes, LLC v. Carter Lumber Co.*, 683 N.W.2d 171 (Mich. Ct. App. 2004), *rev'd on other grounds*, 694 N.W.2d 544 (Mich. 2005), a breach of fiduciary duty case, in support of the argument that aiding and abetting tortious activity is clearly established in Michigan law. Careful examination of the line of cases upon which the Court of Appeals in *Echelon* relied does not support this conclusion. The *Echelon* court stated that Michigan law provides a cause of action for "aiding and abetting the breach of fiduciary duty." 683 N.W.2d at 445. The court cited *Hayes-Albion Corp. v. Kuberski*, 364 N.W.2d 609 (Mich. 1984), in support of this assertion. *Hayes-Albion* did not purport to apply aiding-and-abetting analysis. Rather, it recognized liability for "knowingly joining a fiduciary in an enterprise where the personal interest of the fiduciary is antagonistic to his trust." 364 N.W.2d at 617 (citing *L.A. Young Spring & Wire Co. v. Fall*, 11 N.W.2d 329 (Mich. 1943)). *L.A. Young* was expressly a conspiracy case. 11 N.W.2d at 343. Each of these cases involved defendants who knowingly entered a business or employment relationship with someone who had purloined information in breach of a fiduciary duty. In the words of the *Hayes-Albion* court, the defendants joined an "enterprise." This line of cases was decided under Michigan law regarding civil conspiracies and concerted action and does not represent adoption of an aiding-and-abetting theory, despite the loose use of language by the Michigan Court of Appeals.

-36-

developing the aiding-and-abetting theory were not state courts expounding tort law, but federal courts fashioning a common law of secondary liability for securities violations under section 10(b) of the Securities Exchange Act of 1934. *See, e.g., Edwards & Hanly v. Wells Fargo Sec. Clearance Corp.*, 602 F.2d 478, 483 n.5 (2d Cir. 1979); *Monsen v. Consol. Dressed Beef Co.*, 579 F.2d 793, 800 (3d Cir. 1978); *SEC v. Coffey*, 493 F.2d 1304, 1316 (6th Cir. 1974) (citing § 876 of First Restatement). By 1979, when the Second Restatement was issued with section 876(b) unchanged, federal securities cases were virtually the only authority that had applied the aiding-and-abetting concept in a commercial setting. "Precedent [for aiding and abetting a tort], except in the securities area, is largely confined to isolated acts of adolescents in rural society." *Halbertstam v. Welch*, 705 F.2d 472, 489 (D.C. Cir. 1983).

The development of this line of aiding-and-abetting authority came to an abrupt halt in 1994, with *Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164 (1994), in which the Supreme Court decided on statutory grounds that no cause of action for aiding-and-abetting violations of the Securities Exchange Act exists. In addition to rejecting the aiding-and-abetting theory on statutory grounds, the court was called upon to address an alternative argument for secondary liability made under general tort law and under section 876(b) of the Restatement in particular. The Court did not find the argument persuasive:

> The Restatement of Torts, under a concert of action principle, accepts a doctrine with rough similarity to criminal aiding and abetting. An actor is liable for harm resulting to a third person from the tortious conduct of another "if he . . . knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other . . . ." Restatement (Second) of Torts § 876(b) (1977); see also W. Keeton, D. Dobbs, R. Keeton, & D. Owen, Prosser and Keeton on Law of Torts 322-324 (5th ed. 1984). The doctrine has been at best uncertain in application, however. As the Court of Appeals for the District of Columbia Circuit noted in a comprehensive opinion on the subject, the leading cases applying this

> doctrine are statutory securities cases, with the common-law precedents "largely confined to isolated acts of adolescents in rural society." *Halberstam v. Welch*, 705 F.2d 472, 489 (1983). Indeed, in some States, it is still unclear whether there is aiding and abetting tort liability of the kind set forth in § 876(b) of the Restatement.

*Central Bank of Denver*, 511 U.S. at 181. As a result of the Supreme Court's decision in the *Central Bank of Denver* case, this branch of aiding-and-abetting law has been moribund since 1994.

Aside from the now repudiated body of federal law decided under the Securities Exchange Act, the courts in New York, and especially the Second Circuit and district courts in the City of New York, have had the most occasion to examine claims against banks and other financial organizations alleging the aiding and abetting of fraud or other wrongful conduct perpetrated by the organization's client. *See, e.g., Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 292 (2d Cir. 2006); *In re Sharp Int'l Corp.*, 403 F.3d 43, 49 (2d Cir. 2005); *Wight v. BankAmerica Corp.*, 219 F.3d 79, 91 (2d Cir. 2000); *Fraternity Fund, Ltd. v. Beacon Hill Asset Mgmt, LLC*, 479 F. Supp. 2d 349, 360 (S.D.N.Y. 2007); *Rosner v. Bank of China*, 528 F. Supp. 2d 419, 425-27 (S.D.N.Y. 2007); *Weiss v. Nat'l Westminster Bank, PLC*, 453 F. Supp. 2d 609, 621-22 (E.D.N.Y. 2006); *Stutts v. DeDietrich Group*, No. 03-cv-4058, 2006 WL 1867060, at * 12-14 (E.D.N.Y. June 30, 2006); *Cromer Finance, Ltd. v. Berger*, 137 F. Supp. 2d 452, 470-72 (S.D.N.Y. 2001); *Ryan v. Hunton & Williams*, No. 99-cv-5938, 2000 WL 1375265, at * 8-10 (E.D.N.Y. Sept. 20, 2000); *Renner v. Chase Manhattan Bank*, No. 98civ.926, 1999 WL 47239, at * 11-13 (S.D.N.Y. Feb. 3, 1999); *Williams v. Bank Leumi Trust Co.*, No. 96CIV6695, 1997 WL 289865, at * 4-5 (S.D.N.Y. May 30, 1997). Other sources of authority in analogous factual situations are comparatively sparse. Some state supreme courts have been called upon to apply the doctrine in roughly analogous cases. *See, e.g., Reynolds v. Schrock*, 142 P.3d 1062, 1070 (Or. 2006) (aiding and abetting by attorney); *Wells Fargo Bank v. Arizona*

*Laborers Teamsters, and Cement Masons Local 395 Pension Trust Fund*, 38 P.3d 12, 23 (Ariz. 2002) (aiding and abetting fraud of bank customer); *Witzman v. Lehrman, Lehrman & Flom*, 601 N.W.2d 179, 186 (Minn. 1999) (claim against accountant for aiding and abetting breach of trust). Moreover, several federal courts, including the Sixth Circuit, have had occasion to apply the principles of section 876(b) under *Erie* to fraud cases arising under state law. *See, e.g., Aetna Cas. & Sur. Co. v. Leahey Const. Co.*, 219 F.3d 519, 536 (6th Cir. 2000). Least helpful are those cases applying the theory in factual circumstances completely foreign to the commercial context. *See, e.g., Heick v. Bacon*, 561 N.W.2d 45, 52 (Iowa 1997) (liability for personal injuries under § 876(b) theory for encouraging intoxicated driver to continue drug or alcohol abuse); *Janssen v. Trennepohl*, 421 N.W.2d 4, 7-8 (Neb. 1988) (automobile race); *Halberstam v. Welch*, 705 F.2d 472 (D.C. Cir. 1983) (civil liability for aiding and abetting burglary and murder).

Contrary to plaintiffs' suggestion, the corpus of aiding-and-abetting authority cannot be neatly bifurcated into those jurisdictions that faithfully follow the Restatement approach and those apostate jurisdictions that either do not understand aiding-and-abetting law or choose for some reason to pervert it. Rather, most courts have recognized that the Restatement represents an analytical framework for approaching aiding-and-abetting liability (knowledge plus substantial assistance) and have attempted to harmonize this theory with existing principles of state law or the particular factual context presented by the case. The Sixth Circuit has recently remarked that this is the core function of common-law courts: "In judicial law, as opposed to legislative law, decisions should grow out of the specific facts of the case, not the application of abstract concepts to a myriad of potentially hypothetical transactions." *Keweenaw Bay Indian Community v. Rising*, 569 F.3d 589, 593 (6th Cir. 2009).

In their effort to explain away inconvenient holdings of closely analogous cases in the banking area, plaintiffs are especially critical of cases from courts in California and New York, which they accuse of misunderstanding aiding-and-abetting law and of confusing the concepts of aiding and abetting with conspiracy. On this basis, they argue that New York and California law should be ignored as idiosyncratic and contrary to the Restatement. These cases are not so easily dismissed. California has recognized liability for aiding and abetting another's tortious conduct for over a century. *See Lomita Land Water Co. v. Robinson*, 97 P. 10 (Cal. 1908). Liability for another's fraud arises from "intentional participation with knowledge of the object to be attained." *Id.* at 15. The California Supreme Court expressly adopted section 876 of the Restatement in *Sindell v. Abbott Labs*, 607 P.2d 924 (Cal. 1980), shortly after the Second Restatement was published. Since that time, the California courts have applied straightforward aiding-and-abetting analysis. *See, e.g., Fiol v. Doellstedt*, 58 Cal. Rptr. 2d 308, 312 (Cal. Ct. App. 1996); *Wynh v. Nat'l Broadcasting Co.*, 234 F. Supp. 2d 1067, 1114 (C.D. Cal. 2002) (applying California law and citing Restatement for elements of aiding and abetting). Certainly, California recognizes the close relationship between aiding and abetting and conspiracy, as both theories are based on "concerted wrongful action." *Janken v. GM Hughes Elec.*, 53 Cal. Rptr. 2d 741, 755 (Cal. Ct. App. 1996); *accord Melton v. First Western Corp.*, No. G039877, 2009 WL 499218, at * 3 (Cal. Ct. App. Feb. 27, 2009). The Restatement likewise recognizes this close relationship, by including both theories in a single section devoted to "concerted action." *Compare* § 876(a) (pursuit of common design) *with* § 876(b) (substantial assistance). This hardly justifies the conclusion that the Michigan Supreme Court would reject California cases on this subject. The United States District Court for the Central District of California, a court presumably intimately familiar with California law, has painstakingly

demonstrated that California law on civil aiding and abetting follows the Restatement. *Neilson v. Union Bank of Cal., N.A.*, 290 F. Supp. 2d 1101, 1133 (C.D. Cal. 2003) ("Rather, California cases have consistently cited the elements of the tort as they are set forth in the Restatement (Second) of Torts, § 876. . . .").

Likewise, a state supreme court asked to adopt an aiding-and-abetting theory is not likely to dismiss precedents from New York. The New York state courts recognize secondary liability on an aiding-and-abetting theory, and both the state and federal courts cite section 876(b) of the Restatement for the elements. *See, e.g., Pittman by Pittman v. Grayson*, 149 F.3d 111, 123 (2d Cir. 1998) (applying New York law); *Kolbeck v. LIT Am., Inc.*, 939 F. Supp. 240, 247 (S.D.N.Y. 1996); *Lindsay v. Lockwood*, 625 N.Y.S. 2d 393, 396-97 (N.Y. Sup. Ct. 1994). Contrary to plaintiffs' assertion, the New York courts know the difference between conspiracy and aiding and abetting and do not conflate the two. *Lindsay*, 625 N.Y.S. 2d at 396-98. Moreover, the federal trial and appellate courts in New York have had the most frequent opportunity to apply aiding-and-abetting concepts to factual situations involving banks. In this aspect, the federal court cases applying New York tort law represent the most extensive and coherent body of authority regarding aiding and abetting in the banking context.

In short, the contention that California and New York are "non-Restatement jurisdictions" does not withstand scrutiny. Certainly, cases can be found in any jurisdiction that are poorly reasoned, fail to apply precedent faithfully, or are otherwise unpersuasive. But the corpus of aiding-and-abetting law from New York and California is not fundamentally flawed, such that their cases should be rejected out of hand. Furthermore, the states of New York and California have primary jurisdiction over most of the banks in this country. It should therefore be no surprise that

those courts have had the most experience in analyzing aiding-and-abetting claims against banks in a variety of factual circumstances and have devoted the most thought to the competing interests implicated by such claims. It is not likely that a state supreme court would reject this body of authority wholesale.

An *Erie*-guided court seeking to predict Michigan law on the subject should presume that the Michigan Supreme Court would adopt an approach most compatible with existing state law and give most credence to persuasive cases from other jurisdictions applying the new principle in factually analogous cases. Moreover, a court proceeding under *Erie* should be mindful of the principal policy that the *Erie* doctrine serves: avoiding substantial variations between state and federal litigation which would likely engender forum shopping. *Semtek Int'l*, 531 U.S. at 504. The federal courts should therefore avoid getting too far ahead of the state courts in adopting innovations in state law. The situation in Ohio provides a cautionary tale. In one of the principal cases upon which plaintiffs rely, *Aetna Cas. & Sur. Co. v. Leahey Const. Co.*, 219 F.3d 519, 533 (6th Cir. 2000), the Sixth Circuit concluded that the Supreme Court of Ohio would recognize aiding-and-abetting liability, on the basis of dictum in one state Supreme Court case. The state courts failed to follow suit, and six years later, the Sixth Circuit expressed doubt that Ohio would recognize such a cause of action after all. In *Pavlovich v. National City Bank*, 435 F.3d 560 (6th Cir. 2006), the court rejected a claim of aiding and abetting against a bank both because "Ohio law is unsettled whether this cause of action exists" and because the plaintiff could not establish a *prima facie* case. 435 F.3d at 570. On the first issue, the court stated that, six years after *Aetna Casualty*, it was still "unclear" whether Ohio would recognize a common law cause of action for aiding and abetting tortious conduct. *Id.* (citing *Federated Mgmt. Co. v. Coopers & Lybrand*, 738 N.E.2d 842, 853 (Ohio App.

Ct. 2000) ("Ohio does not recognize a claim for aiding and abetting common-law fraud.")).

Nevertheless, the lower federal courts in Ohio consider themselves bound to follow *Aetna Casualty*, *see, e.g., Metz v. Unizan Bank*, No. 5:05cv1510, 2008 WL 2017574 at * 17 (N.D. Ohio May 7, 2008), creating the anomalous situation in which the litigants are served up one version of Ohio law in the state courts and another in the federal courts. This is precisely the situation that the *Erie* principle sought to avoid and counsels against an expansive injection into state law of principles that the state courts have not yet applied.

### D. Likely Ruling of Michigan Supreme Court

#### 1. Knowledge

As enunciated by the Restatement of Torts, a defendant's liability for the harm caused by the tortious act of another person requires that the defendant "knows that the other's conduct constitutes a breach of duty. . . ." RESTATEMENT (SECOND) OF TORTS, § 876(b). This language clearly contemplates actual knowledge, both of the conduct of the primary tortfeasor and of the fact that it "constitutes a breach of duty" to someone. Courts applying this concept have required that a plaintiff prove actual knowledge of the principal wrong. *See, e.g., Casey v. U.S. Bank Nat'l Ass'n*, 26 Cal. Rptr. 3d 401, 407 (Cal. Ct. App. 2005) ("Of course, a defendant can only aid and abet another's tort if the defendant knows what 'that tort' is."); *Aetna Cas. & Surety Co. v. Leahey Const. Co.*, 219 F.3d 519, 533 (6th Cir. 2000); *Kolbeck v. LIT Amer., Inc.*, 939 F. Supp. 240, 247 (S.D.N.Y. 1996) ("The Restatement Second of Torts also has been interpreted to include a requirement of actual knowledge."). Neither constructive knowledge nor negligence suffices. *Aetna Cas.* 219 F.3d

at 536.  Actual knowledge may be shown by circumstantial evidence, including the atypical nature of the defendant's business transaction with the tortfeasor.  219 F.3d at 536.

To prevent banks, attorneys and others from incurring near-strict liability for the torts of their clients, a "high degree of *scienter* is necessary to extend fraud liability on an aiding-and-abetting theory." *Nat'l Westminster Bank, U.S.A. v. Weksel*, 511 N.Y.S. 2d 626, 630 (App. Div. 1987).  For example, in *Bariteau v. PNC Financial Services, Inc.*, 285 F. App'x 218 (6th Cir. 2008), the Sixth Circuit Court of Appeals analyzed an investor's claim against the PNC Bank for aiding and fraud by the client's president, Kane, who looted PNC accounts while misrepresenting the company's condition to plaintiff.  Applying section 876(b), the court upheld dismissal for lack of allegations that "PNC had actual knowledge that Kane was making misrepresentations to him, let alone any examples of those misrepresentations." 285 F. App'x. at 225.  The court upheld dismissal despite plaintiff's allegations that the Bank had violated its duty of requiring two signatures for account withdrawals.  *Id.* at 225; *accord, Neilson v. Union Bank of Cal., N.A.*, 290 F. Supp. 2d 1101, 1120 (C.D. Cal. 2003) (plaintiff must allege actual knowledge of a "specific primary violation").

The Michigan Supreme Court is likely to adopt the requirement of actual knowledge of the specific underlying tort as the *scienter* requirement for civil aiding and abetting, on four separate grounds.  First, when asked to construe the same word in a closely analogous context, the court adopted an actual knowledge standard.  In *Echelon Homes, LLC v. Carter Lumber Co.*, 694 N.W.2d 544 (Mich. 2005), the court was called upon to construe the Michigan conversion statute, which imposes liability upon a person "buying, receiving, or aiding" in a conversion, if the person "knew" that the property was converted.  MICH. COMP. LAWS § 600.2919a.  The Michigan Court of Appeals held that constructive knowledge -- evidence that the defendant "should have known" --

suffices.  The state Supreme Court held that the term "'know' does not encompass constructive knowledge, that 'one should have known.'"  694 N.W.2d at 547.  It therefore reversed the Court of Appeals and adopted an actual knowledge standard.  The holding in *Echelon* strongly indicates that the Michigan Supreme Court would construe the very same word in the Restatement as requiring actual knowledge, in accordance with the majority rule.

Second, an actual knowledge standard comports most closely with existing Michigan law regarding secondary tort liability in general and with Michigan law regarding the duties of banks in particular.  As explained in section I.B. above, Michigan law requires proof that a defendant and the primary tortfeasor have pursued a common plan or design -- either by agreement or by conduct -- in order to hold the defendant liable in tort for the other's wrong.  Acts of assistance are a sufficient basis of such tort liability, but only if the defendant has somehow committed itself to the tortious plan or scheme:

> All those who, in pursuance of a common plan to commit a tortious act actively take part in it and further it by cooperation or request, or who lend aid or encouragement to the wrongdoer, or who ratify and adopt the acts done for their benefit, are equally liable with him.

*Rosenberg*, 351 N.W.2d at 569.  The aiding-and-abetting theory does not require that the defendant commit itself to a common plan or scheme and substitutes the element of knowledge of the other's wrongdoing.  An actual knowledge standard is a rough substitute for the existing "common plan or scheme" element, as it requires actual knowledge of specific wrongdoing.  A lesser standard, holding a defendant responsible for what it should have known or should have discovered were it exercising a greater level of diligence, approaches a negligence standard.  It is not likely that the Michigan Supreme Court would sanction such a great departure from its settled law on secondary tort liability.

The court has expressed a disinclination to depart from its traditional concepts of secondary liability in tort law, in the absence of a need for new principles to accomplish "equitable loss distribution." *Abel*, 343 N.W.2d at 176. Adoption of a theory of aiding and abetting based on something less than actual knowledge would in essence abolish existing state law on secondary tort liability. Why would a plaintiff undertake to prove a conspiracy to defraud, which requires proof of pursuit of a common scheme by clear and convincing evidence, when plaintiff can invoke an aiding-and-abetting theory, requiring only proof by a preponderance of evidence that the defendant knew that "something" a customer was doing was somehow wrongful? Adoption of a low standard of *scienter* would abolish 100 years of state tort law overnight.

Third, a *scienter* standard of actual knowledge of a specific primary violation comports with existing Michigan law on the duties of banks to discover customer wrongdoing. Michigan law, in accord with the universal rule in this country, holds that a bank's relationship is with its customer and that the bank owes third parties no duty of care to monitor a customer's activities. *See Columbia Land Co. v. Empson*, 9 N.W.2d 452, 455 (Mich. 1943); *Portage Alum. Co. v. Kentwood Nat'l Bank*, 307 N.W.2d 761, 764-65 (Mich. Ct. App. 1981); *see generally Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 286 (2d Cir. 2006) (as a general matter, banks do not owe non-customers a duty to protect them from the intentional torts of their customers); *Eisenberg v. Wachovia Bank, N.A.*, 301 F.3d 220, 225 (4th Cir. 2002) (collecting cases). Adoption of the lax *scienter* standard proffered by plaintiffs would, contrary to this line of authority, impose upon banks a *de facto* duty to scrutinize customers' activities for "red flags," "smoke," and other irregularities suggesting customer misbehavior, for fear of unlimited liability as an aider and abettor of whatever it was that the customer was up to. This is not the law.

Finally, an actual knowledge standard is supported by the most extensive and coherent body of aiding-and-abetting authority as it specifically applies to banks -- the cases decided by the Second Circuit and the New York Federal District Courts. The Second Circuit has recently reaffirmed that the appropriate showing of *scienter* for aiding-and-abetting liability is actual knowledge, and that proof that a bank "suspected fraudulent activity" does not suffice. *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 292-93 (2d Cir. 2006). The *Lerner* court held that a bank's knowledge that its customer, an attorney, was engaged in improper and sanctionable conduct was not equivalent to "actual knowledge of his outright looting of client funds." *Id.* at 293.[5] A plaintiff must show that bank officials "'actually knew that the fraud was, in fact, occurring.'" *Id.* at 293 (quoting *Renner v. Chase Manhattan Bank*, No. 98civ926, 2000 WL 781081 at * 2 (S.D.N.Y. June 16, 2000)). "The burden of demonstrating actual knowledge, although not insurmountable, is nevertheless a heavy one." *Fraternity Fund*, 479 F. Supp. 2d at 367 (quoting *Terrydale Liq. Trust v. Barness*, 611 F. Supp. 1006, 1027 (S.D.N.Y. 1984)); *accord Stutts v. DeDietrich Group*, No. 03-cv-4058, 2006 WL 1867060, at * 13 (E.D.N.Y. June 30, 2006) (actual knowledge required; constructive knowledge and conclusory allegation that defendant banks were "aware of the scheme" insufficient); *Ryan v. Hunton & Williams*, No. 99-cv-5938, 2000 WL 1375265 at * 9 (E.D.N.Y. Sept. 20, 2000) (actual knowledge standard not satisfied by bank's awareness of "red flags" raising suspicion of Ponzi scheme); *National Westminster Bank*, 511 N.Y.S. 2d at 630 (aiding-and-abetting liability requires a "high degree of scienter," including proof of both actual knowledge and acts "done with the intention of advancing the fraud's commission."). Given the familiarity of the New

---

[5] The court went on to hold that although the "red flags" were insufficient to show actual knowledge by the bank of the attorney's fraud, the banks were on actual notice of breaches of fiduciary duty regarding commingling in accounts held by the banks themselves. 459 F.3d at 294.

York federal courts with the Nation's banking system and the number of cases decided by those courts in the banking area, the Michigan Supreme Court is likely to find those cases persuasive.

Contrary to plaintiffs' suggestion, insistence on actual knowledge of *specific* wrongdoing does not stem from some courts' confusion about the elements of aiding-and-abetting liability, but from a desire to avoid unjust results. In the commercial context, the close relationship between banks, lawyers, brokerage houses, accountants and their clients makes these entities inviting targets for lawsuits stemming from client wrongdoing. These institutions will always have more information about the client's conduct than the general public, making them vulnerable to the hindsight accusation that they knew of the client's wrongdoing or were wilfully blind. Courts are unwilling to make such institutions the guarantors of their customers' conduct. With regard to banks, courts have consciously adopted the requirement of actual knowledge of specific wrongdoing to harmonize the general rule (a bank has no duty of disclosure to third parties) with the need to deter deliberate assistance of wrongdoing by customers. Such cases involve "the intersection of two distinct legal principles -- one that strictly limits a bank's duties to nondepositors and another that extends tort liability to anyone who knowingly aids and abets the tort of another." *Casey v. U.S. Bank Nat'l Ass'n*, 26 Cal. Rptr. 3d 401, 411 (Cal. Ct. App. 2005). These competing interests are reconciled by the requirement that "the bank had actual knowledge of the underlying wrong it purportedly aided and abetted." *Id.* "If narrowly circumscribed in this fashion, such an aiding and abetting claim against a bank is a reasonable exception to the case law limiting bank duties to nondepositors." *Id.* The Sixth Circuit in *Aetna Casualty* recognized that a bank's actual knowledge of a fraudulent scheme is the "crucial element" that prevents it from suffering "automatic liability" for the conduct of its customers. 219 F.3d at 535. Any contrary rule would have a "devastating

impact" on commercial relationships. *Id.* at 534 (quoting *Woods v. Barnett Bank of Ft. Lauderdale*, 765 F.2d 1004, 1009 (11th Cir. 1985)).

Plaintiffs nevertheless argue for a much more lenient standard. While acknowledging that the law requires actual, and not constructive, knowledge, they resist any attempt to impose upon them the burden of showing that Huntington Bank knew of Cyberco's "specific tort against plaintiffs." (Brief, docket # 516, at 47). Instead, they say it is sufficient to show that Huntington had a "general awareness" of Cyberco's wrongful activity. All that is necessary, plaintiffs argue, is that the Bank knew that Cyberco was involved in some sort of improper activity. (*Id.*, 48). According to plaintiffs, the Bank is liable to plaintiffs as an aider and abettor, even if the bank had no idea that Cyberco was breaching a duty to plaintiffs. Thus, while professing adherence to the "actual knowledge" standard, plaintiffs argue that the standard is met by evidence that the bank defendant was "generally aware" that its customer was engaged in some sort of wrongdoing, even without specific knowledge of the type of wrongdoing or the victim.

As a primary matter, it is ironic that plaintiffs would invoke the "general awareness" test, which has its genesis not in the Restatement, or in general tort law, but in federal cases applying the aiding-and-abetting theory to securities law violations. *See, e.g., SEC v. Coffey*, 493 F.2d 1304, 1316 (6th Cir. 1974). In a previous round of briefing, plaintiffs objected strenuously to defendant's reliance on securities law cases on the ground that they involve irrelevant issues of statutory interpretation (*see* Brief, docket # 138, at 16-16 and n.22), and have suggested that the court ignore securities law cases (*Id.*).[6] Yet, in this instance, they rely on a securities-law concept that appears

_____

[6] Plaintiffs had it right the first time. The federal cases decided under section 10(b) of the Securities Exchange Act do involve issues of federal policy, statutory interpretation, and legislative history, all of which make them problematic as precedent for state tort law, which is based on much

to lower their burden drastically.  At the same time, they profess fidelity to the Restatement

approach, which does not embody a lenient standard of *scienter*.

Irony aside, the principle that plaintiffs rely on does not lower their burden to the

extent they claim.  As the Sixth Circuit has explained, there is not much practical difference in the

alternative statements of the *scienter* test.  In the *Aetna Casualty* case, plaintiff made the same

arguments that El Camino and ePlus advance here.  Relying on securities cases, the Aetna plaintiff

argued that actual knowledge was not required for aiding-and-abetting liability, and that "general

awareness" of the defendant's role in the wrongful activity was enough.  219 F.3d at 533.  The Court

of Appeals rejected the suggested distinction between the two formulae:

> We see no conflict between the position that an aider and abettor must have
> actual knowledge of the primary party's wrongdoing and the statement that it is
> enough for the aider and abettor to have a general awareness of its role in the other's
> tortious conduct for liability to attach.  If one is aware that he has a role in an
> improper activity, then surely he knows that the primary party's conduct is tortious.

219 F.3d at 534 (quotations and citations omitted).

This passage from *Aetna* points up the fundamental flaw in plaintiffs' argument.

Plaintiffs have misconstrued the test, by omitting a necessary element.  It is not enough to show that

the Bank was generally aware of some improper activity by Cyberco.  *See First Alliance Mortg. Co.*

*v. Lehman Comm. Paper, Inc. (In re First Alliance)*, 471 F.3d 977, 993 n.4 (9th Cir. 2006) (the actual

knowledge test is not met by vague suspicions of wrongdoing).  Rather, under the alternative test,

the Bank must have been aware *not only* of improper activity, *but also* of the Bank's own role in

furthering tortious conduct.  As the Sixth Circuit explained, if one is aware that he has a role in an

improper activity, he surely knows that the conduct is tortious.  219 F.3d at 534.  "General

different policy considerations.

awareness" of another's wrongdoing, standing alone, does not satisfy the actual knowledge standard. *Fletcher v. Atex, Inc.*, 68 F.3d 1451, 1465-66 (2d Cir. 1995) (applying § 876(b) of Restatement). For this reason, courts applying the "general awareness" formula generally require some showing of intent by the alleged aider and abettor to advance the tortious activity. For example, a case relied upon in *Aetna Casualty, Temporomandibular Joint (TJM) Implants Recipients v. Dow Chemical Co. (In re TMJ Implant Recipients)*, 113 F.3d 1484 (8th Cir. 1997), the court articulated the alternative *scienter* formula, focusing on the general awareness of the aider and abettor's role in furthering another's tort. The court found against plaintiffs, citing with approval a New York case requiring the plaintiff to establish that defendant acted with intention of advancing the tortious activity. 113 F.3d at 1495-96 (citing *Nat'l Westminster Bank USA v. Weksel*, 511 N.Y.S. 2d 626, 630 (App. Div. 1987)).

This stands to reason. The alternative test does not require knowledge of all of the details of the primary fraud. *Aetna Cas.*, 219 F.3d at 536. In this situation, however, "the proof must demonstrate actual awareness of the party's role in the fraudulent scheme." *Id.* at 537 (quoting *Woodward v. Metro Bank of Dallas*, 522 F.2d 84, 96 (5th Cir. 1975)). Plaintiffs have not cited any case standing for the simplistic "knowledge" standard that they advocate, under which aiding-and-abetting liability may be based merely on general knowledge that another might be doing something wrongful, without a concomitant showing that the defendant understood the fraud well enough at least to appreciate its own role in the wrongful conduct. If a plaintiff is relying only on a general awareness of wrongdoing, then the law requires this additional showing.

In summary, on the "knowledge" prong of the Restatement test, the Michigan Supreme Court is very likely to follow the majority rule, which requires a showing of actual

knowledge of specific tortious conduct as a prerequisite to aider-and-abettor liability.  This test requires a "high degree of *scienter*," and is not satisfied by constructive knowledge.  For the reasons discussed above (consistency with existing state tort law, consistency with state law concerning the duty of banks, and the persuasive effect of New York cases involving bank liability for customer fraud), the state Supreme Court is less likely to adopt the alternative test, which focuses on a general knowledge of the aider-and-abettor's role in the fraudulent conduct.  This test arises not from the common law, but from federal securities cases whose holdings were repudiated fifteen years ago by the United States Supreme Court.  Nevertheless, indulging the presumption that the Michigan Supreme Court might adopt the alternative test, that test requires a plaintiff to show the defendant's general awareness of *its role* in another's wrongdoing, not merely a general awareness that the other party may be doing something wrong.  Finally, the chances are nil that the state Supreme Court would adopt plaintiffs' homemade test, under which a plaintiff is required to show only that defendant had a general awareness of some sort of wrongdoing, with no requirement that the defendant understood its role in the scheme, understood the scheme's precise nature, or had any idea of who the victim might be.

2.      Substantial Assistance

In addition to requiring actual knowledge of another's breach of duty, the Restatement requires that the putative aider and abettor give "substantial assistance or encouragement to the other so to conduct himself."  RESTATEMENT (2d) TORTS § 876(b).  Establishing this element of aiding-and-abetting liability "'requires the plaintiff to show that the secondary party proximately caused the violation, or, in other words, that the encouragement or assistance was a substantial factor in causing

the tort.'" *Aetna Cas. & Sur. Co. v. Leahey Const. Co.*, 219 F.3d 519, 537 (6th Cir. 2000) (quoting *K & S P'ship v. Continental Bank, N.A.*, 952 F.2d 971, 979 (8th Cir. 1991)). But-for causation is insufficient. *Aetna Cas.*, 219 F.3d at 543. Rather, a plaintiff must demonstrate that its injury was a direct and reasonably foreseeable result of the conduct. *Fraternity Fund*, 479 F. Supp. 2d at 371.

    As a result of the requirement that a defendant's participation proximately cause the plaintiff's injury, it is necessary that the alleged assistance provided to the primary tortfeasor further the fraud itself, and not merely constitute general aid to the tortfeasor. As one state Supreme Court put it, the putative aider-and-abettor must render "substantial assistance to the breach of duty, not merely to the person committing the breach." *Chem-Age Indus., Inc. v. Glover*, 652 N.W.2d 756, 774-75 (S.D. 2002). Therefore, substantial assistance means something more than merely providing routine professional services that aid the tortfeasor in remaining in business, but do not proximately cause the plaintiffs' harm. In the banking area, courts generally hold that a bank does not aid and abet its customer's wrongdoing merely by providing routine banking services to its customer. *See, e.g., Rosner v. Bank of China*, 528 F. Supp. 2d 419, 426-27 (S.D.N.Y. 2007). Thus, the routine extension of a loan does not amount to substantial assistance. *Aetna Cas.*, 219 F.3d at 546; *Bane v. Sigmundr Exploration Corp.*, 848 F.2d 579, 582 (5th Cir. 1988) (collecting cases). Generally, mere maintenance of a bank account, receipt or transfer of funds, or repeated execution of wire transfers involving allegedly purloined funds do not constitute substantial assistance. *See Weiss v. Nat'l Westminster Bank, PLC*, 453 F. Supp. 2d 609, 621-22 (E.D.N.Y. 2006). Ordinary business transactions that a bank performs for its customer can satisfy the substantial assistance element of an aiding-and-abetting claim only if the bank "actually knew that those transactions were assisting the customer in committing a specific tort." *Casey*, 26 Cal. Rptr. 3d at 406.

Judge Bell's decision in *Glidden Co. v. Jandernoa*, 5 F. Supp. 2d 541 (W.D. Mich. 1998), is instructive. *Glidden* involved claims by the parent corporation of Perrigo against banks that had financed a management-led purchase of a subsidiary. The parent corporation alleged that the insiders were guilty of fraud and breach of fiduciary duty and that the financing banks were guilty of aiding and abetting the insiders' alleged tortious conduct. Judge Bell analyzed the aiding-and-abetting claims under both Michigan and New York law, as well as the Restatement. The court synthesized plaintiff's claim as an assertion that "the Banks provided financing to the Perrigo management group despite their knowledge that the Perrigo management group was breaching their fiduciary duty and committing a fraud on [plaintiff]." *Id.* at 557. Accepting plaintiff's allegations as true, Judge Bell entered summary judgment for defendants, because the Bank's extension of financing was not substantial assistance proximately causing plaintiff's loss:

> The Court is aware of no authority for holding a bank liable for financing a client's business undertaking on the basis that the client might be engaged in fraud or breaches of fiduciary duty. A bank cannot be held liable for aiding and abetting fraud or breach of fiduciary duty merely on the basis that it knew that the party it was lending to was not being forthright in its dealings with others. Where, as here, there are no allegations or evidence that the Banks themselves made any misrepresentations or took any actions to affirmatively hide their client's misdeeds, there is no basis for holding the Banks liable for aiding and abetting or conspiracy.

*Id.*

For similar reasons, the courts hold that silence, or a failure to act, generally does not constitute substantial assistance. *Glidden Co.*, 5 F. Supp. 2d at 556. "We know of no case where mere inaction by a defendant has been held sufficient to support aider and abettor liability for fraud." *Nat'l Westminster Bank USA*, 511 N.Y.S.2d at 629. Inaction constitutes substantial assistance only when the defendant had an independent duty directly to the plaintiff. *Kolbeck*, 939 F. Supp. at 247

(applying Restatement). "[A] failure to investigate, *i.e.*, constructive knowledge, is not enough to support a claim for aiding and abetting a fiduciary absent the existence of a fiduciary duty running from defendant to plaintiff." *Id.*; *accord Jebran v. LaSalle Bus. Credit, LLC*, 824 N.Y.S.2d 224, 225 (App. Div. 2006) (in the absence of a duty to plaintiff, defendant's silence insufficient to sustain aiding-and-abetting claim).

Despite the clear majority rule concerning the level of participation needed to establish aiding-and-abetting liability, plaintiffs advocate for a much less substantial standard. Plaintiffs asserts that they "need not prove substantial assistance to specific torts against specific persons." (Brief, docket # 516, at 53). Plaintiffs contend that they need only prove that the Bank somehow assisted Cyberco's business in general in order to become liable for all of Cyberco's wrongdoing. Plaintiffs devote only a single paragraph to this remarkable proposition and cite but two cases. Examination of the cases reveals that they do not support plaintiffs' position and that they, instead, support the general rule.

*First Alliance Mortgage Co. v. Lehman Commercial Paper, Inc. (In re First Alliance)*, 471 F.3d 977 (9th Cir. 2006), arose from the bankruptcy of First Alliance Mortgage Co., which had been driven into insolvency by justified allegations of fraudulent lending practices. First Alliance's borrowers brought a class action seeking to impose liability for aiding and abetting the fraudulent scheme upon Lehman Brothers and its subsidiary Lehman Commercial Paper, growing out of Lehman's activity as a lender to First Alliance and as the underwriter of the company's securitized debt. *Id.* at 483. First Alliance had been a sub-prime lender and engaged in various fraudulent and predatory practices. First Alliance's business model was to originate mortgages to consumer borrowers and then pledge them to a secondary lender in return for a loan under a

revolving line of credit. The company would draw down on that line of credit to fund the mortgages until it had funded approximately $100 million in loans, at which point it would issue bonds to public investors secured by the repayment stream from the mortgage loans. First Alliance would simultaneously pay down the credit line with part of the proceeds from the sale of bonds and notes. *Id.* at 986. Even before becoming one of the secondary lenders, Lehman conducted an inquiry into the company, which revealed that First Alliance had been accused of fraudulent lending practices for at least one year and was the subject of more litigation than any other non-bankrupt firm in the sector. Despite this and other negative information, in 1996, Lehman agreed to extend $25 million in warehousing credit. *Id.* As scrutiny of the firm mounted, First Alliance's other main lenders all withdrew from the business, but Lehman stepped forward to become First Alliance's sole source of warehouse funding and underwriting. 471 F.3d at 986-87. After a jury found Lehman had aided and abetted First Alliance's scheme under California law, the Ninth Circuit reviewed Lehman's allegations of error. The Ninth Circuit principally relied on the leading California Court of Appeals case, *Casey v. U.S. Bank Nat'l Ass'n*, 26 Cal. Rptr. 3d 401 (Cal. Ct. App. 2005). With regard to the "substantial assistance" prong of an aiding-and-abetting claim, the Ninth Circuit specifically followed the *Casey* decision, quoting from that case as follows:

> [O]rdinary business transactions a bank performs for a customer can satisfy the substantial assistance element of an aiding-and-abetting claim if the bank actually knew those transactions were assisting the customer in committing a specific tort. Knowledge is the crucial element.

*In re First Alliance*, 471 F.3d at 995 (quoting *Casey*, 26 Cal. Rptr. 3d at 406). The court found that the jury's verdict in favor of the class was sustainable under this standard, in light of evidence that Lehman continued to fund First Alliance after all other investment banks stopped doing business

with the firm, "knowing that its financial difficulties stemmed directly and indirectly from litigation over its dubious lending practices." 471 F.3d at 995. In the circumstances of the case, the court rejected Lehman's attempted distinction between its provision of service to First Alliance's business, as opposed to its fraudulent conduct. "In a situation where a company's whole business is built like a house of cards on a fraudulent enterprise, this is a distinction without a difference." *Id.* In short, the *First Alliance* case squarely supports the general rule that allows ordinary business transactions by a bank to satisfy the substantial assistance element of an aiding-and-abetting claim only if the bank "actually knew those transactions were assisting the customer in committing a specific tort." *Id.* The decision represents an application of that standard to the specific facts of the case, but in no way supports plaintiffs' assertion that plaintiffs need not prove substantial assistance to specific torts against specific persons. Plainly, as shown from its reliance on *Casey*, *First Alliance* stands for exactly the opposite.

   The only other case that plaintiffs cite is *ABF Capital Mgmt. v. Askin Capital Mgmt., L.P.*, 957 F. Supp. 1308 (S.D.N.Y. 1997). The *ABF Capital* case was a ruling on a motion to dismiss brought in a complicated case involving allegations of RICO violations, state-law fraud, breach of fiduciary duty, and other state-law claims. The principal claims were brought by investors against the manager of a hedge fund that made leveraged investments in volatile mortgage-backed securities. *Id.* at 1314. The plaintiffs also brought claims against the broker-dealers who created and sold a substantial portion of the securities in the fund's portfolios. The broker-dealer defendants moved to dismiss under Rule 12(b)(6), relying on the general rule that holds where a primary fraud claim is predicated on written misrepresentations, the substantial assistance of an unrelated third party must generally relate to the preparation or dissemination of the false statements themselves. 957 F. Supp.

at 1328 (citing *Morin v. Trupin*, 711 F. Supp. 97, 113 (S.D.N.Y. 1989)).  The court held that even though the broker-dealers had not been involved in the preparation or dissemination of false documents, they were engaged in a "highly interdependent scheme  in which both parties benefitted from [the hedge fund's] fraudulent activity.  In such circumstances, allegations that a defendant actively assisted and facilitated the fraudulent scheme itself, as opposed to assisting in the preparation of the documents themselves, are sufficient."  957 F. Supp. at 1328.  Thus, the *ABF Capital* case stands for the unremarkable proposition that a party may aid and abet a fraudulent scheme either by assisting in the dissemination of fraudulent documents or otherwise assisting and facilitating "the fraudulent scheme itself."  *Id.*  It does not remotely support plaintiffs' contentions in this case.

In essence, plaintiffs wish to lower the burden of proof in an aiding-and-abetting case to an insignificant level.  With regard to knowledge of the fraudulent scheme, plaintiffs assert that they need not prove that the Bank knew of any particular fraud aimed at any particular victim, but only that the Bank was "generally aware" of some sort of wrongdoing.  On the substantial assistance prong, they assert that loans made to a client's business, which allow the client to stay afloat but are otherwise unrelated to the fraudulent scheme, will suffice.  Plaintiffs' position represents a dramatic and unprecedented expansion of American tort law.  Plaintiffs' position, if accepted, would abrogate the necessity of showing proximate cause and allow liability to arise from any assistance given the wrongdoer, no matter how unrelated to the fraud, as long as the assistance allowed the wrongdoer to stay in business so as to continue his wrongdoing.  In the words of plaintiffs' counsel, the bank is liable if it helped to "perpetuate the enterprise."  (Tr. of 6/12/09 Hearing, docket # 573, at 61).  One might as easily hold the grocer liable for aiding and abetting Al Capone, on a showing that the

grocer suspected Capone was a hoodlum but sold him food anyway, allowing him to live another day to commit his crimes.  Plaintiffs' position is unsupported in law.

In summary, the Michigan Supreme Court is likely to adopt the Restatement approach, which requires a showing that the alleged aider-and-abettor provided substantial assistance or encouragement to the other "so to conduct himself."  This standard, on its face, requires an aiding and abetting the tortious act itself.  Silence, inaction, or a failure to investigate does not constitute substantial assistance.  A bank's provision of routine banking services is also insufficient, unless the bank actually knew that those services were assisting the customer in committing a specific tort. These principles are well-established in American tort law, and a state supreme court being asked to apply the aiding-and-abetting concept for the first time is very likely to adhere to these concepts and to reject the virtually unprecedented arguments presented by plaintiffs.

E.      Analysis of Plaintiffs' Aiding-and-Abetting Claims

1.      Underlying Torts

"To analyze a claim of secondary liability, the court must first determine the contours of the primary violation on which the secondary liability is alleged to be based." *Kolbeck*, 939 F. Supp. at 235.  In the present case, the underlying torts allegedly committed by Cyberco and its agents were common law fraud in the inducement and common law conversion, both arising under Michigan law.

Plaintiffs' claims of fraud arise from their participation in a rather commonplace commercial transaction.  Plaintiffs each agreed to provide purchase money financing to Cyberco for its acquisition of computer equipment from Teleservices, the putative manufacturer.  Rather than

-59-

granting plaintiffs a security interest in the equipment under the UCC, the documents vested title in the finance companies and purported to lease the equipment to Cyberco. Although there are legal distinctions between the lease transactions involved herein and secured transactions under the UCC, from a business point of view, the transactions are equivalent. Each is a financing arrangement, pursuant to which the computer equipment stands as collateral to secure the underlying purchase money loan. If all goes as expected, in either case, the finance company would never take possession of the equipment (indeed, may never even see it). Although plaintiffs had legal title to the computer equipment, their only practical interest (as opposed to legal interest) in the equipment would arise in the case of a default, where the equipment would presumably be repossessed to satisfy Cyberco's debt.

As things turn out, the computer equipment is alleged never to have existed.[7] Cyberco's affirmative, false representations concerning the existence of the leased equipment give rise to a claim for common-law fraud, in addition to a breach of contract claim, against Cyberco. Under Michigan law, the elements of common-law fraud are (1) that defendant made a material misrepresentation; (2) that it was false; (3) that when he made it he knew that it was false, or made it recklessly and as a positive assertion of fact; (4) that he made it with the intention that it should be acted upon by plaintiff; (5) that plaintiff acted in reliance upon it; and (6) that he thereby suffered injury. *Hi-Way Motor Co. v. Int'l Harvester Co.*, 247 N.W.2d 813, 816 (Mich. 1976). A lender's allegation that it was induced to make a loan on the strength of fictitious collateral is certainly sufficient to state a claim for common-law fraud under these principles. The same conduct, in fact,

---

[7] This is not the only time that unscrupulous businesses have defrauded financial institutions through the lease of nonexistent equipment. *See, e.g., United States v. Allen*, 491 F.3d 178 (4th Cir. 2007).

led to the indictments of the Cyberco principals for perpetrating criminal bank fraud against Huntington Bank. (While the financing companies, such as plaintiffs, were induced to advance purchase money loans on the strength of nonexistent computers as collateral, Huntington Bank was induced to make and extend millions in revolving loans, on the strength of the nonexistent accounts receivable generated by the nonexistent leasing of the same nonexistent computers to nonexistent customers of Cyberco.) Plaintiffs directly deposited millions of dollars into a Teleservices bank account in the Silicon Valley Bank on the strength of false certificates from Cyberco that Teleservices (purportedly a manufacturer of computers) had delivered specifically identified computers conforming to Cyberco's purchase orders. Cyberco's knowing misrepresentation of such material facts would give rise to a claim for fraud in the inducement which, if proved, would render the underlying lease transactions voidable at the option of plaintiffs. *See Custom Data Solutions, Inc. v. Preferred Capital, Inc.*, 733 N.W.2d 102, 105 (Mich. Ct. App. 2006).[8]

Plaintiffs' common-law conversion claim is closely related to their claim of fraud in the inducement. The tort of conversion is any distinct act of dominion wrongfully exerted over another's personal property in denial of or inconsistent with the rights therein. *Head v. Phillips Camper Sales & Rental, Inc.*, 593 N.W.2d 595, 603 (Mich. Ct. App. 1999). To support an action

---

[8] For some reason, plaintiffs argue that the details of the underlying transactions are irrelevant to this case, because the entire transactions were fraudulent and void. (*See, e.g.,* Counterstatement of Facts ¶ 88(a). The argument is not lawyer-like, to say the least. Proof that plaintiffs were fraudulently induced to enter into financing transactions by material misrepresentations does not make those transactions void *ab initio*, but merely voidable. *Hubbell Roth & Clark, Inc. v. Jay Dee Contractors, Inc.*, 642 N.W.2d 700, 703 (Mich. Ct. App. 2001) (fraud in the inducement does not render a contract void, but merely voidable at the election of the defrauded party). Had Cyberco found honest work and paid off the loans according to their terms, plaintiffs would certainly resist any suggestion that the profits they made would be subject to return because the entire transaction was void. Moreover, for purposes of aiding-and-abetting analysis, the court must first identify the "specific tort" that the defendant is accused of assisting.

for conversion of money, the defendant must have an obligation to return the specific money entrusted by plaintiff to his care. *Garras v. Bekiares*, 23 N.W.2d 239, 242 (Mich. 1946); *Blue Cross & Blue Shield of Mich. v. Folkema*, 436 N.W.2d 670, 672 (Mich. Ct. App. 1989). Plaintiffs' theory is that they were fraudulently induced to send money to Teleservices to pay for nonexistent computer equipment and that Teleservices had an immediate obligation to return the funds to plaintiffs. The failure to return fraudulently obtained funds, in plaintiffs' view, amounts to conversion.[9]

Proving "actual knowledge" on the part of the Bank of the "specific tort" of fraud in the inducement would require, in the circumstances of this case, proof that the Bank knew about the financing transactions between plaintiffs on the one hand and Cyberco and Teleservices on the other and that the Bank knew that plaintiffs were being induced to make payment to Teleservices on the basis of false representations concerning the existence of computer equipment. Under the alternative test, plaintiffs would be required to show at least that the Bank was generally aware of a scheme to defraud finance companies and was aware of its own role in furthering the fraud, while perhaps not aware of the particular mechanics of the fraudulent scheme. Because the conversion claim is essentially derivative of the fraud claim, plaintiffs would have essentially the same burden of establishing the Bank's knowledge that the finance companies were somehow being cheated and, further, that Cyberco or Teleservices was exercising dominion and control over plaintiffs' funds in circumstances in which the primary tortfeasors had an obligation to return specific money to plaintiffs. Again, under the alternative test, plaintiffs would not be required to show that the Bank

_____

[9] Plaintiffs' conversion claim, even against Cyberco and Teleservices, is problematic on a number of grounds. For present purposes, however, I assume that plaintiffs could establish their conversion claim against those defendants. The issue is whether plaintiffs can withstand summary judgment on their claim that the Bank aided and abetted the alleged conversion.

knew the precise details of the fraudulent scheme, but would at least be required to show that the Bank generally realized that the finance companies were sending Teleservices money and that Teleservices was exercising control over that money in circumstances that amounted to a conversion of those funds.

### 2. Sufficiency of the Evidence of Actual Knowledge

The core inquiry on defendant's motion for summary judgment is whether plaintiffs have raised a triable issue of fact in support of their claim that the Bank aided and abetted Cyberco in committing the torts of fraud in the inducement and common-law conversion. In other words, the court must determine whether a reasonable jury could find for plaintiffs on the basis of the facts now of record, with all factual disputes and reasonable inferences credited in plaintiffs' favor. Upon review of the record, I conclude that plaintiffs have adduced neither direct nor circumstantial evidence sufficient to sustain a verdict on their common-law aiding-and-abetting claims.

### (a) Direct evidence

The record is completely devoid of direct evidence that the Huntington Bank, or any of its employees, had actual knowledge of the specific torts of fraud in the inducement or conversion perpetrated by Cyberco against plaintiffs. Although the Bank knew that Cyberco was financing its purchase of computer equipment with third-party financing companies, there is no evidence that the Bank knew of the details of any such transaction. Plaintiffs have admitted that the banks had no access to documentation showing the nature of these transactions or the source of funds flowing into the Teleservices account. (SMF ¶ 46). Crucially, plaintiffs have adduced no evidence that

Huntington Bank knew (or had any way of learning) that Cyberco was dealing in nonexistent computer inventory.

In an effort to establish these facts in the method required by this court, Huntington Bank listed in its statement of material facts (docket # 514) the following factual assertions:

> 73.　There is simply no evidence that HNB actually knew that Teleservices or Cyberco was obtaining funds from plaintiffs in connection with worthless or nonexistent computer equipment.

> 74.　There is no evidence that HNB knew that Teleservices or Cyberco was even involved in transactions with worthless or nonexistent computer equipment.

> 75.　There is no evidence that HNB participated with either Teleservices or Cyberco in the preparation of any false oral or written representation that either Teleservices or Cyberco made to plaintiffs in order to induce plaintiffs to transfer funds to Teleservices.

> 76.　There is no evidence that HNB participated with either Teleservices or Cyberco in the making or dissemination of any false oral or written representation by either Teleservices or Cyberco to plaintiffs in order to induce plaintiffs to transfer funds to Teleservices.

(Defendant's Statement of Material Facts ¶¶ 73-76).　Rather than responding to these statements, plaintiffs evaded them, asserting that defendant's factual statements presumed "a legal requirement on behalf of plaintiffs to show that HNB knew precisely how Cyberco was stealing money and from whom.　No such requirement exists."　Plaintiffs therefore objected to each statement as "immaterial and improper," without admitting or denying their substance.　(Plaintiffs' Responses and Counter-Statements of Material Facts, docket # 528, ¶¶ 73-76).　This is a patent obfuscation.　Certainly, if plaintiffs had evidence that the Bank knew that Cyberco was obtaining funds from plaintiffs in connection with worthless or nonexistent computer equipment, plaintiffs would have produced the evidence and would strenuously deny that such direct evidence of complicity was "immaterial and

improper." How then can the absence of direct evidence be immaterial? Plaintiffs' attempt at indirection only underscores the conclusion, based on a thorough review of the record, that no direct evidence exists to support plaintiffs' aiding-and-abetting theory.

Plaintiffs do assert that there is "proof that HNB knew generally how the scheme worked at Cyberco." (Plaintiff's Responses and Counter-Statements of Material Facts ¶ 73). Plaintiffs rely on an excerpt from the testimony of Special Agent Roberta Gilligan and her handwritten notes of the interview of Gail White on May 20, 2004, in support of this assertion. Citing the same two bits of evidence, plaintiffs repeatedly assert that White "knew how the fraud worked at Cyberco." (*See, e.g.*, Plaintiffs' Brief, docket # 516, at 33, 46 n.42; Plaintiffs' Responses and Counterstatement of Material Facts ¶¶ 21, 73). Plaintiffs' assertions are not remotely supported by the evidence cited.

The citation to the deposition of Special Agent Gilligan relates to her interview of Gail White on May 20, 2004:

Q.    Could you just read that entry [from the agent's handwritten notes] for me.

A.    Teleservices collect money from finance and Teleservices pays Cyberco wire lump sum of money.

Q.    Was that something that you learned from Ms. White during the interview?

A.    Yes.

Q.    And then the next entry down, could you read that for me?

A.    The one scratched out?

Q.    Actually the one just below it that beings with the word Cyberco.

A.    Cyberco pays finance company and Cyberco gets money from Teleservices to pay out.

Q.      And then the next entry under that?

A.      Teleservices primary source of money.  Checks changed to wires.

(Gilligan Dep. at 30).  The handwritten notes reflected White's "guesses or her thoughts of where the money came from, but I don't think any of those documents reflects the source of the funds to the Teleservices account." (*Id.* at 43).  Agent Gilligan's handwritten notes of the interview (Ex. 238) are to the same effect.  They reflect that Teleservices was the primary source of money to Cyberco and that Cyberco "pays finance company & Cyberco gets $ from Teleservices to pay out."  This led White to suspect that Teleservices was collecting Cyberco's accounts receivable.  (Gilligan Dep. at 49).  This evidence supports a finding that the Bank had speculated concerning the possible flow of money within the Cyberco-Teleservices family.  Agent Gilligan testified that White had only suspicions but did not have a clear understanding of what Teleservices was or what the source of funds from Teleservices to Cyberco was.

Q.      All right.  Was there -- did either Ms. Hutchings or Ms. White draw any conclusions from the fact and share with you any conclusions about Teleservices given the fact that it had these two addresses?

A.      No, but they thought it was suspicious.

Q.      (BY MR. ANDING)  Now, let me ask this question:  Ms. Gilligan, in general terms, when you interviewed Ms.White, it -- would -- is there a way that you can fairly characterize what you gleaned from Ms. White about her -- her feelings or instincts about Cyberco and Teleservices?

A.      Well, there were suspicious transactions occurring that were a concern to the bank and she was suspicious of what Teleservices was.  I don't think she had a clear understanding what it was or what the source of funds from Teleservices to Cyberco were.  But they were -- she was clearly concerned about what was happening and Cyberco's explanations for checks, that they were either stopped payment or nonsufficient funds and so on and so forth, and their explanations for the accounts receivables.

Q.      (BY MR. ANDING)   Did you -- did you come to a similar opinion or assessment about Ms. Hutchings in terms of whether she was suspicious about Cyberco?

A.      Yes.

Q.      (BY MR. ANDING)   And tell me what you concluded in that regard.

A.      She was suspicious because they were reluctant to provide all of the financials that they kept requesting.  She was made aware of this Teleservices and the accounts receivables and the stopped payment check and the large amounts, and many things that Gail White had also related.

(Gilligan Dep. at 84-85) (objections omitted).

Special Agent Gilligan explained that she interviewed White to determine the basic structure of Cyberco's accounts at the Huntington Bank and to "find out from her how things worked."  (*Id.* at 32, 34).  There is a vast difference between knowing how "things" worked and knowing how the fraud against plaintiffs worked.  Neither Agent Gilligan's notes nor her testimony would remotely support a jury's finding that Gail White -- or anyone else at the Bank, for that matter -- knew that this money was the proceeds of a fraudulent scheme or even had a general idea of how the fraud against plaintiffs "worked."  Agent Gilligan testified that it was not until November of 2004 that the FBI itself had sufficient grounds to believe that Teleservices was fraudulent (Gilligan Dep. at 103), completely dispelling any notion that Gail White had told the FBI in May of that year "how the fraud worked."[10]

To be sure, the record clearly supports a finding that Bank employees knew (or strongly suspected) that Cyberco was engaged in some kind of wrongdoing.  The Bank, after all,

---

[10] Agent Gilligan considered Huntington Bank to be a victim of the fraud.  (Gilligan Dep. at 104).  It will be remembered that the *only* count of financial institution fraud (as opposed to conspiracy) brought against the Cyberco principals was for defrauding Huntington, not plaintiffs.

reported Cyberco to the FBI and provided a good deal of information that ultimately led to seizure

of Cyberco's assets and criminal indictments. The wrongdoing known or suspected by the Bank,

however, had nothing to do with the finance companies. The record shows, first of all, that Gail

White's initial reaction to the $2.3 million NSF check that she was called upon to investigate in

September of 2003 was that it could be evidence of check-kiting. Check-kiting is "a form of bank

fraud." *First Nat'l Bank in Harvey v. Colonial Bank*, 898 F. Supp. 1220, 1222 (N.D. Ill. 1995).

Check-kiting "consists of drawing checks on an account at one bank and depositing them in an

account in a second bank when neither accounts has sufficient funds to cover the amounts drawn.

Just before the checks are returned for payment to the first bank, the kiter covers them by depositing

checks drawn on the account in the second bank." *Cannon v. J.C. Bradford & Co.*, 277 F.3d 838,

844 n.3 (6th Cir. 2002) (quoting *United States v. Stone*, 954 F.2d 1187, 1188 n.1 (6th Cir. 1992)).

In other words, check-kiting occurs when a person artificially inflates a checking account balance

during the "float" period that occurs when a check passes between a depository bank and the drawer

bank. *See generally Williams v. United States*, 458 U.S. 279, 281 n.1 (1981). In this case, the

suspicion of check-kiting was never confirmed, and the record does not establish that Cyberco was

in fact engaged in check-kiting. But even if Huntington had actual knowledge of check-kiting,

plaintiffs would not have been in the class of likely victims of any check-kiting scheme. The victims

of check-kiting schemes are generally depository banks or drawee banks (depending on when the kite

is discovered), not creditors:

> By depositing in one account checks drawn on other insufficiently funded accounts,
> the offender in a check-kiting scheme tricks two or more banks into inflating account
> balances and honoring bad checks. In effect, the offender writes himself a series of
> unauthorized, unsecured, and interest-free "loans," which may or may not be repaid.
> His actions put the banks at risk for the amount of the insufficient funds and deprive

the banks of their assets by placing the unauthorized funds at the disposal of the check kiter.

*United States v. Flowers*, 55 F.3d 218, 220 (6th Cir. 1995). In short, the fact that Huntington Bank suspected possible check-kiting in mid-2004 does nothing to prove that the Bank was aware, even generally, of a scheme to defraud the finance companies.[11]

The other strong suspicion entertained by Bank employees, and the one that ultimately sent them to the FBI, was that Cyberco was engaged in a "receivables fraud." As explained by Gail White, the suspected fraud involved Cyberco's possible reporting of work in progress as actual receivables. This would inflate the company's receivables, as reported to the Bank, thereby inducing the Bank to increase advances under the revolving loan, which were collateralized by the receivables. (White Dep., 78-83, 327-29). The victim of such a receivables fraud would be Huntington itself, not the finance companies. As things turn out, the fraud against the Bank was even more egregious than suspected by White. The point, however, is that the only wrongdoing even suspected by the Bank involved itself or other banks as victims, not the finance companies.

In short, plaintiffs have produced no direct evidence that the Huntington Bank had actual knowledge that Cyberco was defrauding plaintiffs or converting their funds, or even that the Bank was generally aware of the fraudulent scheme against plaintiffs *and* of the Bank's role in it.

---

[11] Furthermore, a bank has no duty to warn other banks of a known or suspected check-kiting scheme. *See, e.g., Frost Nat'l Bank v. Midwest Autohaus, Inc.*, 241 F.3d 862, 873-74 (7th Cir. 2001) (collecting cases); *Mid-Cal Nat'l Bank v. Fed. Reserve Bank of S.F.*, 590 F.2d 761, 764 (9th Cir. 1979); *First Nat'l Bank in Harvey v. Colonial Bank*, 898 F. Supp. at 1230-31; *Citizens Nat'l Bank v. First Nat'l Bank*, 347 So. 2d 964, 967 (Miss. 1977). *A fortiori*, no duty is owed to general creditors of the suspected kiter, who are well outside of the "zone of danger" from the kiting scheme.

(b)      Circumstantial evidence

For purposes of establishing aiding-and-abetting liability, the requisite knowledge may be shown by circumstantial evidence. *Aetna Cas.*, 219 F.3d at 535. As the record contains no direct evidence that Cyberco was committing the torts of fraud and conversion against plaintiffs, their aiding-and-abetting case is necessarily premised exclusively on circumstantial evidence. Circumstantial evidence is evidence which, although not directly proving a material fact, would support a reasonable inference in favor of the likelihood of that fact. *See Stockman v. Oakcrest Dental Ctr., P.C.*, 480 F.3d 791, 800 (6th Cir. 2007). Plaintiffs' circumstantial case rests on a concatenation of "red flags," suspicious circumstances, and other irregularities allegedly known by the Bank, combined with "atypical banking practices" committed by Huntington Bank, including violation of the Bank's anti-money-laundering responsibilities and its own internal policies. Plaintiffs' showing in this regard is legally insufficient.

Plaintiffs' circumstantial evidence consists of suspicious circumstances, "red flags," and other irregularities concerning Cyberco that came to the Bank's attention during the time that Cyberco was its customer. Plaintiffs themselves summarize these circumstances at pages 49 and 50 of their brief:

    a.      As early as July and not later than October 2003, after permitting millions of dollars in sustained overdrafts since the inception of its relationship with Cyberco just months earlier, HNB suspected that Cyberco was engaged in the federal crime of check-kiting.

    b.      Not later than October 2003, HNB was aware that Cyberco's primary source of funds was an unverifiable, "suspicious" company called Teleservices.

    c.      Not later than October 2003, HNB knew the Cyberco accounts, on which HNB suspected kiting, were being used to process large dollar transactions

-70-

with countries HNB and federal regulators had identified as "high Risk" for money-laundering such as Pakistan and the Philippines.

d.    Not later than December 2003, HNB knew that the Cyberco accounts, 1) were suspected of kiting; 2) were processing large transactions through "High Risk" foreign countries such as the Philippines and Pakistan; 3) were primarily funded by an unverifiable and "suspicious" source; and 4) were the target of a grand jury subpoena.

e.    Not later than January 2004, HNB decided Cyberco was "getting out of hand" and that it needed to exit the relationship because of the numerous "red flags."

f.    Not later [sic] March 2004, HNB knew that Teleservices, the unverifiable, suspicious and "illegitimate source" of tens of millions to Cyberco, appeared *nowhere* on Cyberco's accounts receivables reports.

g.    Not later than March 2004, HNB knew that Cyberco would not allow "under [any] circumstances," HNB to contact Cyberco's alleged customers to confirm existence of its accounts receivables.

h.    Not later than March 2004, HNB had concluded that "some or all" of Cyberco's accounts receivables were bogus.

i.    Not later [sic] March 2004, HNB *knew* "something criminal was going on" at Cyberco.

j.    Not later than March 2004, HNB had concluded that Cyberco was being "deceptive" about its business.

k.    As early as April and not later than June 2004, HNB *knew* that it was "in a receivables fraud situation" with Cyberco.

l.    HNB *knew* as early as March 2004 and not later than June 2004 that the paydown funds it would eventually (beginning July 2004) accept directly from Teleservices (an unverifiable, suspicious, "illegitimate source" were being funneled through the Philippines, a known money laundering haven.

m.    Not later than April 2004, HNB's President, Dames Dunlap, had been given "behind the scenes info" on Barton Watson, Cyberco's CEO and a convicted felon, from a "little birdie" outside the Bank.

n.    In mid-April 2004, HNB concluded Cyberco's activities were sufficiently culpable to inquire of the FBI about a criminal investigation.

o.    Not later than April 2004, HNB knew that Barton Watson, Cyberco's CEO and Chairman, had been sanctioned by the SEC and had served 3 years in a federal penitentiary for fraud.

(Plaintiffs' Summary Judgment Brief, docket # 516, at 49-50) (citations to record omitted).  Except where plaintiffs have exaggerated the evidence well beyond the bounds of the record,[12] I assume for purposes of defendant's motion that plaintiffs can prove the substance of each of these assertions.  These "circumstances," taken either individually or in their totality, are legally insufficient to show actual knowledge of a specific tort or even that the Bank was generally aware that Cyberco was defrauding, cheating, or committing any sort of tort with regard to the finance companies.

As an initial matter, mere "suspicions," even of tortious conduct, are insufficient to satisfy the actual knowledge standard.  *See, e.g., Lerner*, 459 F.3d at 293 ("'Allegations that Chemical [Bank] suspected fraudulent activity . . . do not raise an inference of actual knowledge of Wolas's fraud.'") (quoting *Ryan v. Hunton & Williams*, No. 99-cv-5938, 2000 WL 1375265, at * 9

---

[12] For example, circumstance h., which contends that the Bank knew that "some or all" of Cyberco's accounts receivable were bogus, is totally unsupported by the record.  Plaintiffs refer to their Counter-Statement of Facts ¶¶ 29(a) and (b).  The counter-statement cites as support the testimony of Gail White and Lawrence Rodriguez, both employees of Huntington Bank, and Exhibit 67.  The cited testimony of White (Dep., p. 123, lines 4-20) relates only that Ms. White told Mr. Rodriguez "at the time that I had suspicions of a kite, that I had suspicions of receivables being bogus . . ."  The cited passages of the Rodriguez deposition (p. 119, line 21 through p. 120, line 11) shows that Ms. White reported to Rodriguez her concern about the $2.3 million bounced check, for which Watson could not provide a satisfactory explanation.  At that point, White and Watson "started discussing verification of accounts receivable," after which Watson "threw a fit."  Exhibit 67 is a collection of Cyberco financial statements as of the end of February 2004.  This evidence supports only a conclusion that the Bank suspected some of the receivables were bogus on account of mischaracterizing work in process as receivables.  None of the cited sources remotely suggests that anyone at the Bank was suspicious that "all" of Cyberco's receivables were bogus.  Plaintiffs' use of quotation marks around the words "some or all" suggests, without any basis, that these words have some source in the record.

(E.D.N.Y. Sept. 20, 2000)). Similarly, knowledge of "red flags" is insufficient, as these indicate only the possibility of irregularities and therefore establish, at best, only constructive knowledge. *See, e.g., Mazzaro de Abreu v. Bank of Am. Corp.*, 525 F. Supp. 2d 381, 388 (S.D.N.Y. 2007); *Pension Comm. of Univ. of Montreal v. Banc of Am.*, 446 F. Supp. 2d 163, 202 (S.D.N.Y. 2006) (bank's knowledge of financial reports "conspicuously false on their face" insufficient to satisfy actual knowledge standard); *Rosner v. Bank of China*, 528 F. Supp. 2d 419, 426 (S.D.N.Y. 2007) (suspicious withdrawals of large amounts of cash inconsistent with customer's business indicate, at most, only constructive knowledge of fraudulent scheme); *Nigerian Nat'l Petroleum Corp. v. Citibank, N.A.*, No. 98 civ. 4960, 1999 WL 558141, at * 7 (S.D.N.Y. July 30, 1999) (allegations of knowing or reckless disregard of irregularities in wire transfers and other "badges of fraud" do not give rise to inference, "let alone a strong inference" of underlying fraud); *Casey v. U.S. Bank, Nat'l Ass'n*, 26 Cal. Rptr. 3d 401, 412 (Cal. Ct. App. 2005) (bank's knowledge of money laundering insufficient to show actual knowledge of misappropriation, as California law "imposes no duty on a bank to investigate or report a depositor's suspicious activities.").

More basically, plaintiffs' proof of "actual knowledge" does not bear on the Bank's knowledge of any specific wrongdoing against plaintiffs. As demonstrated in section I.D.1. above, the universal rule requires actual knowledge of the tortious conduct by the wrongdoer, not merely that the defendant knew something was wrong in general. *See, e.g., Halifax Corp. v. Wachovia Bank*, 604 S.E.2d 403, 411-12 (Va. 2004) (aider and abettor must have actual knowledge of both its customer's duty and the conduct allegedly breaching that duty); *Terrydale Liq. Trust v. Barness*, 611 F. Supp. 1006, 1027 (S.D.N.Y. 1984) (applying Missouri law: "liability cannot be imposed absent a showing that the defendants had actual knowledge of tortious conduct by the primary wrongdoer.").

Thus, circumstances a. and d., which refer to suspicions of check-kiting, could not possibly show actual knowledge of wrongdoing against the finance companies, for the reasons discussed in section I.E.2.(a) above. Circumstance k., which refers to the Bank's knowledge that it was in a "receivables fraud situation" with Cyberco, again indicates that Cyberco was involved in some wrongdoing, but the Bank (and not the financing companies) was being victimized. The suspicion was that the receivables were being inflated by counting work in process as accounts receivable, not that the receivables were all fraudulent. Likewise, circumstances i. and n., indicating that the Bank knew "something criminal was going on" refer to the crimes against the Bank that led it to go to the FBI, not any crimes against plaintiffs. The other circumstantial evidence does not point even remotely to a fraud against the financing companies.

In addition to the Bank's knowledge of "red flags" and suspicious circumstances, including its suspicions of Cyberco's possible defrauding of the Bank itself, plaintiffs point to alleged evidence of "atypical banking practices." The cases indicate that a bank's atypical banking practices can indeed provide circumstantial evidence of actual knowledge. *See Aetna Cas.*, 219 F.3d at 536. In this regard, plaintiffs rely on the Bank's alleged failure to follow the requirements of federal anti-money-laundering regulations or the Bank's own internal policies in reaction to these suspicious circumstances. Plaintiffs' argument is that the Bank, had it discharged its duty to investigate under anti-money-laundering regulations or the Bank's own procedures, would have discovered the fraud and closed down the Cyberco accounts, in time to prevent Cyberco from entering into fraudulent transactions with plaintiffs. ("If HNB had adhered to its duties under federal law and its own internal policies and closed down the Cyberco accounts at any time after July 2003,

the Cyberco fraud would have 'ceased.'"). (Plaintiffs' Counter-Statement of Facts ¶ 77). Plaintiffs' extensive reliance on the Bank's alleged breaches of duty is insufficient as a matter of law.

First, it is now well settled that the anti-money-laundering obligations of banks, as established by the Bank Secrecy Act, obligate banks to report certain customer activity to the government but do not create a private cause of action permitting third parties to sue for violations of the statute. *See AmSouth Bank v. Dale*, 386 F.3d 763, 777 (6th Cir. 2004); *Hanninen v. Fedoravitch*, 583 F. Supp. 2d 322, 326 (D. Conn. 2008). Likewise, there is no private cause of action for money laundering or for aiding and abetting money laundering. *See de Pacheco v. Martinez*, 515 F. Supp. 2d 773, 787 (S.D. Tex. 2007). If the Huntington Bank did violate its obligations under the Bank Secrecy Act, it may be accountable to the United States government for its failures, but no duty arises to plaintiffs for any such failure.

Second, courts have routinely rejected the notion that a bank's failure to execute a duty to investigate, whether that duty is alleged to arise from federal regulation or from the bank's own internal policies, somehow satisfies the actual knowledge standard. A recent decision from the Massachusetts Supreme Judicial Court is instructive. In *Cahaly v. Benistar Property Exchange Trust Co.*, 885 N.E.2d 800 (Mass. 2008), the Massachusetts Supreme Judicial Court reviewed claims against Merrill Lynch of aiding and abetting a customer's real estate fraud. Among the theories of liability advanced by plaintiffs was that Merrill Lynch violated the compliance policies of the New York Stock Exchange and the bank's own "know the client" policies. 885 N.E.2d at 812. In support of this theory, plaintiffs laid before the jury voluminous documentary evidence of wire transfer authorizations in circumstances that "may signal a fraudulent scheme" and which should have been reported to the Office of General Counsel. *Id.* at 812 n.26. Although the jury may well have agreed

with the plaintiffs that Merrill Lynch's "apparent indifference to the large volume of wire transfers was in derogation of its own written policies for detecting 'con games' and 'scams,'" the Massachusetts high court found the evidence insufficient to support the aiding-and-abetting claim. "At most, this conclusion leads reasonably to the inference that Merrill Lynch 'should have been aware' of possible wrongdoings in the account. However, constructive knowledge is not 'actual knowledge.'" 885 N.E.2d at 813. The court likewise found insufficient the argument that Merrill Lynch's alleged violation of its obligations under the rules of the New York Stock Exchange showed actual knowledge of the client's fraud. *Id.*; *accord Bariteau v. PNC Fin. Servs. Group, Inc.*, 285 F. App'x 218, 225 (6th Cir. 2008) (no actual knowledge despite allegations that bank failed to follow its own policies in dealing with fraudulent customer); *Chance World Trading v. Heritage Bank of Commerce*, 438 F. Supp. 2d 1081, 1085-86 (N.D. Cal. 2005) (evidence that transfers from client account did not comport with bank rules or California corporation law insufficient to show bank was aware of misuse of funds); *Casey*, 26 Cal. Rptr. 3d at 403 (bank's violation of its own internal policies and procedures was insufficient to show awareness of fiduciary breaches by customers).

Third, even if plaintiffs had proof of the Bank's actual knowledge of money laundering (which they do not), that proof would not support, even inferentially, a finding that the Bank had knowledge of any tortious activity aimed at plaintiffs or the other finance companies. In a sense, plaintiffs' allegations that the Bank ignored possible money laundering proves too much. Money laundering can involve the proceeds of any number of illegal activities, including drug dealing, counterfeiting, illegal currency transactions, or trafficking in contraband goods. Warning signs of possible money laundering, including large wire transfers or receipt of funds from money-laundering havens such as the Philippines, might indicate that Cyberco was involved with any

number of illegal activities. Under plaintiffs' view of things, the Bank would have been liable for aiding and abetting any or all of this wrongdoing, whatever it turned out to be. This expansive view of "actual knowledge" has not been endorsed by any court.

It is clear that plaintiffs' arguments based on "red flags" and violation of anti-money-laundering obligations is aimed at a constructive knowledge theory of liability. Plaintiffs repeatedly argue that the Bank should have disseminated "this and all other information related to suspicious activity on the Cyberco account to the appropriate HNB account and security (AML/BSA) personnel so that appropriate action could be taken by HNB pursuant to federal and internal security policies." (Plaintiffs' Brief, docket # 516, at 24 n.23). Such arguments do nothing to prove actual knowledge, but assert only what the Bank should have known had it fulfilled its duties of investigation. "However, constructive knowledge is not 'actual knowledge.'" *Cahaly*, 885 N.E.2d at 813. "We stress that the requirement is *actual* knowledge (which, again, may be proven by circumstantial evidence), and therefore evidence establishing negligence, *i.e.*, that a bank 'should have known,' will not suffice." *Aetna Cas.*, 219 F.3d at 536.

The inadequacy of plaintiffs' circumstantial evidence contrasts markedly with the evidence of direct knowledge of wrongdoing present in the *Aetna Casualty* case, plaintiffs' principal authority. *Aetna Casualty* involved a claim against a bank for aiding and abetting a fraud practiced by a bank customer against a bonding company. The facts were straightforward. The customer needed a performance bond as a prerequisite to its ability to bid for public construction projects. The customer met with the bonding company, which expressed concern concerning the client's low level of capitalization. 219 F.3d at 525. The customer told the bonding company that funds could be obtained from the principal's father-in-law. Instead, the customer inquired of its banker, Mr.

Donnelly of Key Bank, concerning the possibility of obtaining a traditional bank loan.  *Id.* at 526.

Donnelly had processed several loans for the customer over the previous five years, the majority of

which were related to bonding requirements.  The customer told Donnelly explicitly that the purpose

of the loan was to obtain approval from a new bonding company.  The bank ultimately agreed to loan

the client $275,000.00.  A memo from the banker to the client confirmed the banker's knowledge

that:  (1) the funds were being used to increase the bonding capacity of the client; (2) the funds

needed to be in the checking account at month's end; (3) the bank would deposit the funds on July

29 and withdraw the funds from the account on August 2 to repay the loan; (4) once the loan was

repaid, the loan and guaranty would be canceled.  The loan transaction was consummated, thus

artificially and temporarily inflating the customer's cash position, in order to persuade the surety

company to issue a bond.  *Id.*

In finding the evidence sufficient to show actual knowledge of the fraudulent scheme

on the part of the bank, the Sixth Circuit described the tortious conduct as "the wrongful

manipulation of [the client's] financial position for the purpose of inducing [the bonding company]

to agree to bond the company's construction projects.  Central to that manipulation was Donnelly's

and Key Bank's four-day loan."  *Id.* at 535.  The court found sufficient evidence from which the jury

could find that Key Bank knew the customer was engaging in tortious conduct, based on the bank's

long history of assisting the client in loans for bonding purposes and the effect of the memorandum,

showing that the bank knew that the money would be in the account only for a few days for purposes

of manipulating the bank's bottom line.  Even though Donnelly did not have a full understanding of

the bonding business, the jury could conclude that "he knew enough to realize that adding significant

funds to a company's bank account for only a four-day period would not serve to meet a bonding company's capitalization requirements." *Id.* at 535-36.

When compared with the direct and circumstantial knowledge of the specific tortious conduct present in *Aetna Casualty*, the evidence in the present case is shown to be plainly insufficient. In *Aetna Casualty*, the bank had direct knowledge of the fraudulent transaction itself, knew of its purpose, and aided and abetted that purpose by issuing the four-day loan by which the bonding company was deceived. Defendant's liability was not premised on "red flags," suspicious circumstances, or failure to investigate. In the present case, Huntington Bank was completely ignorant of the allegedly fraudulent transactions between Cyberco and the finance companies, knew nothing of Cyberco's misrepresentations concerning the nonexistent computer inventory and had no role whatsoever in negotiating or otherwise facilitating the fraudulent transactions. In *Aetna Casualty*, the "atypical banking practice" forming the basis for circumstantial evidence of actual knowledge of wrongdoing was the bank's own involvement in the very loan transaction upon which the fraud was based. In the present case, plaintiffs can point only to "atypical banking practices" that had nothing to do with the fraud itself but involved only a failure to investigate and police suspicious circumstances of the Cyberco account in general.

It is unclear that even a mountain of circumstances could have put Huntington Bank on actual notice of fraud or conversion against the plaintiffs (or financing companies in general), as the Bank did not have the means of knowledge to discover the fraud. Even after examining all of Huntington's paper and electronic records concerning Cyberco, plaintiffs cannot produce a single piece of evidence in the Bank's files that disclosed the fraud against the financing companies. The testimony of one of Cyberco's main miscreants, James Horton, clearly shows Cyberco's efforts to

keep the Bank in the dark, including issuing false financial statements to the Bank and false information about the nature of Teleservices. (Horton Exam. at 121-25, 134-37). There is accordingly no basis for a finding that the Cyberco principals somehow took the Bank into their confidence. As plaintiffs have adduced no evidence that the Bank even had access to information showing a fraud against the financing companies, a jury would be forced to speculate that the Bank had actual knowledge of the fraud from some unknown source.

In summary, the facts in the record and all *reasonable* inferences therefrom, credited in a light most favorable to plaintiffs, fail to establish any triable issue of fact concerning the Bank's actual knowledge of the specific torts of fraud and conversion practiced by Cyberco against plaintiffs. Only adoption of plaintiffs' unprecedented legal argument -- that a party is responsible for aiding and abetting *all* wrongdoing by another, as long as he is aware of *any* wrongful act, no matter how unrelated -- would entitle plaintiffs to present their case to a jury. As plaintiffs' legal argument is unsupported in law, its proofs -- that the Bank was aware that something wrongful was going on -- are insufficient as a matter of law.

3.      Sufficiency of the Evidence of Substantial Assistance

The lack of any direct or circumstantial evidence of actual knowledge on the part of Huntington Bank requires the grant of summary judgment in the Bank's favor. Assuming for the sake of argument that the proofs of actual knowledge are sufficient to raise a jury issue, the next question is whether plaintiffs' proofs are sufficient on the question whether the Bank provided "substantial assistance or encouragement to the primary party in carrying out the tortious act." *Aetna Cas.*, 219 F.3d at 533. To establish this element, plaintiffs must show that the Bank proximately

caused the violation, or in other words, that the encouragement or assistance was a substantial factor in causing the tort. *Id.* at 537.

Plaintiffs list a number of actions by the Bank which allegedly aided and abetted the torts of fraud and conversion. (Plaintiffs' Brief, docket # 516, at 54-56). Virtually none of these acts, however, had anything to do with the underlying torts. Rather, in plaintiffs' own words, plaintiffs' charge is that the Bank "kept Cyberco alive." (*Id.* at 54). Plaintiffs' litany includes a number of acts by the Bank that were totally unrelated to the fraud against plaintiffs, including:

- the Bank allowed a pre-funding, third-party audit in 2002 that featured no direct contact with any Cyberco employees;

- the Bank failed to insist on Cyberco's use of the "lockbox" to process Cyberco's receivables (a requirement designed to protect Huntington Bank's collateral);

- the Bank granted Cyberco's request for two unnecessary "hard holds" in 2003, both of which caused numerous overdrafts and failed to report the overdrafts to the anti-money-laundering officers;

- the Bank chose not to call a default under its 2002 loan agreement with Cyberco when Cyberco failed to produce audited financial statements;

- the Bank knew that Cyberco accounts were the target of a grand jury subpoena, but did not report this fact to its compliance or anti-money-laundering officers;

- the Bank chose to extend its revolving line of credit for Cyberco, despite the "red flags" that had come to the Bank's attention and despite the Bank's previous decision to sever ties with Cyberco; and

- the Bank did not close or restrict use of the Cyberco accounts even after suspecting that something criminal was going on.

(*Id.* at 54-56). It is not necessary to catalog all of the allegations of substantial assistance, because they are all of a piece. Many of the alleged acts of assistance took place over one year before plaintiffs even dealt with Cyberco. Others involve failure to investigate or act. Plaintiffs' proofs do not show that the Bank substantially assisted Cyberco in committing acts of fraud and conversion against plaintiffs. Rather, plaintiffs assert that the Bank failed to act, failed to close down Cyberco's account, failed to call the Cyberco loan despite default, and failed to perform investigations that might have uncovered the fraud earlier. As a result of these failures, Cyberco was "kept alive," thus allowing it to defraud the plaintiffs.

As noted in section I.D.2., proof of silence and inaction is universally deemed insufficient to establish aiding-and-abetting liability under the Restatement approach. *See Glidden Co.*, 5 F. Supp. 2d at 556. "We know of no case where mere inaction by a defendant has been held sufficient to support aider-and-abettor liability for fraud." *Nat'l Westminster Bank, USA*, 511 N.Y.S.2d at 629. The only recognized circumstance in which such conduct can be deemed substantial assistance is the case in which the bank had actual knowledge of the wrongdoing and understood that its conduct was keeping the client alive so that it could commit a specific tort. *Casey*, 26 Cal. Rptr. 3d at 406. "Knowledge is the crucial element." *Id.* Plaintiffs have adduced no evidence that Huntington Bank "kept Cyberco alive" with the knowledge that the Bank's actions

allowed Cyberco to work its fraud against plaintiffs. In the absence of such proofs, there is simply no proximate causation between the Bank's failure to shut down the Cyberco enterprise and the harm accruing to plaintiffs. *See Oki Semiconductor Co. v. Wells Fargo Bank, N.A.*, 298 F.3d 768, 771-74 (9th Cir. 2002); *Cromer Finance, Ltd. v. Berger*, 137 F. Supp. 2d 452, 470 (S.D.N.Y. 2001).

Plaintiffs' failure to show proximate causation is not cured by the testimony of James Horton cited by plaintiffs. The testimony shows only that it was important to Cyberco to have a principal bank in order to continue its operations and work its fraudulent scheme:

> Q.      Now, as it relates to the ability to attract leasing companies who were ultimately defrauded, was Huntington an important part of being able to track those leasing companies?
>
> THE WITNESS: It was always important that Cyberco have a primary bank relationship. We could not -- we couldn't expect for leasing companies to do business with us without the legitimacy that those banking relationships gave to us.
>
> Q.      And in 2002, who was that banking relationship with Cyberco with?
>
> A.      It all runs together. It was with Huntington.
>
> Q.      Now, you used Huntington, did you not, to essentially sell the leasing companies on the respectability of Cyberco?
>
> THE WITNESS: That was part of the formula with the offices and the fancy cars and the fancy house and everything else.

(Horton Exam. at 175-77) (objections omitted).

As Horton was frank to admit, Cyberco needed a bank, just as it needed offices, fancy cars, and fancy houses, in order to create the air of legitimacy. This testimony shows only "but for" causation, which is insufficient under all the cases. *See, e.g., Aetna Cas.*, 219 F.3d at 543; *Cromer Fin.*, 137 F. Supp. 2d at 470 ("But-for causation is insufficient; aider-and-abettor liability requires

the injury to be a direct or reasonably foreseeable result of the conduct."). Providing general banking services to a client is no more the direct and reasonably foreseeable cause of injury to the client's customers than the providing of offices or fancy cars. "The mere maintenance of a bank account and the receipt or transfer of funds do not, however, constitute substantial assistance." *Weiss v. Nat'l Westminster Bank PLC*, 453 F. Supp. 2d 609, 621 (E.D.N.Y. 2006) (applying section 876(b) of Restatement); *accord Musalli Factory for Gold & Jewelry v. J.P. Morgan Bank, N.A.*, No. 1:08cv1720, 2009 WL 860635, at * 11 (S.D.N.Y. Mar. 31, 2009); *Williams v. Bank Leumi Trust Co.*, No. 96 civ. 6695, 1997 WL 289865 at * 5 (S.D.N.Y. May 30, 1997) ("The mere fact that all participants in the scheme used accounts at [the defendant bank] to perpetrate it, without more, does not rise to the level of substantial assistance necessary to state a claim for aiding and abetting liability."). Similarly, Huntington's failure to shut down Cyberco's accounts does not constitute substantial assistance, because Huntington owed plaintiffs no duty to do so. *Musalli Factory*, 2009 WL 860635 at * 12. If the law were otherwise, every bank would be an aider and abettor of every fraudulent customer, merely on the theory that the customer needed access to bank accounts to accomplish the fraud.

The Bank's only affirmative acts[13] that had anything to do with the transactions between Cyberco and plaintiffs was the issuance of reference letters, including a one-sentence "good standing letter" by Glenn Getschow of Huntington Bank, addressed to "whom it may concern," dated

_____

[13] Plaintiffs have attached as "Addendum 4" to their brief a request dated May 24, 2004, from a lease manager at American Auto Lease asking for trade references for Cyberco. The e-mail indicates that the auto leasing company was working with James Horton to secure vehicles for him and the company. The trail of e-mails shows that Huntington Bank provided a fax number where American Auto Lease could direct a credit inquiry. Plaintiffs fail to explain, however, how the Bank's response to an auto leasing company provided any "substantial assistance" to the scheme to defraud plaintiffs.

February 12, 2004, which stated as follows: "As of February 12, 2004, The CyberNET Group accounts with Huntington National Bank are in good standing." (Ex. 502). Plaintiffs argue that the issuance of this letter facilitated the fraud by creating the false impression that Cyberco was in good standing with the Bank, when in fact the Bank had already decided to terminate the relationship because of numerous irregularities. The testimony of Horton, however, shows that Cyberco manipulated Getschow into issuing the letter:

> Q. Mr. Horton, let me show you a document that has been marked as deposition Exhibit 35, which is a letter from Huntington National Bank to whom it may concern, dated February 12th, 2004. Have you seen that letter before?
>
> A. Yes.
>
> Q. And do you recall that there is a signed version of that letter?
>
> A. Yes.
>
> Q. Was it signed by Mr. Getschow?
>
> A. Yes.
>
> Q. As of February 12th, 2004, and even restricting yourself to simply the information that had been requested by Huntington and ignoring all of the false financials that Cyberco had previously provided to the bank, was Cyberco -- were the Cyberco accounts in good standing with Huntington as of that date?
>
> THE WITNESS: All right. No, the reason that Glenn Getschow signed this letter was that no one in the commercial loan department at Huntington would have signed a letter saying that our accounts were in good standing.
>
> THE WITNESS: And Barton and I had Dave Roepke go to Glenn Getschow because in our view Glenn Getschow, while he was the vice president in the bank, was primarily a sales person. And he was interested in keeping his clients happy, and we thought he would bite on sending out this kind of letter.
>
> BY MR. DONNELL:
> Q. And he did?

A.      And he did, and we in turn sent it to leasing companies in lieu of the bank reference.

(Horton Exam. at 135-37) (objections omitted).[14]

As the Sixth Circuit has noted, aiding-and-abetting liability requires proof of the defendant's "knowledge of wrongful purpose" as the crucial element. *Aetna Cas.*, 219 F.3d at 534 (quoting *Woodward v. Metro Bank of Dallas*, 522 F.2d 84, 96 (5th Cir. (1975)). No reasonable trier of fact could conclude that the issuance of the February 12, 2004 letter or of Trombetta's references were done with the Bank's knowledge of Cyberco's wrongful purpose. The issuance of these letters was obviously the work of Cyberco, manipulating its contacts at the Bank. Furthermore, there is no evidence that the issuance of the letters proximately caused plaintiffs' loss or otherwise was a "substantial factor in causing the tort." *Aetna Cas.*, 219 F.3d at 537.

On the issue of causation, as well as the issue of actual knowledge, plaintiffs' heavy reliance on the *Aetna Casualty* case only serves to underscore the relative paucity of plaintiffs' case, in comparison with the facts found sufficient by the Sixth Circuit in *Aetna Casualty*. In *Aetna Casualty*, the court found that there could be "little doubt" that the defendant bank's $275,000.00 loan substantially assisted the bank's customer in its efforts to temporarily inflate corporate assets for the purpose of inducing the surety company to issue construction bonds. 219 F.3d at 537. The bank's issuance of the highly irregular four-day loan, with knowledge of its purpose, was the very act that artificially swelled the customer's balance sheet. *Id.* By contrast, the alleged acts of

---

[14] Similarly, in March and September of 2004, plaintiff ePlus asked Huntington Bank for a credit reference, which was supplied by the Bank's Leasing Vice-President, Kim Trombetta. It is undisputed that Trombetta knew nothing about Cyberco's troubles with the Bank when he issued the reference. (Plaintiffs' Brief, docket # 516, at 30). Issuance of the letter without adequate research may be an act of negligence, but it cannot be deemed the knowing assistance of another's fraud.

assistance in this case were unrelated to the fraud and served only to keep Cyberco alive during the time it perpetrated its fraud. Plaintiffs have not come forward with evidence of any affirmative act by the Bank that a reasonable trier of fact could find proximately caused plaintiffs' losses. Consequently, rather than supporting plaintiffs' claims, the *Aetna Casualty* decision demonstrates the level of substantiality required for aiding-and-abetting liability, which is not remotely present in this case.

No reasonable trier of fact could conclude that Huntington Bank substantially assisted Cyberco's torts of fraud in the inducement or conversion committed against plaintiffs. Plaintiffs' proofs, at best, show only "but for" causation, arising from the argument that the Bank kept Cyberco alive during the period of its fraudulent conduct. The cases, however, universally reject "but for" causation, and require that a defendant's acts of substantial assistance proximately cause the plaintiff's harm. Plaintiffs' effort to water down the substantial assistance test to fit the nonexistent proof of causation in this case is unsupported in law. Huntington Bank is therefore entitled to a summary judgment on counts 1 and 2 of the complaint, for a complete failure of proof to support plaintiffs' aiding-and-abetting theory.

## II.    Count 3:  Statutory Conversion

Count 3 is brought pursuant to the Michigan conversion statute, MICH. COMP. LAWS § 600.2919a. The parties agree that the 2000 version of the statute controls the present case and that the 2005 amendment is inapplicable. The conversion statute provides as follows:

> A person damaged as a result of another's buying, receiving, or aiding in the concealment of any stolen, embezzled or converted property when the person buying, receiving or aiding in the concealment of any stolen, embezzled, or converted property knew that the property was stolen, embezzled, or converted may recover 3

times the amount of actual damages sustained, plus costs and reasonable attorney's fees. This remedy shall be in addition to any other right or remedy the person may have at law or otherwise.

MICH. COMP. LAWS § 600.2919a (2000). The statutory conversion case rests upon the allegation that the money plaintiffs deposited in the Teleservices bank account was "stolen, embezzled or converted property" within the meaning of the statute and that plaintiffs can trace that money from the Teleservices account into the hands of Huntington Bank. (Brief, docket # 516, at 72) ("Plaintiffs can trace the funds disbursed under the Leases to Teleservices for the account of Cyberco through Teleservices' bank accounts directly to HNB.").

It would serve no useful purpose to review the evidence discussed in connection with plaintiffs' common law conversion claim. Suffice it to say that there is no direct evidence that the Bank had actual knowledge that any monies received from it had been converted from plaintiffs (or from anyone else for that matter) nor is the circumstantial evidence sufficient to raise a jury submissible case on this issue.

The Michigan Supreme Court has squarely held that the statute requires proof of actual knowledge that the property was indeed stolen, embezzled or converted. *Echelon Homes, LLC v. Carter Lumber Co.*, 694 N.W.2d 544 (Mich. 2005). Constructive knowledge -- evidence that defendant "should have known" -- is insufficient. 694 N.W.2d at 547. Actual knowledge may be established by direct or circumstantial evidence. *Id.*

It would serve no useful purpose to review the evidence discussed in connection with plaintiffs' common law conversion claim. Suffice it to say that there is no direct evidence that the Bank had actual knowledge that any monies received from it had been converted from plaintiffs (or from anyone else for that matter) nor is the circumstantial evidence sufficient to raise a jury submissible case on this issue.

Summary judgment should therefore be entered on behalf of Huntington Bank on count 3, for lack of proof that the Bank had "actual knowledge" that any funds received by it from Cyberco or Teleservices had been "stolen, embezzled, or converted."

### III.    Count 4:  Unjust Enrichment and Constructive Trust (El Camino Only)

Count 4 of the complaint sets forth equitable claims by El Camino for unjust enrichment and imposition of a constructive trust.  These claims arise from a payment made by Teleservices to Huntington Bank in the amount of $1.945 million on October 22, 2005, shortly before the collapse of the Cyberco enterprise.  The payment was made to pay down Cyberco's revolving line of credit with Huntington Bank.  El Camino asserts that this payment is directly traceable to a $4.9 million deposit made by El Camino into the Teleservices bank account on the same day.  El Camino alleges that the Bank was unjustly enriched by accepting this payment against its preexisting loan to Cyberco.  On this basis, El Camino seeks to impress a constructive trust on the $1.945 million loan payment received by Huntington Bank.

To sustain a claim for unjust enrichment under Michigan law, a plaintiff must establish (1) the receipt of a benefit by the defendant from the plaintiff, and (2) circumstances rendering defendant's retention of the benefit inequitable or unjust.  *See McCreary v. Shields*, 52 N.W.2d 853, 855 (Mich. 1952); *Barber v. SMH (US), Inc.*, 509 N.W.2d 791, 796 (Mich. Ct. App. 1993).  A court of equity may impose a constructive trust to prevent unjust enrichment.  *McCreary*, 52 N.W.2d at 855.  Proof of fraud is not necessary, but the circumstances must show that defendant's retention of money or other benefits conferred on it would be unjust.  *Id.* at 856; *see Michigan Educ. Empl. Mut. v. Morris*, 596 N.W.2d 142, 151 (Mich. 1999).[15]  It is difficult to define the precise metes and bounds of these claims, because they arise in equity and are addressed to chancellor's conscience.  *See Kent v. Klein*, 91 N.W.2d 11, 14 (Mich. 1958) ("Fraud in the inception we do not

---

[15] "Plaintiff has the duty of establishing the nature of the transaction and the character of the liability arising therefrom as a prerequisite to [its] right to recover at all."  596 N.W.2d at 151.

require, nor deceit, nor chicanery in any of its varied guises, for it is not necessary that property be wrongfully received. It is enough that it be unconscionably withheld.").

El Camino has presented two different legal theories in support of its equitable claims. El Camino's original theory was based upon the argument that "the defendant's inequitable conduct provided it with benefits that originated with the plaintiff." (Plaintiff's Brief, docket # 516, at 72). "Here, the record, as discussed above, shows that HNB was aware of Cyberco's improper activities and yet continued to provide credit references and banking services so that Cyberco could continue to defraud equipment leasing companies." (*Id.* at 73). As discussed above, plaintiffs' proofs are completely insufficient to support El Camino's charges of complicity in Cyberco's wrongdoing. Michigan law certainly allows recovery for unjust enrichment when the defendant's own inequitable conduct contributed to plaintiffs' loss. *See, e.g., Gulf Refining Co. v. Perry*, 6 N.W.2d 756, 757 (Mich. 1942) (granting relief to prevent defendants "to profit from their own wrong."). El Camino, however, has not supported this legal theory with evidence creating a genuine issue of material fact for trial, for the reasons set forth above.

At oral argument, plaintiffs' counsel presented a completely different theory, which is not based upon any proof of the defendant's wrongdoing. (Transcript, docket # 573, at 66-67). Because this theory of recovery did not appear in plaintiffs' brief, I requested that the parties address the legal basis for this theory in supplemental briefing. (Memorandum to Counsel, docket # 578). Plaintiff filed a supplemental brief on August 12, 2009 (docket # 579), and defendant responded on August 14, 2005 (docket # 580).

In El Camino's supplemental brief, it cites Michigan authority supporting the proposition that the victim of a fraud (such as El Camino) can recover from a third party (such as

Huntington Bank) money that is traceable as the proceeds of fraud, unless the defendant has changed his position in reliance. *Franklin Bank, N.A. v. Zero Plus Advantage*, No. 212712, 2001 WL 682228 (Mich. Ct. App. Apr. 20, 2001). In that case, the Michigan Court of Appeals held that Michigan law "does not require a showing of knowledge or improper conduct to find that a party was unjustly enriched." *Id.* at * 3. Defendant criticizes this case both because it is unpublished and because it was allegedly decided contrary to Michigan law. I note that Judge Cleland of the Eastern District has relied on the *Franklin Bank* decision, finding it persuasive despite the fact that it is unpublished and therefore not precedentially binding. *Ticor Title Ins. Co. v. Nat'l Abstract Agency*, No. 05-cv-73709, 2007 WL 2710113, at * 8, n.14 (E.D. Mich. Sept. 13, 2007). In that case, Judge Cleland entered a summary judgment for plaintiff against a title company that received an escrow deposit by mistake, despite the argument the title company was blameless in causing the situation. *Franklin Bank* does appear to be supported by state Supreme Court authority. As the Michigan Supreme Court stated in *Kent v. Klein*, proof of fraud or wrongdoing is not necessary, only proof that the defendant's retention of the benefit would be unjust or unconscionable. 91 N.W.2d at 14. For example, in *Michigan Educational Employees Mutual Insurance Co. v. Morris*, the Michigan Supreme Court upheld the viability of an unjust enrichment claim brought by insurance companies against their insureds seeking to recover excess no-fault insurance benefits paid by the insurance companies. At the time the insured parties accepted the benefits, Michigan law did not allow insurance companies to offset social security benefit payments. Thereafter, the Michigan Supreme Court held that social security benefits are subject to offset. Even though the insured parties accepted benefits innocently and in accordance with then-prevailing law, the Supreme Court held that the insurance companies were entitled to seek equitable reimbursement on an unjust enrichment

theory. 596 N.W.2d at 151. This case, among others, shows that a plaintiff seeking to recover for unjust enrichment in equity is not always required to show that the defendant was culpable in causing the loss.

The facts of the *Franklin Bank* case are roughly similar to those presented in the present case, in that the victim of a fraudulent scheme was allowed to trace the proceeds of the fraud into the hands of a third party, who had received the proceeds in payment of a preexisting debt. Despite the defendant's lack of complicity in the fraud, the Michigan Court of Appeals affirmed the trial court's finding that retention of the funds would be inequitable in the circumstances. 2001 WL 682229 at * 3. *Franklin Bank* therefore indicates that Michigan law could support El Camino's unjust enrichment claim regarding the $1.945 million paid to Huntington, allegedly traceable to the proceeds of a deposit made by El Camino into the Teleservices account earlier the same day, depending on the facts and circumstances of the case.

Relying on three federal appellate decisions, Huntington argues that El Camino did not confer a benefit and that retention of the funds would not be unjust. *See United States v. Goforth*, 465 F.3d 730 (6th Cir. 2006) (Tennessee law); *B.E.L.T. v. Wachovia Corp.*, 403 F.3d 474, 477 (7th Cir. 2005) (Illinois law); *Comerica Bank v. Suburban Trust & Savings Bank*, No. 95-1551, 1996 WL 585888 (6th Cir. 1996) (Michigan law). These cases are indeed helpful to the Bank. They generally stand for the proposition that a creditor who receives payment from a debtor is not unjustly enriched merely because other creditors went unpaid. *See Goforth*, 465 F.3d at 734 (the "repayment of loans by a company who fraudulently pledged the same collateral to different banks did not unjustly enrich the lender who was paid while other lenders' loans went unsatisfied.") After considering all the facts and circumstances of the present case, the court may indeed conclude, as

these cases did, it is not unjust for Huntington, a creditor of Cyberco and a victim of its fraud, to retain the payment against its loans, even though other victims went unpaid. But El Camino points to circumstances that the court may deem relevant to this decision, such as the payment of the loan not by Cyberco but by Teleservices, an entity about which Huntington had entertained suspicions, and the massive influx of cash in the final months. Or, the court may conclude that El Camino was likewise heedless of the warning signs of fraud (*see* Defendant's Brief, docket # 513, at 36) and failed to protect itself and its funding sources from avoidable loss in the Cyberco fraud. The court may therefore find that El Camino was at least equally culpable and not in a position to seek equity.[16]

In a similar vein, the Bank asserts that it was a holder in due course of the check, under section 3-302 of the Uniform Commercial Code, MICH. COMP. LAWS § 440.3302, and therefore took the check free of claims by virtue of UCC § 3.306, MICH. COMP. LAWS § 440.306. The holder-in-due-course defense is available against unjust enrichment claims. *See Watson Coating, Inc. v. Amer. Exp. Travel Related Servs., Inc.*, 436 F.3d 1036, 1044-45 (8th Cir. 2006); *J.H. Stevedoring Co. v. Fasig-Tipton Co.*, 275 F. Supp. 2d 644, 649 (E.D. Pa. 2003). A party seeking holder-in-due-course status, however, bears the burden of proving that it accepted a check in good faith and without notice of personal claims. *See Nida v. Michael*, 191 N.W.2d 151, 153-54 (Mich.

---

[16] El Camino and ePlus are in the computer leasing business. Nevertheless, Huntington Bank has amassed a considerable record showing plaintiffs' lack of due diligence in dealing with Cyberco. (*See* SMF ¶¶ 92-239). The Second Circuit has found, in a related case, that plaintiff ePlus was negligent in failing to conduct a proper inspection of the computers so as to prevent a loss to itself and to its participating lenders. *ePlus Group, Inc. v. Traveler's Prop. Cas. Co.*, 268 F. App'x 117, 120 (2d Cir. 2008). Plaintiff El Camino was sued for breach of contract by its lending sources, arising from its alleged lack of due care in these transactions. In balancing the equities, the court may conclude that plaintiffs were in the best position to protect themselves against fraud and that it would be inequitable to impose plaintiff's loss on Huntington, which was not involved in these transactions.

Ct. App. 1993); *King v. C.B. Todd & Sons*, 16 N.W.2d 709, 712 (Mich. 1944) (pre-Code). Although the proofs are insufficient to show that the Bank was complicit in aiding and abetting Cyberco's fraud, Huntington has not borne its heavy burden of showing that the proofs are so one-sided that the Bank must prevail on its claims of good faith and lack of notice in the circumstances of this case. The two issues are quite distinct: a party may not have "actual knowledge" of another's fraud, but may have enough notice to deprive it of a good-faith defense. There is a difference between being innocent and not guilty. Similarly, the Bank argues that it relied to its detriment on the receipt of money from Teleservices. Again, the burden of proving this proposition rests with the Bank, the party asserting it. *See Michigan Educ. Empl. Mut.*, 596 N.W.2d at 151 ("The burden of establishing detrimental reliance is on the party opposing the restitution claim."). In either case, as the party with the burden of proof, the Bank has the burden of proving that the evidence is so one-sided that it must prevail as a matter of law. *United States v. $67,220 in U.S. Currency*, 957 F.2d 280, 287 (6th Cir. 1992). This is a "substantially higher hurdle" than faced by a party seeking merely to defend a claim upon which it does not bear the burden of proof. *See Arnett v. Myers*, 281 F.3d 552, 561 (6th Cir. 2002).

Finally, the Bank makes a halfhearted request that the court stay further proceedings on count 4, because the bankruptcy trustees in the Cyberco and Teleservices bankruptcies are seeking to recover the very same $1.945 million from Huntington Bank for the benefit of all creditors, on the theories that the receipt of funds by the bank constituted either a preference voidable in bankruptcy or a fraudulent conveyance under state law. (Defendants' Brief, docket # 513, at 43-44). The Bank argues that the maintenance of the present case could impede the trustees' efforts to recover funds for the creditors as a whole or expose the Bank to multiple liability.

Huntington does not cite any authority supporting a stay of proceedings by this court. The Bank cites *Fisher v. Apostolou*, 155 F.3d 876 (7th Cir. 1998), in which the Seventh Circuit upheld the issuance of an injunction by the *bankruptcy court* under 11 U.S.C. § 105 staying a civil action that sought to recover the same pool of money that the trustee was attempting to gain in bankruptcy proceedings for the benefit of all creditors. The Court of Appeals held that the bankruptcy court had jurisdiction to stay actions in other courts which may affect the amount of property in the bankruptcy estate. 155 F.3d at 882. *Megliola v. Maxwell*, 293 B.R. 443 (N.D. Ill. 2003), is to the same effect, as it involved the issuance of an injunction by the bankruptcy court under 11 U.S.C. § 105 in circumstances where the lawsuit would affect the amount of property available for distribution among creditors. 293 B.R. at 448. Under these authorities, the bankruptcy court would arguably have authority to enjoin prosecution of this action, if it found that El Camino's claims somehow interfered with that court's ability to administer the bankruptcy estates. The issue is one for the bankruptcy court, and the Bank has not cited any authority that would support similar action by this court. With regard to the problem of double recovery, the Bank does not explain how, in the event that El Camino prevails in this court, the bankruptcy trustee would be in a position to demand from the Bank recovery of the same money that this court had already awarded to El Camino.

In short, Huntington Bank has not demonstrated that it is entitled to judgment as a matter of law on the equitable claims set forth by plaintiff El Camino in count 4.

**Recommended Disposition**

For the foregoing reasons, I recommend that defendant's motion for summary judgment be granted in part, and that judgment be entered in its favor on all claims set forth in counts 1, 2 and 3 of the complaint. I further recommend that the motion be denied with regard to the claims in count 4 brought by plaintiff El Camino and that those equitable claims proceed to a bench trial.


Dated:   September 16, 2009              /s/  Joseph G. Scoville
                                         United States Magistrate Judge


**NOTICE TO PARTIES**

Any objections to this Report and Recommendation must be filed and served within ten days of service of this notice on you.  28 U.S.C. § 636(b)(1)(C); FED. R. CIV. P. 72(b).  All objections and responses to objections are governed by W.D. MICH. LCIVR 72.3(b).  Failure to file timely objections may constitute a waiver of any further right of appeal.  *See Thomas v. Arn*, 474 U.S. 140 (1985); *Neuman v. Rivers*, 125 F.3d 315, 322-23 (6th Cir.), *cert. denied*, 522 U.S. 1030 (1997); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).